**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No.08-cr-00409-CMA

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**RONALD PHILIP WALLACE,**

**Defendant.**

_____

**REPORTER'S PARTIAL TRANSCRIPT**
**(Hearing on Motions - Volume 1)**
_____

        Proceedings before the HONORABLE CHRISTINE M.
ARGUELLO, Judge, United States District Court, for the
District of Colorado, commencing at 1:15 p.m. on the 13th
day of April, 2012, Alfred A. Arraj United States
Courthouse, Denver, Colorado.


                  **A P P E A R A N C E S**

**FOR THE PLAINTIFF:**
LINDA S. KAUFMAN, Assistant U.S. Attorney, 1225 17th St.,
Suite 700, Denver, CO 80202

**FOR THE DEFENDANT:**
LYNN A. PIERCE, Butler, Landrum & Pierce, P.C., 720
Kipling St., Suite 201, Lakewood, CO 80215

<u>I N D E X</u>

**WITNESSES:**                                                                **PAGE**

### PROBATION OFFICER ELIZABETH OPPENHEIMER
DIRECT EXAMINATION BY MS. KAUFMAN                                                  5
CROSS-EXAMINATION BY MS. PIERCE                                                   72
REDIRECT EXAMINATION BY MS. KAUFMAN                                               87

### RAY WALL
DIRECT EXAMINATION BY MS. PIERCE                                                  94
CROSS-EXAMINATION BY MS. KAUFMAN                                                 101
REDIRECT EXAMINATION BY MS. PIERCE                                               114

### PHILIPP THEUNE
DIRECT EXAMINATION BY MS. PIERCE                                                 115

<u>E X H I B I T S</u>

**NO.**                                                                      **ADMITTED**

| No. | Admitted |
|-----|----------|
| 1   | 9        |
| 2   | 16       |
| 3   | 17       |
| 4   | 18       |
| 5   | 28       |
| 6   | 39       |
| 7   | 40       |
| 8   | 41       |
| 9   | 42       |
| 10  | 71       |
| 11  | 71       |
| 12  | 71       |
| 13  | 44       |
| 14  | 31       |
| 15  | 31       |
| 17  | 37       |
| 18  | 37       |
| 19  | 44       |
| 20  | 49       |
| 21  | 55       |
| 22  | 59       |
| 23  | 57       |
| 24  | 67       |
| 25  | 92       |

| | |
|---|---|
| 1 | **APRIL 13, 2012** |
| 2 | (Proceedings commence at 1:15 p.m.) |
| 3 | THE COURT:  You may be seated. |
| 4 | Court calls Criminal Case No. 08-cr-409, |
| 5 | encaptioned the United States of America v. Ronald Philip |
| 6 | Wallace. |
| 7 | Counsel, would you enter your appearances. |
| 8 | MS. KAUFMAN:  Good afternoon, Your Honor, Linda |
| 9 | Kaufman for the United States. |
| 10 | THE COURT:  Good afternoon. |
| 11 | MS. PIERCE:  Good afternoon, Your Honor, Lynn |
| 12 | Pierce appearing on behalf of Mr. Wallace, who stands next |
| 13 | to me. |
| 14 | THE COURT:  Good afternoon. |
| 15 | All right.  We are here today on a hearing of |
| 16 | petition alleging violation of supervised release for the |
| 17 | third time. |
| 18 | Ms. Pierce, I understand, based on the fact that |
| 19 | you all requested additional time for this hearing, that |
| 20 | your client intends to deny the allegations of the |
| 21 | petition and proceed with evidence; is that correct? |
| 22 | MS. PIERCE:  That's correct, Your Honor. |
| 23 | THE COURT:  All right.  Ms. Kaufman, is the |
| 24 | Government ready to proceed? |
| 25 | MS. KAUFMAN:  We are, Your Honor. |

1     THE COURT:  You may call your first witness.

2     MS. KAUFMAN:  Your Honor, may I at this time move

3  for an order of sequestration of the other witnesses in

4  the courtroom?

5     THE COURT:  You may.

6     MS. KAUFMAN:  I so move.

7     THE COURT:  All right.  Any witnesses in the

8  courtroom who are intending to testify toady need to leave

9  the courtroom.  There is a waiting room right outside

10  there.  You may wait there.

11     All right.  Ms. Kaufman, you may proceed.

12     MS. KAUFMAN:  Your Honor, the United States would

13  call Elizabeth Oppenheimer.

14           **PROBATION OFFICER ELIZABETH OPPENHEIMER**

15  having been first duly sworn, testified as follows:

16     THE COURT:  Please be seated.

17     Please state your name, and spell your first and

18  last names for the record.

19     THE WITNESS:  Elizabeth Oppenheimer,

20  E-L-I-Z-A-B-E-T-H O-P-P-E-N-H-E-I-M-E-R.

21     THE COURT:  Actually, before we start, I should

22  state, Ms. Dohanic -- or Officer Dohanic was on the phone.

23  We had problems getting her on the video-conferencing

24  machine.  She was not answering now that we tried to call

25  her back, but we are hoping to get her connected once we

1    get out video-conferencing equipment fixed.  So we may

2    have to interrupt the hearing at some point just to get

3    her on video conference.  But right now she is not on.

4         MS. KAUFMAN:  I gave a telephone number to the

5    clerk a moment ago.  And they might want to double check

6    that with probation to make sure that it is the right

7    number.

8         THE COURT:  All right.

9         MS. KAUFMAN:  That might be part of the problem.

10        THE COURT:  All right.  You may proceed.

11        MS. KAUFMAN:  Thank you.

12                    **DIRECT EXAMINATION**

13   **BY MS. KAUFMAN:**

14   Q.   Ms. Oppenheimer, how are you employed?

15   A.   I am a Senior United States Probation Officer.

16   Q.   How long have you been a probation officer?

17   A.   For 15 years.

18   Q.   Were you assigned to supervise the defendant in this

19   case, Ronald Philip Wallace?

20   A.   Yes.

21   Q.   Do you see him here in the courtroom today?

22   A.   I do.

23   Q.   Would you identify him, please.

24   A.   He is seated at defense table, wearing a gray suit.

25        MS. KAUFMAN:  Would the record reflect she has

1    identified the defendant.

2          THE COURT:  It will so reflect.

3    Q.   (BY MS. KAUFMAN)  When were you assigned to this

4    case?

5    A.   In approximately March of 2011, prior to the

6    commencement of his supervised release term.

7    Q.   Are you familiar generally with the history of this

8    case, since his conviction in California?

9    A.   Yes.

10   Q.   And can you review that for the record, please?  Once

11   he was convicted and sentenced to probation in California,

12   how did he end up being in Colorado court?

13   A.   He was sentenced in the Central District of

14   California in February of 2007 to a 5-year term of

15   probation.  Given that he resided in the District of

16   Colorado, his supervision was transferred to this

17   District, and his supervision was assigned to Denise

18   Dohanic in the Grand Junction office in Colorado.

19         In October of 2008, jurisdiction of the case was

20   transferred to the District of Colorado, which had been

21   initiated by Officer Dohanic, and that was due to the fact

22   that she needed to get court intervention to deal with

23   some violation conduct.

24         In June of 2009, his probation was revoked, and he

25   was sentenced -- I am sorry, his -- when jurisdiction was

1    transferred, his case was assigned to Judge Arguello.  And

2    in June 2009, his probation was revoked when he appeared

3    before Judge Arguello, and he was sentenced to 3 months

4    imprisonment and 3 years of supervised release.

5         He was -- the next term of supervision commenced in

6    September of 2009, and his supervision, again, was

7    assigned to Officer Dohanic out of the Grand Junction

8    office.  That term of supervised release was revoked in

9    June of 2010 when he appeared before Judge Arguello.  And

10   at that time he was sentenced to 9 months of imprisonment

11   and 27 months of supervised release.

12        And then his third term, which is the current term,

13   commenced on April 8th of 2011.

14   Q.   And was it at that time that you then began to be his

15   supervising officer in this case?

16   A.   Yes.

17   Q.   Are you the author of the document dated March 15,

18   2012, the Amended Petition Due to Violation of Supervised

19   Release in this case?

20   A.   Yes.

21   Q.   And have you had an opportunity to review that prior

22   to your testimony today?

23   A.   Yes.

24   Q.   Do you stand by the statements in that report, or is

25   there one or two details that you would want to change?

1  A.    There is one correction that I would make to that.

2  Q.    Why don't you tell us what that is.

3  A.    Okay.  In the attachment to the violation petition,

4  the Violation No. 1 that is charged for failure to follow

5  instructions of probation officer, within that violation

6  there are three months that are discussed, as far as that

7  violation.

8        One of the months -- the monthly written

9  supervision report for May of 2011 is discussed in terms

10 of Mr. Wallace not providing the required documentation

11 for his employment with Powell Theune, PC.  As we were

12 preparing for this hearing, I discovered that while

13 Mr. Wallace did not provide that documentation with the

14 monthly report packet, he did provide it later on June the

15 2nd, via e-mail.

16 Q.    Okay.  So as far as the allegations relating to May

17 2011 in Allegation No. 1, would you withdraw that

18 allegation of the violation?

19 A.    Yes.

20 Q.    Otherwise, are there any material changes from your

21 report?

22 A.    No.

23 Q.    Did you meet with the defendant early on in the

24 supervisory period to review with him the conditions of

25 his supervised release?

1    A.    Yes.

2    Q.    When did you meet?

3    A.    We met on April the 8th of 2011, and -- I am sorry,

4    April the 11th of 2011 and April 12th of 2011.

5    Q.    Where did you meet?

6    A.    In the probation office.

7    Q.    How long did you talk with him about the conditions

8    of his supervised release that began in about that time?

9    A.    We met for a total of more than 5-and-a-half hours.

10   Q.    I would like to direct your attention, please, to

11   Exhibit No. 1, which is in the book before you, and ask if

12   you can identify what that document is.

13   A.    That is the Judgment that pertains to the last

14   revocation hearing and is applicable to his current

15   supervision term.

16         MS. KAUFMAN:  Move for its admission.

17         THE COURT:  Any objection?

18         MS. PIERCE:  No objection, Your Honor.

19         THE COURT:  Exhibit 1 is admitted.

20         (Exhibit No. 1 is admitted.)

21   Q.    (BY MS. KAUFMAN)  Is there a portion of this document

22   -- are these pages numbered on this document?

23   A.    Yes.

24   Q.    Are the numbers in handwriting on the bottom right

25   hand, were those added for ease of reference in this

1    hearing today?

2    A.    Yes.

3    Q.    Would you direct us to the portion of that document,

4    Exhibit 1, which relates and sets forth the conditions of

5    the supervised release?

6    A.    Those conditions begin, stated on page 4 through page

7    8, are the relevant portions of the Judgment.

8    Q.    And when you met the defendant on those two days;

9    April 11 and 12 in April last year, did you actually have

10   him, at the conclusion of the period of time, the 5 hours

11   or so that you went over this, sign his name to one of

12   these pages?

13   A.    Yes, I did.

14   Q.    What page is that on?

15   A.    Page 6.

16   Q.    Does that also bear your signature?

17   A.    It does.

18   Q.    Did he sign that after you spent that time going

19   through the conditions with him?

20   A.    Yes.

21   Q.    And did you just chat about them, or what did you do

22   in connection with these conditions?

23   A.    I read through each and every one of them, explained

24   the expectations of the probation office, explained how we

25   were going to execute the conditions, and explained the --

1    what would happen as far as non-compliance and court

2    intervention should he not adhere to the conditions.

3    Q.   When he was with you, did he appear alert and lucid?

4    A.   Yes.

5    Q.   Did he state that he understood as you explained the

6    conditions and read them to him?

7    A.   Yes.

8    Q.   And is he able to read, do you know?

9    A.   As I understand, yes.

10   Q.   Were you satisfied at the completion of that exercise

11   of 5-and-a-half hours, that he did, in fact, understand

12   all of the conditions, not only the standards, but also

13   the additional conditions?

14   A.   Yes.

15   Q.   Beginning in May of 2011, where was he living?

16   A.   He was living with Phil Theune and Mr. Theune's

17   significant other at their residence.

18   Q.   At Mr. Theune's residence?  How do you spell Theune?

19   A.   Theune is spelled T-H-E-U-N-E.

20   Q.   And was that in Denver?

21   A.   Yes.

22   Q.   Where was he employed as of May 2011?

23   A.   He was employed by Mr. Theune, at Mr. Theune's law

24   firm.

25   Q.   Is that Powell Theune, PC?

1    A.    Yes.

2    Q.    What was the nature of the work, as you understood

3    it, that he was doing for Mr. Theune?

4    A.    He was doing things such as accounts receivable,

5    accounts payable, administrative-type duties; filing,

6    things like that.

7    Q.    In connection with his employment, as a condition of

8    his supervision in this case, was there a condition that

9    related specifically to having your prior approval for the

10   different jobs that he had?

11   A.    Yes.

12   Q.    And did he, in fact, have your approval to work at

13   that job?

14   A.    He did.  That employment had been approved by the

15   halfway house while he was residing there.  When he and I

16   met in April of 2011, I advised him that he could continue

17   that employment given our discussion of his duties and how

18   he was going to be paid.

19   Q.    Did you visit his home at the Steele Street address?

20   A.    I did.

21   Q.    Did you also visit his place of work at the law firm?

22   A.    I did.

23   Q.    And were there any problems necessarily in connection

24   with that?

25   A.    No.

1  Q.   Was the defendant required, as a condition of his

2  supervised release, to file with you regular monthly

3  reports setting forth certain information about his

4  employment, his expenses and so on?

5  A.   Yes.

6  Q.   And did he, in fact, during this period of time,

7  request a hearing; that being from April of 2011 to the

8  present?  Did he comply with that condition?

9  A.   He did.

10 Q.   When, typically, are those reports filed?

11 A.   They are due between the 1st and the 5th of each

12 month to report for the prior month.

13 Q.   And did he file on time?

14 A.   Yes.

15 Q.   Was there a condition, and specifically an additional

16 condition of supervision, No. 2, which required how he was

17 to be paid and what sort of information he was to provide

18 to you, as his supervisor, about his hours and wages?

19 A.   Yes.

20 Q.   Tell us what the conditions were.

21 A.   The conditions states that the defendant shall be

22 employed.  And the defendant's employment shall be

23 approved by the U.S. Probation Officer prior to the

24 defendant commencing that employment.  The defendant's

25 employer shall pay him by way of a paycheck that denotes

1    hours worked, wages earned and taxes withheld.

2    Q.    Now, that is under the section called "additional

3    conditions;" is that correct?

4    A.    Correct.

5    Q.    So that was something that was added especially for

6    him for this subsequent term of supervised release?

7    A.    Correct.

8    Q.    Is that correct?  Do you know why that was?  What was

9    the concern of the probation department and the Court?

10   A.    It is my understanding from the prior term of

11   supervision that there were issues with him having

12   verifiable employment, and so that this condition was

13   relevant to the issues that had arisen during that prior

14   term.

15   Q.    So this was added specially for him; is that correct?

16   A.    I believe part of the condition was actually imposed

17   at his original sentencing.  And I believe that it was

18   modified for the most recent term of supervision.

19   Q.    All right.  In connection with his employment for

20   Powell Theune, PC between May and July of 2011, did he

21   provide to you information which was required concerning

22   the hours that he worked, the taxes that were withheld,

23   and the wages earned?

24   A.    Not for each month.

25   Q.    For which of those three months did he provide that

1     information?

2     A.    For May of 2011.

3     Q.    That is what you spoke about at the beginning of the

4     testimony?

5     A.    Yes.

6     Q.    How about for June and July of 2011?

7     A.    No.

8             COURTROOM DEPUTY:  United States District Court.

9             OFFICER DOHANIC:  Yes, this is Denise Dohanic call

10    from U.S. Probation in Grand Junction.

11            COURTROOM DEPUTY:  You are connected.

12            THE COURT:  All right.  Ms. Dohanic, we've started

13    the testimony already.

14            OFFICER DOHANIC:  Okay.

15            THE COURT:  So Ms. Kaufman is actually examining --

16    direct examining Officer Oppenheimer.

17            OFFICER DOHANIC:  Okay.  Thank you.

18    Q.    (BY MS. KAUFMAN)  Would you please turn to Exhibit 2.

19    And before we go through all of these exhibits, I would

20    like to ask you, have you had an opportunity to look at

21    all of the exhibits and all of the pages in the Government

22    exhibit book before you this morning?

23    A.    Yes.

24    Q.    And have you authenticated them as true copies of

25    documents that you provided in this case?

1    A.    Yes.

2    Q.    Let's look at Exhibit 2.  What is Exhibit 2

3    generally?

4    A.    That is the monthly report that Mr. Wallace submitted

5    pertaining to May 2011.

6    Q.    And are there typically three or four pages of a form

7    that he would fill out at the beginning of each of these

8    packets followed by a number of documents that he would

9    have provided to you?

10   A.    Yes.

11   Q.    And is that what that document is?

12   A.    It is.

13   Q.    Let's look at, then, Exhibit No --

14         MS. KAUFMAN:  I move for its admission.

15         MS. PIERCE:  No objection.

16         THE COURT:  Exhibit No. 2 will be admitted.

17         (Exhibit No. 2 is admitted.)

18   Q.  (BY MS. KAUFMAN)  Let's look at Exhibit No. 3.  Can

19   you identify what that is, please?

20   A.    That is the monthly supervision report that

21   Mr. Wallace submitted related to June 2011.

22         MS. KAUFMAN:  I move for its admission.

23         THE COURT:  Any objection to Exhibit 3?

24         MS. PIERCE:  No objection.

25         THE COURT:  Exhibit 3 is admitted.

1          (Exhibit No. 3 is admitted.)

2    Q.   (BY MS. KAUFMAN)   What amount of income did he report

3    that month?

4    A.   He reported $1,550.

5    Q.   And what documentation did he provide to establish

6    what the source of those funds were?

7    A.   May I review the document?

8    Q.   Yes, you may.

9    A.   The documentation he provided is on page 15 of the

10   exhibit, which is a copy of a check from Powell Theune,

11   PC.

12   Q.   Did he provide any other information to cover the

13   other $800, to cover the balance we see?

14   A.   No.

15   Q.   Did he include a statement of the hours worked or the

16   taxes withheld?

17   A.   No.

18   Q.   Was this check sufficient, in your view, to comply

19   with the conditions which was just described?

20   A.   No.

21        MS. KAUFMAN:   I move for admission -- excuse me.

22   Q.   (BY MS. KAUFMAN)   I will direct your attention now to

23   Exhibit 4.   What is Exhibit 4?

24   A.   Exhibit 4 is the monthly supervision report

25   Mr. Wallace submitted pertaining to July 2011.

```
 1            MS. KAUFMAN:  I move for its admission.

 2            THE COURT:  Any objection to Exhibit 4?

 3            MS. PIERCE:  No, Your Honor.

 4            THE COURT:  Exhibit 4 is admitted.

 5            (Exhibit No. 4 is admitted.)

 6    Q.   (BY MS. KAUFMAN)  What amount of income did he report

 7    for the month of July?

 8    A.   $360.

 9    Q.   And did he report other income in addition to that as

10    income for work?

11    A.   He did.  He reported $695.53.

12    Q.   Which page of this exhibit are you looking at to see

13    that?

14    A.   I am looking at both page 1 and page 6, which is a

15    supplemental explanation that Mr. Wallace provided.

16    Q.   Let me direct your attention first to page 3.  Does

17    that show the same information?

18    A.   It does.

19    Q.   What is the -- what is he stating there in connection

20    with the 695.53?

21    A.   On page 3, he states that -- he makes an indication,

22    "paid bills.  See attached," related to the figure of

23    $695.53.

24    Q.   And that is when you turn to page 6?

25    A.   Correct.
```

1    Q.    What is the explanation for that?  The $695, where
2    was that money coming from?
3    A.    At the top of page 6, he makes a general statement,
4    stating "Mr. Theune paid the other things in my life.  See
5    below directly.  All receipts enclosed."
6    Q.    Then, as part of this report to you, did he then
7    attach a series of receipts from various stores, starting
8    at page 12?
9    A.    Yes.
10   Q.    Are those the receipts that he's talking about?
11   A.    Yes.
12   Q.    Now, was that sufficient for your purposes, as
13   supervising officer, to determine the source of the funds
14   that he received in that month?
15   A.    No.
16   Q.    What was wrong with it?
17   A.    Well, it was in conflict with the condition of the
18   Court that he be paid by paycheck.
19   Q.    Can you tell from these receipts from various stores,
20   gas stations and so on, whose money is being spent there?
21   A.    No.
22   Q.    Did he report any taxes withheld?
23   A.    No.
24   Q.    Did he report hours worked?
25   A.    No.

1    Q.    Was Phil Theune a friend of his?

2    A.    Yes.

3    Q.    So he was living with him and working for him; is

4    that correct?

5    A.    Yes.

6    Q.    Did he continue to live with Mr. Theune after the

7    beginning of July of 2011?  Or, perhaps, what I should

8    say, what did you learn about his -- where he was living

9    starting with about July of 2011?

10   A.    Well, when Mr. Wallace and I met in September of --

11   on September 2nd of 2011, and we had a discussion about a

12   number of matters, he indicated that he was spending more

13   and more time in the Aspen area.  And that during the

14   month of August, he had only spent approximately 6 or 7

15   nights in the Denver area.

16   Q.    The Denver area being the Steele Street residence?

17   A.    That was my understanding.

18   Q.    Was that the discussion?

19   A.    Yes.

20   Q.    And who lived in the -- I am sorry, what was the town

21   in the mountain?

22   A.    The Aspen area.  The Aspen area.

23   Q.    Who lived up there that he would be staying with?

24   A.    His wife and his son.  And during the summertime,

25   also his daughter.

1   Q.   And did he state whether or not he was estranged from

2   his wife at that time?

3   A.   He indicated that they were headed toward a divorce.

4   That was the representation that he had made to me since

5   April of 2011.

6   Q.   Okay.  Did he talk to you, starting in, say, July --

7   first of all, did he stop working for Mr. Theune at a

8   particular time?

9   A.   He did.

10  Q.   When was that, approximately?

11  A.   Approximately July 2011.

12  Q.   All right.  At that time, did he also start talking

13  to you about the possibility of moving to the mountains?

14  A.   Yes.

15  Q.   So were you aware that he was thinking about moving

16  to the mountains?

17  A.   Yes.

18  Q.   But you say that it wasn't until September that you

19  realized he had been living there in August?

20  A.   Yes.

21  Q.   Is that your testimony?  And did that cause you

22  concern when you learned that in September?

23  A.   Yes.

24  Q.   Why?

25  A.   The Aspen area is not supervised by the Denver

1    office, it is supervised by our satellite office in Grand

2    Junction.  And Mr. Wallace and I had had conversations

3    about that we needed -- we would need to make arrangements

4    to transfer his supervision to the Western Slope if that

5    is where he was going to reside permanently.

6    Q.    So that is where Ms. Dohanic would be his supervisor?

7    A.    Correct.

8    Q.    Was it a condition of his supervised release that he

9    report to you in advance of the move from one place to

10   another?

11   A.    Yes.

12   Q.    And what was the condition?

13   A.    That is a standard condition of supervision that he

14   notify the probation office at least 10 days in advance of

15   changing residences.

16   Q.    Did he do that?

17   A.    No.

18   Q.    In addition to the standard condition of notifying 10

19   days in advance, did you have a conversation with him on

20   or about July 19, 2011, about when he should report if he

21   was going to move?

22   A.    I believe he and I ---he and I exchanged e-mails on

23   that date where I gave him information to that effect,

24   yes.

25   Q.    Is there -- was there an additional condition of his

1    supervised release that required that his employer be

2    approved by the probation office prior to his commencing

3    employment?

4    A.    Yes.

5    Q.    Was he aware of that?

6    A.    Yes.

7    Q.    Is that one of the things you discussed with him on

8    April 2011?

9    A.    Yes.

10   Q.    Are there several violations in your petition -- in

11   your amended petition which allege that that condition was

12   violated?

13   A.    Yes.

14   Q.    I would address your attention first to Allegation

15   Nos. 3 and 4.  Did the first two of these alleged

16   violations relate to the period of time of July and August

17   of 2011?

18   A.    Yes.

19   Q.    And were there two different -- are there two

20   different violations alleged because there were two

21   different employers alleged?

22   A.    Yes.

23   Q.    Let's talk about the employers.  Who was the first

24   employer that relates to Violation No. 3 -- alleged

25   violation?

1    A.    The first is Imago, LLC.

2    Q.    How do you spell that?

3    A.    I-M-A-G-O.

4    Q.    What is that?

5    A.    That is an entity that is either owned or managed by

6    an individual named Bruce Blackwell.  And the other

7    involved party is Ray Wall, who is the attorney for

8    Mr. Blackwell and/or Imago, LLC.

9    Q.    And what was the second employer?

10    A.    The second was Saint John's Trust.

11    Q.    What is that entity?

12    A.    That is another client of Ray Wall.

13    Q.    So there is a person named Mr. Saint John?

14    A.    Yes.

15    Q.    And there is an entity called Saint John's Trust?

16    A.    Yes.

17    Q.    About when did the defendant start talking to you and

18    telling you about the potential job with Ray Wall,

19    Mr. Blackwell and/or Imago?

20    A.    When he came to my office on July 5th, he advised me

21    that this was a prospective long-term employment

22    situation.

23    Q.    At that meeting, did you discuss the possibility of

24    the employment, or did you simply approve it at that time?

25    A.    We discussed the possibility of it.

1    Q.    What type of work would be involved?

2    A.    Mr. Wallace described that he would be doing research

3    for land development.

4    Q.    Where would the land be that would be subject to this

5    job?

6    A.    In the Aspen area.

7    Q.    Did he describe any further what the research would

8    consist of?

9    A.    He did.  He discussed various components of and

10   phases of the project that would be involved.

11   Q.    With any more specificity, did you understand at that

12   point what the job would entail?

13   A.    I generally understood what it entailed, yes.

14   Q.    So you said that was July 5th.  Do you recall whether

15   defendant told you on July 19th about when he would like

16   to start that job?

17   A.    I believe in an e-mail from Mr. Wallace on that date,

18   he indicated to me that -- he made statements in the

19   e-mail indicating both that he was still getting

20   documentation together for me, but also making some

21   inferences that he had already started work at that time.

22   Q.    Had you approved the work?

23   A.    No.

24   Q.    Or that work, I should say?

25   A.    Not at that time.

1    Q.    And had he, by that time, actually stopped working

2    for Mr. Theune?

3    A.    That was my understanding.

4    Q.    Did you request anything in writing specifically

5    before you would approve his work for Mr. Wall,

6    Mr. Blackwell and Imago?

7    A.    Yes.  When Mr. Wallace was in my office on July 5th,

8    we had a lengthy discussion about how the employment might

9    be structured; whether it be would be structured as W2

10   employment where he would actually be an employee of an

11   entity, or whether it would be structured as 1099

12   contractor employment, where it would be structured more

13   as self employment.

14        And Mr. Wallace was instructed by me that if it was

15   W2 employment, that I needed a description of the duties

16   that he would have for that employment.  If it was going

17   to be 1099 employment, I would need a copy of the

18   contractor agreement between him and whoever the entity

19   that was going to pay him would be.

20        At the time, he was not sure what the different

21   parties involved would be willing to do in terms of how to

22   structure the employment.

23   Q.    Did you have a preference for one over the other?

24   A.    I advised him I would prefer that it be structured as

25   W2 employment.

1    Q.    Why was that?

2    A.    Because that put responsibility on the employer to

3    have more oversight of Mr. Wallace.  And, in addition, it

4    would allow for a generation of a paycheck and an earning

5    statement, which is what the Court had ordered in terms of

6    his supervision conditions.

7    Q.    In any event, understanding that this particular job

8    might not fit into that category, the W2 job, were you

9    willing, and did you work with the defendant to assist him

10   in obtaining the contract necessary to be compliant with

11   conditions of his probation?

12   A.    I did.  I reviewed with Mr. Wallace during that July

13   5th office visit, we reviewed his supervision conditions

14   together.  We had a discussion that it didn't appear that

15   his supervision conditions precluded his being

16   self-employed.  In fact, there are some of the special

17   conditions that speak to self employment.  So we had a

18   discussion about how that would need to be structured.

19   Q.    Did he agree that he would produce a contract for you

20   for this job opportunity?

21   A.    Yes.

22   Q.    Was that contract via immediately forthcoming in July

23   of 2011?

24   A.    No.

25   Q.    Did the defendant file a monthly report for August?

1    And I will direct your attention to Exhibit 5.

2    A.    Yes, he did.

3    Q.    What is Exhibit 5?

4    A.    It is the monthly supervision report Mr. Wallace

5    submitted in relation to August 2011.

6          MS. KAUFMAN:  I move for its admission.

7          THE COURT:  Any objection?

8          MS. PIERCE:  No objection.

9          THE COURT:  Exhibit 5 will be admitted.

10          (Exhibit No. 5 is admitted.)

11    Q.    (BY MS. KAUFMAN)  In this report, on page 1, who does

12    the defendant indicate he is working for?

13    A.    He indicates Jonathan Hellman/Judge Ray Wall.

14    Q.    And were you familiar with Jonathan Hellman; who that

15    was?

16    A.    Yes.

17    Q.    Who is Jonathan Hellman?

18    A.    Jonathan Hellman, is a -- from my understanding, is a

19    disbarred attorney.  He worked with Phil Theune as a

20    paralegal.  And from Mr. Wallace's description, he is the

21    individual who introduced Mr. Wallace to Ray Wall.

22    Q.    Did he report gross and net income on the third page

23    of that report?

24    A.    Yes.

25    Q.    Is that the subject of this -- any of your conditions

1    of violation of condition?

2    A.    It is the subject of Violation No. 5, and also

3    Violation No. 3.

4    Q.    All right.  What was the problem with this, as

5    illustrated by this report?

6    A.    One issue was the fact that he was working without

7    approval for these parties.  And the second issue was that

8    for the funds he had received, and was characterizing as

9    income, that the verification of it was not sufficient and

10   didn't comport with his supervision conditions and my

11   instructions.

12   Q.    Did you meet with him at your office on September 2,

13   2011?

14   A.    Yes.

15   Q.    And do you recall what he told you about whether he

16   had been working for Mr. Wall, Mr. Blackwell and Imago

17   during the period of July and August?

18   A.    I discussed with him that he had been working for

19   those parties.

20   Q.    Had you approved his work for those parties?

21   A.    No.

22   Q.    What did he say he had been doing?

23   A.    That he had been doing research work on their land

24   development projects.

25   Q.    As described earlier?

1    A.    Yes.

2    Q.    Shortly after your meeting with him on September 2nd,

3    did you send him an e-mail on September 4th?  And I will

4    direct your attention to Exhibit 14.

5    A.    Yes, I did.

6    Q.    What is Exhibit 14?

7    A.    That is an e-mail that I sent to Mr. Wallace after

8    his office visit on September 2nd, to restate to him the

9    issues that we had discussed during that office visit.

10   Q.    Did you make it clear to him that he had not yet been

11   approved to work for Mr. Wall, Mr. Blackwell and Imago?

12   A.    Yes.

13   Q.    Did you, at that time, set a deadline for him to

14   produce some documentation for you concerning that

15   employment so that you could help him come into compliance

16   with his conditions of supervised release?

17   A.    Yes.  When he and I met on September 2nd, I gave him

18   a deadline of September 9th.

19   Q.    And what was he to produce to you September 9th to

20   come into compliance with the conditions?

21   A.    The same documentation that we discussed on July 5th;

22   a description of duties; if this was structured as W2

23   employment or a contractor agreement; if this was going to

24   be structured as 1099 contract work.

25   Q.    And did he say then that he, at that time, would work

1   on that and produce a contract for you?

2   A.   Yes.  He seemed very eager to do so.

3   Q.   Did he, in fact, produce that contract for you as

4   requested by the deadline, September 9th, 2011?

5   A.   No.

6   Q.   I address your attention to exhibit --

7           MS. KAUFMAN:  I move for the admission of Exhibit

8   14 if I have not yet done so.

9           THE COURT:  Any objection?

10          MS. PIERCE:  No objection, Your Honor.

11          THE COURT:  Exhibit 14 is admitted.

12          (Exhibit No. 14 is admitted.)

13  Q.   (BY MS. KAUFMAN)  Addressing your attention to

14  Exhibit 15.  Do you recognize this?

15  A.   Yes.

16  Q.   What is it?

17  A.   It is an e-mail that -- it is e-mail correspondence

18  between Mr. Wallace and myself.

19          MS. KAUFMAN:  Move for its admission.

20          THE COURT:  Any objection to the admission of

21  Exhibit 15?

22          MS. PIERCE:  No objection.

23          THE COURT:  Exhibit 15 is admitted.

24          (Exhibit No. 15 is admitted.)

25  Q.   (BY MS. KAUFMAN)  And what was your purpose in

1    sending Exhibit 15?

2    A.    That was the date of the deadline that I had given

3    him.   I was responding to his e-mail from very early that

4    morning, indicating that he was "on track" with things and

5    should have everything done by Tuesday/Wednesday next

6    week.   I was restating for him that the deadline that I

7    had given him was that particular day.

8          And I also gave him an instruction that he needed

9    to submit documentation for me to approve the employment

10    or that he would need to return to Denver to his last

11    residence of record.

12    Q.    Did you then speak to Mr. Ray Wall on September 9th?

13    A.    I did.

14    Q.    Was that a phone call or an e-mail or both?

15    A.    It was a phone call from Mr. Wall.

16    Q.    What was the nature of that conversation?

17    A.    Mr. Wall wanted to introduce himself to me and advise

18    me that he was interested in retaining Mr. Wallace to do

19    work for his clients.  He asked questions about what the

20    requirements were for Mr. Wallace's supervision.   He

21    discussed with me that he was not sure what his client --

22    particularly, we were discussing his client, Bruce

23    Blackwell, in relation to Imago.  But he was not sure what

24    Mr. Blackwell would be able to do financially, and also

25    from a practical standpoint, given that Mr. Blackwell

1    lives both out of Colorado and also out of the area where

2    Mr. Wall lives.

3           And then I asked Mr. Wall questions about the work

4    that Mr. Wallace had done up to that point.

5    Q.   And what did he tell you about the work he had done

6    up to that point?

7    A.   He told me that Mr. Wallace had done work for both

8    Bruce Blackwell and Imago and also Saint John's Trust

9    during July and August.

10   Q.   And had he been approved for any of that work during

11   that period of time?

12   A.   No.

13   Q.   Where did Mr. Wall live?

14   A.   In New Mexico.

15   Q.   Where did Mr. Blackwell live?

16   A.   I believe on the West Coast.

17   Q.   Outside of Colorado?

18   A.   Yes.

19   Q.   At the conclusion of your September 9th phone

20   conversation with Mr. Wall, did you approve the work for

21   Mr. Wall, Mr. Blackwell and Imago?

22   A.   No.

23   Q.   Address your attention to exhibit -- I will withdraw

24   that.

25          Let's talk about your Allegation No. 4, which

1   relates specifically to whether or not this defendant had

2   an authorization, a prior approval from you, to be

3   employed by Saint John's Trust.  Did you ever, in this

4   whole period of supervision, give him permission to be

5   employed by Saint John's Trust?

6   A.   No.

7   Q.   Therefore, in July and August of 2011, did he have

8   permission from you to be employed by that entity?

9   A.   No.

10  Q.   How did you learn about this work?

11  A.   When he submitted the copy of the check with his

12  monthly report.

13  Q.   Would that have been in the month of September -- for

14  the month of September?

15  A.   That is the monthly report pertaining to August 2011

16  that he submitted on September 2nd.

17  Q.   Okay.  So that is Exhibit 5?

18  A.   Yes.

19  Q.   And do you have the page number at which that check

20  was illustrated?  Is that page 17?

21  A.   Yes.

22  Q.   So Exhibit 5, page 17, is that what you are talking

23  about?

24  A.   Correct.

25  Q.   Beyond not being approved, did this even give you

1    hours worked and that sort of thing?

2    A.    No, it does not.

3    Q.    Did -- in your conversation with Mr. Wall on

4    September 9th, did he indicate what type of work the

5    defendant had been doing for Mr. Saint John and Saint

6    John's Trust?

7    A.    He did.  He advised that Mr. Saint John had some

8    software that he was trying to sell to larger companies,

9    such as Google, and that Mr. Wallace was doing research in

10   relation to that, as well as trying to arrange meetings

11   for Mr. Saint John to -- I guess, sales meetings for

12   Mr. Saint John's prospective buyers for the software.

13   Q.    What was it about Mr. Wallace's talents or ability

14   that he was able to sell, so to speak, to these people to

15   make him believe he can help them in their businesses in

16   the Aspen area?

17       MS. PIERCE:  I will object, Your Honor.  That is

18   speculation.

19       THE COURT:  Lacks foundation.  Sustained.

20   Q.    (BY MS. KAUFMAN)  Did you talk to Mr. Wall about what

21   it was that Mr. Wallace presented himself as in order to

22   get those jobs?

23   A.    I think we had a very general conversation on that

24   topic.  I think that Mr. Wallace presented himself as

25   someone who had knowledge of real estate matters in the

1    Aspen area, and had contacts in the Aspen area.  And that

2    that was -- those were aspects that they felt they could

3    capitalize on by dealing with Mr. Wallace.

4    Q.   Let's talk a moment now about generally other events

5    that were occurring in the month of September in addition

6    to these.  In September 2011, did the defendant also

7    obtain a different job unrelated to what we have

8    discussed?

9    A.   Yes.

10   Q.   What was that job?

11   A.   That was a job with Aspen Country Day School.

12   Q.   And what was the nature of that job?

13   A.   That was an as-needed, part-time job, working in the

14   school's kitchen.

15   Q.   Did you give him prior approval for that work?

16   A.   I did.

17   Q.   Addressing your attention, please, to Exhibit No. 17.

18   Do you recognize what that is?

19   A.   Yes.

20   Q.   What is it?

21   A.   These are e-mails between me and Mr. Wallace.

22        MS. KAUFMAN:  I move their admission.

23        MS. PIERCE:  No objection.

24        THE COURT:  Any objection to admission of Exhibit

25   17?

1          MS. PIERCE:  No objection, Your Honor.

2          THE COURT:  Exhibit 17 is admitted.

3          (Exhibit No. 17 is admitted.)

4   Q.   (BY MS. KAUFMAN)  In the e-mail, that has the time at

5   the top of 5:52 p.m.  Did you specifically write -- we are

6   addressing Exhibit 17.  In the part of the e-mail that is

7   5:52, did you specifically relate to Mr. Wallace that you

8   were giving tentative approval of that job at this day

9   school?

10  A.   Yes.

11  Q.   And then addressing -- if you would look, please, at

12  Exhibit 18.  Do you recognize that?

13  A.   I do.

14  Q.   What is it?

15  A.   These are e-mails between me and Mr. Wallace.

16         MS. KAUFMAN:  Move for their admission?

17         THE COURT:  Any objection to Exhibit 18 being

18  admitted?

19         MS. PIERCE:  No objection, Your Honor.

20         THE COURT:  Exhibit 18 is admitted.

21         (Exhibit No. 18 is admitted.)

22  Q.   (BY MS. KAUFMAN)  And addressing your attention to

23  the e-mail that is 1:34 p.m., did you, in fact, explicitly

24  approve his employment at the Aspen Country Day School?

25  A.   Yes, I did.

1    Q.    Did you ever do that for the other jobs at issue in
2    this case?
3    A.    No.
4    Q.    How long did -- did he get the job there at Aspen
5    Country Day School?
6    A.    Yes.
7    Q.    How long did he work there?
8    A.    He continues to work there now, to my understanding.
9    Q.    Was that full-time employment?
10   A.    No.
11   Q.    The alleged Violation No. 6 addresses his employment
12   at this day school.  And you indicate that he failed to
13   verify income and employment.  Can you explain what it is
14   was the problem in connection with this job?
15   A.    For some months, there were issues with the -- with
16   him providing earning statements or providing all of the
17   earning statements related to that employment and/or
18   copies of all of the checks that related to the income he
19   reported.  It was inconsistent from month to month that he
20   provided complete verification of this income.
21   Q.    Addressing your attention to Exhibit 6, what is
22   Exhibit 6?
23   A.    Exhibit 6 is the monthly report Mr. Wallace submitted
24   for September 2011.
25           MS. KAUFMAN:  I move for its admission.

1          THE COURT:  Any objection to Exhibit 6 being

2     admitted?

3          MS. PIERCE:  No objection.

4          THE COURT:  Exhibit 6 is admitted.

5          (Exhibit No. 6 is admitted.)

6     Q.  (BY MS. KAUFMAN)  In this particular report, what

7     does he report on page 1 as his wages for the day school?

8     A.   It is actually difficult to tell what he is reporting

9     as far as the wages for the day school, as he lists

10    multiple sources of income.

11    Q.   I am just looking at page 1 of Exhibit 6, on the

12    right-hand side in the center of the page.  What does that

13    box that says "gross wages," and then "? not sure" relate

14    to?  Do you see that?

15    A.   I apologize.  You are on page 1?

16    Q.   Exhibit 6, page 1, right-hand column, center of the

17    page.

18    A.   Oh, I see.  I am sorry.  Yes, he lists as his

19    employment Aspen Country Day School.  And then as gross

20    wages for that employment, yes, he indicates "? not sure."

21    Q.   Let's look at Exhibit No. 7.  What is Exhibit 7?

22    A.   Exhibit 7 is the monthly report Mr. Wallace submitted

23    pertaining to October 2011.

24         MS. KAUFMAN:  Move for its admission.

25         THE COURT:  Any objection?

1            MS. PIERCE:  No objection.

2            THE COURT:  Exhibit 7 will be admitted.

3            (Exhibit No. 7 is admitted.)

4     Q.  (BY MS. KAUFMAN)  What did he report as income for

5     that month, as set forth on page 3?

6     A.   As set forth on page 3, he reported total net income

7     of $4,292.

8     Q.   Was any part of that related to the day school?

9     A.   Yes.

10    Q.   Which part?

11    A.   He reports $992.25.

12    Q.   Did he provide any documentation of his hours and

13    wages, as required, for that work?

14    A.   He provided a copy of a check from the school in the

15    amount of $451.25.

16    Q.   Is that set forth on page 4 -- excuse me, page 7 of

17    the same exhibit?

18    A.   Yes.

19    Q.   What about the other half of the income he reports

20    from the day school?

21    A.   He did not provide any documentation.

22    Q.   Did he provide an amount of taxes withheld or hours

23    worked for that month for that job?

24    A.   He provided no earning statements for any of the

25    amounts that he reported for Aspen Country Day School.

1    Q.   Following through with Aspen Country Day School,

2    directing your attention to Exhibit 8, is Exhibit 8 the

3    report that he submitted to you for his activities in

4    November of 2011?

5    A.   Yes.

6         MS. KAUFMAN:  Move for its admission.

7         THE COURT:  Any objection?

8         MS. PIERCE:  No objection.

9         THE COURT:  Exhibit 8 is admitted.

10        (Exhibit No. 8 is admitted.)

11   Q.  (BY MS. KAUFMAN)  In connection with the day school,

12   did he report working there?

13   A.   Yes.

14   Q.   What income did he report from that job?

15   A.   He reported $109.25.

16   Q.   Did he report the number of hours worked?  Did he

17   give the report of taxes withheld or any other details?

18   A.   No.

19   Q.   And then, looking at Exhibit 9, in connection with

20   the Country Day School, is Exhibit 9 the monthly report

21   covering his behavior in December of 2011?

22   A.   Yes.

23        MS. KAUFMAN:  I move for its admission.

24        THE COURT:  Any objection?

25        MS. PIERCE:  No objection.

1          THE COURT:  Exhibit 9 is admitted.

2          (Exhibit No. 9 is admitted.)

3    Q.    (BY MS. KAUFMAN)  What information did he give about

4    his job at the day school for that month?

5    A.    He reported $126 in income from the school.

6    Q.    Any list of hours worked or earning statement?

7    A.    No.

8    Q.    Or taxes withheld?

9    A.    No.

10   Q.    In your amended petition, you also allege in

11   Allegation No. 9 that the defendant worked for Ray Wall,

12   Bruce Blackwell and Imago, LLC and/or Aspen Silver Water

13   between September 2011 and January 27, 2012, without prior

14   approval; correct?

15   A.    Yes.

16   Q.    Let's talk about that.  What is Aspen Silver Water?

17   A.    It is another entity that is represented by or

18   managed by Ray Wall.

19   Q.    Do you know what it is other than that?

20   A.    No.

21   Q.    I am sorry?

22   A.    No.  Well, I am sorry.  It is my understanding that

23   it may be an entity that owns properties in Aspen.  It may

24   be the entity that -- it was one of the entities that was

25   involved in the land development project that Mr. Wallace

1    had talked to me about.

2    Q.   Now, going back to the defendant's involvement with

3    Mr. Wall and associates, you said that in September you

4    had requested -- or, actually, before September; July, you

5    had requested a contract; is that correct?

6    A.   Correct.

7    Q.   And had you received it July, August, September?

8    A.   No.

9    Q.   Did you, though, get a draft of the contract in

10   October?

11   A.   Yes.

12   Q.   Please look at Exhibit 13.  What is that?

13   A.   This is an e-mail from Mr. Wallace to me.  Attached

14   to was a draft 1099 contractor agreement.

15   Q.   And so is this the sort of thing you had told him to

16   produce much earlier?

17   A.   Yes.

18   Q.   And is this a signed document?

19   A.   No.

20   Q.   Was it presented to you as a draft?

21   A.   Yes.

22   Q.   Is it backdated?

23   A.   Yes.

24   Q.   To what date?

25   A.   October 3, 2011.

1    Q.    On the first page, it says --

2    A.    I am sorry, yes, July 15, 2011.

3    Q.    And you received it when?

4    A.    October 15, 2011.

5    Q.    Any explanation as to why it was dated back to July

6    from the defendant?

7    A.    Not stated.  And I don't believe we discussed it.

8    Q.    Did you, then, discuss this draft contract with the

9    defendant either by phone and/or e-mails or in person?

10   A.    On October 25th.

11   Q.    Addressing your attention to Exhibit No. 19.

12             MS. KAUFMAN:  I move admission of Exhibit 13.

13             THE COURT:  Any objection?

14             MS. PIERCE:  No objection.

15             THE COURT:  Exhibit 13 is admitted.

16             (Exhibit No. 13 is admitted.)

17   Q.    (BY MS. KAUFMAN)  And now please look at Exhibit 19.

18   Is this an e-mail between you and Mr. Wallace?

19   A.    Yes.

20             MS. KAUFMAN:  I move for its admission.

21             THE COURT:  Any objection?

22             MS. PIERCE:  No objection, Your Honor.

23             THE COURT:  19 is admitted.

24             (Exhibit No. 19 is admitted.)

25   Q.    (BY MS. KAUFMAN)  And how does the substance of this

1   conversation relate to the contract that you have just

2   described, Exhibit 13?

3   A.    This was the probation office's response to the draft

4   contract that he submitted on October 15.

5   Q.    And, in substance, what was the response?

6   A.    The response was that I had discussed the proposal

7   with my supervisor; that we had outstanding concerns about

8   the structuring of this employment and the details of the

9   employment, and that we -- I mean, it was advising him of

10  the concerns that we had about it.

11  Q.    What was your overreaching concern?

12  A.    The largest concern was that the employment situation

13  too closely resembled the employment situations that had

14  presented themselves during Mr. Wallace's prior

15  supervision terms, and those employment situations that

16  had turned out to be problematic and had resulted in

17  violations before the Court.

18  Q.    Problematic in what way?

19  A.    Problematic from the standpoint of his receiving

20  regular income.  Problematic from the standpoint of our

21  office being -- from the employment being transparent and

22  our office being able to identify the source of the

23  income.  There had been some issues in the past with it

24  appearing that there was -- that there were funds being

25  provided to Mr. Wallace under the guise of employment, but

1    they were being afforded to him by either friends or

2    associates.

3        There were problems in the past with income not

4    being regular because it was tied to performance of

5    projects.  And in the past it had also been employment

6    that was related to land development-type projects.

7    Q.   Was there also a problem with this proposed

8    employment in knowing who would be available to actually

9    supervise him and report to you that he had worked so many

10   hours on so many days?

11   A.   Yes.

12   Q.   So, as of this date of this exhibit; that being

13   October 25, 2011, had you approved his employment with

14   Mr. Wall, Mr. Blackwell or either of the entities you have

15   described?

16   A.   No.

17   Q.   Even so, after that, did you continue to work with

18   the defendant to try to get him to a point where he could

19   be approved in this work?

20   A.   Yes.

21   Q.   And did you even communicate with Mr. Wall from New

22   Mexico?

23   A.   Yes.

24   Q.   What is it that you were hoping to learn from

25   Mr. Wall about this employment that would make it work?

1  A.   The primary information that we wanted to obtain from

2  Mr. Wall was a verification from him that there was going

3  to be -- that there was a commitment from his client for

4  regular income for Mr. Wallace.  Mr. Wall had called me on

5  September the 16th and had communicated to me that one of

6  the issues that was still outstanding was whether

7  Mr. Blackwell had the funds available to pay Mr. Wall.

8  And that was one of the things that was delaying the

9  process of them moving forward with a contract with

10 Mr. Wallace.

11      So, Mr. Wall and I, after the October -- after my

12 October 25th e-mail to Mr. Wallace, I subsequently

13 received an e-mail response from Mr. Wall, who was trying

14 to address some of the concerns that were raised in my

15 e-mail on October 25th.  And, unfortunately, his response

16 did not satisfy our concerns and led to additional

17 discussion within my office, both between me and my

18 supervisor and Denise Dohanic, because at that point we

19 needed to involve her due to Mr. Wallace's location in

20 Aspen.

21 Q.   So those conversations with Mr. Wall were in what

22 month?

23 A.   I was referencing a phone conversation with him on

24 September 16th.  And then in response to my e-mail to

25 Mr. Wallace on October 25th, it appeared that Mr. Wallace

1    had forwarded that to Mr. Wall, and Mr. Wall then

2    responded to me on October 27th.  Then, following that,

3    Mr. Wallace and I had a very lengthy phone conversation on

4    November the 10th, where we discussed at length what the

5    probation office's concerns were again.  And I advised him

6    that, you know, if he were able to -- if they were able to

7    revise this employment proposal and address the probation

8    office's concerns, we had come to the conclusion that

9    Officer Dohanic was willing to give this a trial period of

10   60 days, you know, if we could approve it based on

11   revisions to the employment proposal.

12          So, at that point, Mr. Wallace was -- at the

13   conclusion of our conversation on November 10th, his

14   intent was to go back and revisit the employment proposal

15   with Mr. Wall and his client.

16   Q.   His stated intent was to do that?

17   A.   Yes.

18   Q.   And when you say it was a lengthy conversation, how

19   long did you talk with him on November 10th about this?

20   A.   Approximately an hour and a half.

21   Q.   Was he lucid during that period and communicating

22   with you and appearing to understand what you were saying?

23   A.   Yes.

24   Q.   Did you, then, receive an amended version of the

25   draft contractor agreement?  And I direct your attention

1    to Exhibit 20.

2    A.    Yes.

3    Q.    What is Exhibit 20?

4    A.    Exhibit 20 is an e-mail from Mr. Wallace with the

5    subsequent draft of the 1099 contractor agreement.

6    Q.    You have here an Exhibit 20, an e-mail -- or, excuse

7    me, an e-mail message and then an attachment.  Is that

8    what is here?

9    A.    Correct.

10   Q.    And is that the way it came to you by e-mail?

11   A.    Yes.

12         MS. KAUFMAN:  Move for its admission.

13         THE COURT:  Any objection to Exhibit 20 being

14   admitted?

15         MS. PIERCE:  No objection.

16         THE COURT:  Exhibit 20 is admitted.

17         (Exhibit No. 20 is admitted.)

18   Q.  (BY MS. KAUFMAN)  How does this draft vary from

19   Exhibit 13, which was the draft you received in October?

20   A.    From my perspective, there was very little difference

21   between the first draft and the second.  There were a few

22   additional details that were added to Appendix A to try to

23   describe the type of work that Mr. Wallace was -- that

24   they were proposing Mr. Wallace perform.  But, apart from

25   that, it was not significantly different.

1    Q.    And those changes, are those noted on page 4 of

2    Exhibit 20?

3    A.    Yes.

4    Q.    Under subparagraph A?

5    A.    Yes.

6    Q.    Is that part of what you were looking for?

7    A.    It was part of what we were looking for.

8    Q.    And what was this lacking, this contract?

9    A.    It was lacking information to detail for us -- we

10   wanted something that would describe a very structured

11   employment arrangement between him and the party that was

12   going to pay him.  We wanted it to be very structured in

13   terms of what he was being specifically paid to do.  And

14   on the schedule -- I am sorry, and for what schedule he

15   was going to be paid.

16         On November the 10th, Mr. Wallace and I -- part of

17   our discussion was in reference to the -- that our office

18   was taking issue with the fact that there was so much

19   focus in the draft agreement about the monthly amount that

20   he was to be paid.  And it seems like that was the focus,

21   as opposed to explaining why he was going to be paid that

22   amount.

23         We had a discussion about it didn't describe for us

24   whether this was intended to be a full-time venture or

25   not.  I broke down for him figures to say, if this was

1   intended to be a full-time 40-hour-a-week venture, then,

2   frankly, he was -- the way that the numbers broke out to

3   be, he was going to make a little bit more than $9 an hour

4   based on the amount that they were proposing that they pay

5   him.

6          We were looking for there to be specifics to talk

7   about; like a schedule of deliverables; what he was going

8   to be paid for; why they were going to pay him that

9   amount, and talk about more on the oversight piece of

10  things.

11  Q.   Addressing your attention to page 5 of that exhibit,

12  that being No. 20, is that the page on which the monthly

13  pay was discussed?

14  A.   Yes.

15  Q.   That being what?

16  A.   It talks about $1,500 per month, and then it being

17  increased to $2,000 per month.

18  Q.   Was it also part of this agreement that he was to get

19  5 percent on the tail end after the resale of the

20  properties?

21  A.   There was some verbiage talking about that, yes.

22  Q.   And when he talked to you, either by phone or in your

23  office, did he talk about coming -- being almost ready to

24  get large amounts of money from time to time based on

25  their resale of the property and him netting the 5

1    percent?

2    A.    I don't think he talked to me about specifics, but he

3    did indicate that they were close to some sales of some

4    properties.

5    Q.    And did he talk about receiving the 5 percent on the

6    other end?

7    A.    I believe in e-mails he did make mention of that,

8    yes.

9    Q.    You have indicated that you had long discussions with

10   the defendant about this revised contract and his proposed

11   work.  Did you discuss that with anyone else in your

12   office?

13   A.    Yes.

14   Q.    Who?

15   A.    My supervisor and also Denise Dohanic.

16   Q.    Is Denise Dohanic's supervisor also involved in these

17   discussions, do you know?

18   A.    I believe so, yes.

19   Q.    Why would Denise be involved?

20   A.    At that point, Mr. Wallace was living full time in

21   the Aspen area, and we were preparing to transfer

22   Mr. Wallace's supervision to her.  He was at that point in

23   between two probation officers, because we were trying to

24   bring some resolution to this situation.

25   Q.    Let's look at exhibit -- excuse me, Exhibit No. 9

1    which is the December report, please.  Did he indicate at

2    page 3 of this report income from Imago and Judge Ray

3    Wall?

4    A.    Yes.

5    Q.    And for what months?

6    A.    He indicates paid from July and August work.

7    Q.    Had he, as of December, been approved to work for

8    them?

9    A.    No.

10   Q.    Do you have reason to believe that, in fact, the

11   defendant was working for Mr. Wall, Mr. Blackwell and the

12   entities Imago and the Silver -- I can't remember.

13   A.    Aspen Silver Water.

14   Q.    Aspen Silver Water, between the time of September and

15   December of 2011?

16   A.    Yes.

17   Q.    And on what do you base your belief that he was

18   working for those entities during those months of

19   September through December?

20   A.    One of the reasons is due to some e-mail

21   correspondence with Ray Wall in January of this year, when

22   I requested that -- or I communicated with Mr. Wall asking

23   him about the funds that Mr. Wall had conveyed to

24   Mr. Wallace during the months of September and going

25   forward, and asked him what work he had paid Mr. Wallace

```
1    for.
2    Q.   And what was Mr. Wall's response?
3    A.   My -- he explained that Mr. Wallace had been paid in
4    accordance with the agreement that I had been provided a
5    copy of.
6    Q.   That being the contract we have been looking at?
7    A.   Yes.
8    Q.   Addressing your attention to Exhibit 21, please.  Is
9    this the e-mail you are talking about?
10   A.   Yes.
11   Q.   What is Exhibit 21?
12   A.   Yes.
13   Q.   What is this?
14   A.   These are e-mails between me and Mr. Wall.
15   Q.   And is this the e-mail that you have just described
16   in which Mr. Wall talks about him being paid September 4,
17   2011, forward, based on the payment schedule in the
18   agreement?
19   A.   Yes.
20   Q.   Was that, then, inconsistent with the defendant's
21   statement on his report stating that three-thousand-some
22   dollars had been received for payment work done back in
23   July and August?
24   A.   Yes.
25   Q.   Addressing your attention again to -- let's start at
```

1    the bottom of Exhibit 21.

2         MS. KAUFMAN:  I don't know whether I moved to admit

3    it, but I do so at this time if I have not.

4         THE COURT:  You have not.

5         Any objection?

6         MS. PIERCE:  No objection.

7         THE COURT:  Exhibit 21 is admitted.

8         (Exhibit No. 21 is admitted.)

9    Q.   (BY MS. KAUFMAN)  At the -- when you read these, do

10   you read them from the bottom up?

11   A.   Correct.

12   Q.   And that is the way the sequence of conversation

13   goes?

14   A.   Yes.

15   Q.   So the first conversation is whose statement?

16   A.   I initiated the e-mail on January 26th to Mr. Wall.

17   Q.   And what months and what amounts were you

18   specifically talking about?

19   A.   I was inquiring about amounts from September 2011

20   through December 2011; funds that Mr. Wallace had received

21   -- reported to me that he had received from Mr. Wall in

22   the amounts of $1,200, $3,300, $2,000, and $3,200

23   respectively.

24   Q.   And when Mr. Wallace reported those to you, did he

25   relate them back to work having been performed by him in

1    July and August?

2    A.    Yes.

3    Q.    And is that what you were talking about here?

4    A.    Yes.

5    Q.    And, again, if you read upward, is that the paragraph

6    where you get the response from Mr. Wall?

7    A.    Yes.

8    Q.    Finally, at the top of the page, is that the last

9    thing you said to him on January 27, 2012?

10    A.    Yes.

11    Q.    And what was it you were asking Mr. Wall for at that

12    point?

13    A.    Whether there was an executed copy of the contractor

14    agreement.

15    Q.    And did he respond to that question?

16    A.    No.

17    Q.    Ever?

18    A.    Never.

19    Q.    Was this, then -- you received no response?

20    A.    Correct.  No response from him.

21    Q.    Did you receive a signed contract ever?

22    A.    No.

23    Q.    Have you ever approved that work?

24    A.    No.

25    Q.    In Exhibit 21, now admitted, is there also some

 1    mention of another prospect or means of employment; that

 2    being Aspen Ski in Ski Out?

 3    A.    Yes.

 4    Q.    What was that?

 5    A.    Aspen Ski in Ski Out was another employment proposal

 6    that Mr. Wallace submitted to the probation office on or

 7    about January 31st of this year.

 8    Q.    Would you look at Exhibit 23, please.  Do you

 9    recognize that?

10    A.    Yes.

11    Q.    What is that?

12    A.    That is a document that Mr. Wallace submitted to

13    Officer Dohanic on January 31st.

14          MS. KAUFMAN:  I move for its admission.

15          THE COURT:  Any objection?

16          MS. PIERCE:  No objection.

17          THE COURT:  Exhibit 23 is admitted.

18          (Exhibit No. 23 is admitted.)

19    Q.    (BY MS. KAUFMAN)  And what is the substance of this

20    communication?

21    A.    It is a letter from Ray Wall to Mr. Wallace stating

22    that Mr. Wallace has agreed to work as an at-will employee

23    for Aspen Ski in Ski Out starting February 1st of 2012,

24    and describing his duties and agreed upon salary.

25    Q.    Did you or Officer Dohanic do any research into what

1  this entity, Aspen Ski in Ski Out, LLC was?

2  A.   Yes.

3  Q.   What did you learn?

4  A.   I learned that the entity had been recently created

5  in the State of Colorado.  The Colorado Secretary of State

6  showed a filing the same week as a newly-created LLC.

7  Mr. Wall was indicated as the managing member, and

8  Jonathan Hellman was indicated as the registered agent.

9  Q.   And this letter is from Mr. Wall?

10  A.   Correct.

11  Q.   So did you approve this potential employment?

12  A.   No.

13  Q.   Why not?

14  A.   We did not because it -- two reasons.  It appeared to

15  us that this had been -- this entity had been created for

16  Mr. Wallace's benefit.  And, also, because I had

17  previously advised Mr. Wallace that we did not want him

18  involved with Jonathan Hellman.  And because this entity

19  -- or involved Mr. Hellman, we disapproved it, or we

20  declined to approve it.

21  Q.   Aside from this letter, was there any substantive

22  description of what the business would be; who would run

23  it, so on and so forth, or was this letter it?

24  A.   This is what we received.

25  Q.   Did you specifically inform the defendant that you

1   would not approve the Ski in Ski Out, as well as any

2   employment with or through Mr. Wall, on February 2, 2012?

3   A.   Yes.

4   Q.   And let's look at Exhibit No. 22.  Do you recognize

5   that?

6   A.   I do.

7   Q.   Is that --

8         MS. KAUFMAN:  I move for its admission.

9         THE COURT:  Any objection?

10        MS. PIERCE:  No objection.

11        THE COURT:  Exhibit 22 is admitted.

12        (Exhibit No. 22 is admitted.)

13  Q.   (BY MS. KAUFMAN)  Is this the communication in which

14  you made it clear that he was not approved for either of

15  those means of employment?

16  A.   Yes.

17  Q.   I would like to focus now on the substance of your

18  alleged Violation No. 10.  You apparently ask Mr. Wall

19  about the defendant's employment in September, October,

20  November and December.  And directing your attention to

21  Exhibit No. 7, which is the October report, and

22  particularly page 3 of Exhibit 7.  Is there an entry on

23  the second line there that is similar in those months by

24  the defendant?

25  A.   Yes.

1    Q.    And what is that entry?

2    A.    That entry is July/August income Imago/Judge Ray Wall

3    in the amount of $3,300.

4    Q.    And, similarly, Exhibit 8, the November statement,

5    directing your attention to page 3, line 2.  Excuse me, it

6    appears to be in line 1.  Is it a similar statement about

7    Imago?

8    A.    Yes.

9    Q.    And then again in December, which is Exhibit 9, page

10   3, about the fifth line down, is there another similar

11   entry by the defendant?

12   A.    Yes.

13   Q.    And in all of those does he say that the money that

14   is coming in in those months of October, November,

15   December from Imago was related to work in July and

16   August?

17   A.    Yes.

18   Q.    And is that inconsistent with what you learned from

19   Mr. Wall?

20   A.    Yes.

21   Q.    You alleged in your Violation Allegation No. 10 that

22   that is false.  What is false about it, in your view?

23   A.    In my view, it is a false reporting of the time

24   period in which that income was earned.

25   Q.    Addressing your attention now to your Allegation No.

1    11, you have indicated in your allegation that the

2    defendant failed to follow instructions by seeking

3    employment as required.  And this has to do with the

4    number of job applications he was asked to file.  What did

5    you instruct the defendant to do as far as seeking work in

6    Aspen?

7    A.    On February 2nd, as part of the written communication

8    to him regarding the employment that would not be

9    approved, he was instructed to, at that point, conduct an

10   active job search and submit verification of that and

11   search -- I am sorry, submit verification that he had

12   applied for no less than 18 jobs a week.

13   Q.    And did he actually present to you evidence that he

14   had filed some job applications?

15   A.    Some.

16   Q.    How many?

17   A.    He submitted on two occasions job search contact

18   forms.  The ones he submitted in February indicated that

19   he had made 12 contacts during the prior three weeks.  And

20   if I could reference the violation report, I discuss in

21   that report the further contacts that he made during

22   March.

23   Q.    Would you stand on your statement in the report in

24   support of that allegation?

25   A.    Yes.

1    Q.    In connection with your Allegation No. 7, my question

2    is, upon what do you base your allegation that the

3    defendant failed to work regularly between July 2011 and

4    March 2012, as required?

5    A.    The expectation is that Mr. Wallace work full time

6    and submit verification of the same, and that the

7    employment be approved and consistent with all his

8    supervision conditions.  And, to this point, the only

9    approved employment he had was with Aspen Country Day

10   School.  That was very sporadic.  It did not constitute

11   full-time employment.

12         And the primary issue at hand is that between July

13   and February, Mr. Wallace's efforts were focused on the

14   employment situation with Ray Wall as opposed to

15   legitimate approved employment.

16   Q.    From your perspective, being his probation officer,

17   supervising officer, what is the difference if he could do

18   the job in three hours instead of 40?  Would that be okay

19   with you, that he work just three hours a week?

20   A.    No.  The concern with the standard condition for

21   employment -- or the theory behind the standard condition

22   of employment is that, one, he being something productive

23   with their time on a full-time basis, and also be

24   generating consistent income, particularly in light of the

25   sizable restitution obligation that Mr. Wallace had.

           1            If he was able to earn additional income by

           2    combining different jobs to create a full-time employment

           3    situation for himself, that was our goal.

           4    Q.    And just approximately how much restitution does he

           5    still owe?

           6    A.    Approximately 11 million.

           7    Q.    $11 million?

           8    A.    Yes.

           9    Q.    I would like to address your allegations in No. 5;

          10    Allegation No. 5, and that is that between August and

          11    December 2011, the defendant failed to follow the

          12    instructions of the probation officer, in that he failed

          13    to report all salary, income, interest, profits and so on;

          14    basically, where he was getting his money.  Was it part of

          15    your instruction to him that he inform you what the source

          16    was of the money that he was receiving on a monthly basis?

          17    A.    Yes.

          18    Q.    And when did you talk to him about that?

          19    A.    When we reviewed his supervision conditions in April

          20    of 2011.

          21    Q.    Did he appear to understand that when you told him

          22    that?

          23    A.    Yes.

          24    Q.    Addressing your attention to Exhibit 5, the August

          25    report -- and I believe you have talked about this to a

1    certain extent.  You said you pointed out the Saint John's

2    check in the amount of $1,700.  Were there also deposits

3    to his checking account in addition to that?  And I

4    address your attention to Exhibit 5, page 10.

5    A.    Yes.

6    Q.    Did he provide on a regular basis a copy of his

7    checking account --

8    A.    Yes.

9    Q.    -- statements, monthly statements?

10   A.    Yes.

11   Q.    And, for example, on this page 10 of Exhibit 5, do

12   you see various deposits?

13   A.    Yes.

14   Q.    Do you know where that money came from?

15   A.    No.

16   Q.    Could you tell from what he presented to you?

17   A.    No.

18   Q.    Is that something you wanted to know as his

19   supervisor?

20   A.    Yes.

21   Q.    Similarly, Exhibit 6, September report.  If you would

22   look at that, please.  And, particularly, page 7.  Is that

23   a similar bank statement for the next month?

24   A.    Yes.

25   Q.    Can you tell from what he provided to you at the time

1    where the money was coming from?

2    A.    No.

3    Q.    What did the defendant tell you about Ray Wall making

4    direct deposits to the defendant's account?

5    A.    He told me that Mr. Wall banked with a sister bank to

6    Mr. Wallace's bank, which was the Colorado State Bank and

7    Trust, and that it was convenient for Mr. Wall to make

8    deposits directly into Mr. Wallace's account that were, in

9    effect, a wire transfer.

10   Q.    Or just a transfer?

11   A.    Correct.

12   Q.    Either a wire transfer or a transfer from one account

13   to another?

14   A.    Correct.

15   Q.    And was that acceptable under the terms and

16   conditions of his probation on supervised release?

17   A.    No.

18   Q.    And had you talked to him about -- did you talk to

19   him about that specific issue?

20   A.    We specifically talked about it in November when I

21   had a lengthy phone conversation with him.

22   Q.    By looking at the bank statement, can you tell, even,

23   that these come from Mr. Wall?

24   A.    Not in regard to the ones that we're discussing as to

25   Exhibit 6, no.

1    Q.    And even if they did come from Mr. Wall, can you tell

2    from this information provided that it is for employment

3    as opposed to anything else?

4    A.    No.

5    Q.    And did you need to know what it was from?

6    A.    Yes.

7    Q.    Let's look at Exhibit 7, October, and specifically

8    page 8.  What do you see there?

9    A.    There is a $3,000 deposit indicated from Ray Wall.

10   Q.    And it was after that that you had a discussion with

11   him to not do that from Mr. Wall any more?

12   A.    Correct.

13   Q.    Was there an issue in the last revocation hearing

14   with a Mr. Randy Egan, who was providing Mr. Wallace with

15   money, do you recall?

16   A.    That is my understanding.

17   Q.    And was there an issue as to what the source of the

18   money was that Mr. Egan was passing on to Mr. Wallace?

19   A.    Yes.

20   Q.    Look, please, at Exhibit No. 8, and specifically at

21   page 5.  Do you see a similar issue there relating to the

22   deposit and the unknown reason for the transfer?

23   A.    Yes.

24   Q.    And, similarly, Exhibit 9, December.  Please look at

25   page 7, top of the page.  What do you see?

1    A.    There is a credit indicated as incoming wire/mail

2    only for $3,250.

3    Q.    Can you tell from this that he gave you what the

4    source of that was or why he was being paid that amount of

5    money?

6    A.    No.

7    Q.    Did the defendant later provide you with some checks

8    purportedly drawn by Ray Wall?

9    A.    Yes.

10   Q.    Please look at Exhibit 24.  What is this?

11   A.    This is an e-mail that Mr. Wallace sent to me on

12   December 2nd.  That purportedly is a forwarded e-mail from

13   Mr. Wall to Mr. Wallace the same date, and it contained an

14   attachment with copies of checks written to Mr. Wallace

15   purportedly from Ray Wall.

16   Q.    And what was the point of his sending this, do you

17   know?

18   A.    Mr. Wallace was aware that I was wanting additional

19   verification of his income.

20         MS. KAUFMAN:  I move for the admission of Exhibit

21   24.

22         THE COURT:  Any objection?

23         MS. PIERCE:  No objection.

24         THE COURT:  24 is admitted.

25         (Exhibit No. 24 is admitted.)

1   Q.   (BY MS. KAUFMAN)   Addressing your attention to

2   Allegation No. 8, the allegation is that the defendant

3   failed to follow instructions of the probation officer not

4   to receive income via wires.   And is that what you have

5   just discussed?

6   A.   Yes.

7   Q.   In your Allegation No. 12, the probation officer,

8   Denise Dohanic -- it is alleged that the defendant failed

9   to appear, and that is report to her on a particular day.

10  Did you discuss this with her?

11  A.   I did.

12  Q.   And what did she instruct him to do, and what did he

13  do?

14  A.   She instructed him to report to what is called

15  Community Office Day, reporting day on February 8th.

16  There is an approximate 7-hour time window that the

17  defendant can report to meet with her during that date,

18  and he did not do so.

19  Q.   Did she tell him to report on January 20th?   Did she

20  tell him on January 20th to report on February 8th?

21  A.   Yes.

22  Q.   Did he report?

23  A.   No.

24  Q.   What happened on February 9th, the next day?

25  A.   He contacted her by telephone and asked when he was

1   to report.

2   Q.   The answer being?

3   A.   The day prior.

4   Q.   Who is Dr. James Pelton?

5   A.   He is the regional medical director for the Bureau of

6   Prisons.

7   Q.   And had you spoken to him about Mr. Wallace's last

8   two stays at the Bureau of Prisons in this case; that

9   being the 3-month term and the 9 -month term?

10  A.   Yes.

11  Q.   Was he aware of the fact that the defendant had

12  Crohn's disease?

13  A.   Yes.

14  Q.   What did he tell you about his treatment,

15  particularly in the 9-month stint, and his treatment for

16  Crohn's disease and his apparent condition when he left?

17  A.   He told me that upon arrival, that Mr. Wallace was

18  evaluated by BOP medical staff; that they adjusted his

19  treatment protocol to that of the BOP's medical protocol.

20  And that his health improved during the time he was at the

21  Bureau of Prisons, and that they could accommodate him

22  while he was there.  And they didn't have any issues with

23  him, health wise, while he was incarcerated .

24  Q.   And was he given a particular drug called Humira?

25  A.   I don't think he was given that during his prior

1    incarcerations.  Dr. Pelton advised me that that is part

2    of the Bureau of Prisons' formulary at this point.

3    Q.   It is?

4    A.   It is.

5    Q.   Finally, how would you quantify the amount of time

6    and effort you have put into your supervision of this

7    defendant over the last -- from April of 2011?

8    A.   This defendant has required a large amount of time

9    and attention.  When Mr. Wallace and I met initially in

10   April of 2011, we reviewed the violation petitions from

11   his two prior terms of supervision in an effort to have an

12   understanding of what the problems on supervision had been

13   before, so that he would not have these problems again, or

14   have similar problems again.

15        And he is someone on my case load that I have

16   communicated with more extensively and in more detail than

17   most, because I wanted to make sure that the expectations

18   were set forth as clearly as possible.

19   Q.   Are the e-mails that we have marked as exhibits in

20   this hearing all of the e-mails that you had communicated

21   with him, or are there more?

22   A.   Oh, there are a large number more.

23        MS. KAUFMAN:  Your Honor, I don't know whether I

24   have addressed these three exhibits, those being --

25        THE COURT:  10, 11 and 12.

1          MS. KAUFMAN:  Yes.

2     Q.   (BY MS. KAUFMAN)  Is Exhibit No. 10 the January

3     report, monthly report, Ms. Oppenheimer?

4     A.   Yes.

5          MS. KAUFMAN:  Move for its admission.

6          THE COURT:  Any objection?

7          MS. PIERCE:  No objection.

8          THE COURT:  It is admitted.

9          (Exhibit No. 10 is admitted.)

10    Q.   (BY MS. KAUFMAN)  Is Exhibit 11 the February report?

11    A.   Yes.

12         MS. KAUFMAN:  Move for its admission.

13         THE COURT:  Any objection?

14         MS. PIERCE:  No objection.

15         THE COURT:  Its admitted.

16         (Exhibit No. 11 is admitted.)

17    Q.   (BY MS. KAUFMAN)  Is Exhibit 12 the March report?

18    A.   Yes.

19         MS. KAUFMAN:  Move for its admission.

20         THE COURT:  Any objection?

21         MS. PIERCE:  No objection.

22         THE COURT:  Exhibit 12 is admitted.

23         (Exhibit No. 12 is admitted.)

24         MS. KAUFMAN:  Thank you.  I have no further

25    questions.

1    THE COURT:  All right.  I think now would be a good

2    time to take a break.  We have been going for quite some

3    time.  We will take a 15-minute break, and reconvene at

4    3:15.

5         (A break is taken from 3:00 p.m. to 3:15 p.m.)

6    THE COURT:  You may be seated.

7         Good afternoon, Ms. Dohanic.  Glad to have you on

8    the video conference.

9    OFFICER DOHANIC:  Good afternoon, Your Honor.

10   THE COURT:  Are we ready to proceed with

11   cross-examination?

12   MS. PIERCE:  Yes, Your Honor.

13   THE COURT:  You may proceed.

14                  **CROSS-EXAMINATION**

15   **BY MS. PIERCE:**

16   Q.   Good afternoon, Ms. Oppenheimer.

17   A.   Good afternoon.

18   Q.   Now, you testified that there was an ongoing

19   discussion between you and Mr. Wallace about his proposed

20   employment with Imago; correct?

21   A.   Correct.

22   Q.   And that during that communication or that

23   correspondence, he disclosed to you what he was doing or

24   what he wanted to do with that company --

25   A.   Correct.

1   Q.   -- in e-mails?

2   A.   Yes.

3   Q.   And also in some of your meetings you discussed that?

4   A.   Yes.

5   Q.   And you also testified that you became aware that he

6   was, in your opinion, working or doing some research for

7   this company, and that you continued to communicate with

8   him to help him or assist him into working towards

9   compliance with your requirements; is that correct?

10   A.   Correct.

11   Q.   And in those communications, you advised him exactly

12   what you needed as far as details, income, things like

13   that.  Is that fair to say?

14   A.   Are you asking whether there was a specific income

15   requirement?

16   Q.   Well, you indicated the types of things that you

17   wanted specifics on; for example, income, job duties, et

18   cetera; correct?

19   A.   Between e-mails and discussions in person and on the

20   telephone, yes.

21   Q.   Okay.  And there were numerous discussions and

22   e-mails back and forth about this; correct?

23   A.   Yes.

24   Q.   And at some point, you even -- you indicated you even

25   talked to Mr. Wall about it?

1    A.    Yes.

2    Q.    And you were aware that Mr. Wall and Mr. Wallace were

3    trying to draft a contract that would include all those

4    details you requested; correct?

5    A.    Yes.

6    Q.    And they did, in fact, provide one to you eventually,

7    I think you said it was in October?

8    A.    Yes.

9    Q.    And then in that one, you indicated that that was not

10   sufficient; you wanted a few additional items in order for

11   it to be satisfactory?

12   A.    Correct.

13   Q.    And wasn't one of the conditions that you wanted more

14   specifics about the 1099 aspect of the agreement?

15   A.    The agreement, itself, was being proposed as a 1099

16   agreement.

17   Q.    And you weren't necessarily opposed to it being a

18   1099 agreement as long as there was sufficient details?

19   A.    Correct.

20   Q.    And then they gave you an additional agreement.  Do

21   you recall the date that that was provided to you?

22   A.    That was November 19th.

23   Q.    And that one did have some additional items that

24   addressed your previous concerns?

25   A.    It addressed some of the concerns.

1    Q.    At no time did Mr. Wallace indicate to you that he

2    would refuse to cooperate with your request; correct?

3    A.    Correct.

4    Q.    In fact, all of his actions and his correspondence

5    with you would indicate that he was attempting to satisfy

6    the requirements that you had voiced to him?

7    A.    Yes.

8    Q.    Now, you dealt with Mr. Wallace -- I know you had

9    numerous discussions with him; correct?

10   A.    Yes.

11   Q.    And is it fair to say that Mr. Wallace is a very

12   optimistic person?  Is that a fair description of him?

13   A.    I think that is a fair description.

14   Q.    Is it also fair to say that sometimes maybe he

15   overpromises what he can deliver?

16   A.    I think that is a fair representation, too.

17   Q.    But you have no indication that he does that kind of

18   thing to being malicious.  He's not outright promised you

19   something and appeared to be being deceptive about that;

20   is that fair to say?

21   A.    I'm not sure if I'm in the best place to assess his

22   underlying motives.

23   Q.    Is it -- did you observe, though, that he would be

24   overly optimistic about completing tasks and then not be

25   able to complete those tasks within the time he

1    anticipated?

2    A.    He would indicate to me that he was optimistic about

3    completing them, then he would not follow through.

4    Q.    So there was a problem with him following through on

5    certain things that he obligated himself to perform?

6    A.    That has been an ongoing theme with all of his terms

7    of supervision.

8    Q.    Okay.  But Mr. Wallace has never been evaluated or

9    anything like that, to your knowledge, while he has been

10   on probation?

11   A.    Not to my knowledge.

12   Q.    Now, you indicated that he moved at some point to

13   Aspen without your approval.  That is one of the

14   violations; correct?

15   A.    That he moved without advance notice; correct.

16   Q.    Well, at the time that you say that he had moved, he

17   still had a residence in Denver; correct?

18   A.    He still had what he was describing as a residence in

19   Denver.

20   Q.    And he was getting mail at that address?

21   A.    I don't know whether he was receiving mail there.

22   Q.    So you don't know whether he had mail coming there.

23   Do you know whether he had his personal items at that

24   residence?

25   A.    I don't know.

Q.   So your contention that he had moved is really just a conclusion that you had based on him spending some time up in Aspen; correct?

A.   The probation office's assessment of where someone resides does not relate necessarily to where someone's belongs are or where they receive mail.  We are looking more at where someone is spending their time.  And that -- my conclusion was, based on Mr. Wallace's statements to me, that during the month of August he had only spent six or seven nights in the Denver area.

       Because of that, the majority of the time, therefore, he had been spending in the Aspen area, at his wife's residence.  And I had actually asked him -- I said to him, based on what you are telling me, it sounds like you have then moved to Aspen, and he agreed.

Q.   Well, in your conversation with him, it was discussed that he planned to move to Aspen, and he was also requesting your approval; correct?

A.   I don't know if the conversation was specific as far as the approval.

Q.   But there was a discussion about his intent; correct?

A.   He had made indications in prior months that that was his long-term goal, was to secure employment in the Aspen area and move back with his family.

Q.   And eventually you did approve that move?

1    A.    There was no direct approval.  He had already changed

2    his circumstances where he was spending the majority of

3    his time in the Aspen area.

4    Q.    But you did not forbid him from traveling to Aspen?

5    A.    No.

6    Q.    And you did not forbid him from spending time with

7    his family in Aspen?

8    A.    No.

9    Q.    Now, at all times that he was going back and forth

10   between Denver and Aspen, he stayed in pretty much

11   constant contact with you, correct?

12   A.    There were no issues as far as me not knowing or

13   having trouble getting in contact with him, no.

14   Q.    And that would be one of the reasons that residence

15   would be an important aspect of supervision?

16   A.    That can be.

17   Q.    Now, with regard to his employment with Imago, you

18   indicated that you had insufficient proof as to the source

19   of funds.  Is that one of the issues that you had with it?

20   A.    That is one of the issues.

21   Q.    But he did provide copies of checks to you?

22   A.    He provided those well after he reported that income.

23   Q.    But he did report income on every occasion; correct?

24   A.    On monthly reports he reported the funds coming from

25   Ray Wall as being income.

1    Q.   Okay.  So he didn't attempt to conceal the income,

2    itself?

3    A.   I don't have any direct information about that, no.

4    Q.   I think you testified that there was a copy of a

5    check from the Aspen Country Day School for 451, and that

6    you did not have the balance of that amount.  I think that

7    is in No. 7.  Isn't it a fact that he later provided -- or

8    that later the balance of that was provided directly from

9    the director of the school to you?

10   A.   Could you -- I am sorry, could you tell me what month

11   we're talking about; what month that relates to?

12        MS. PIERCE:  Your Honor, if I could have one

13   minute.

14        THE COURT:  You may.

15   Q.   (BY MS. PIERCE)  So, for the month of September,

16   there was a discrepancy in the check and the actual total

17   amount paid by Aspen Country Day School.

18   A.   Okay.

19   Q.   Is that correct?

20   A.   Yes.

21   Q.   And then -- but then in October, you did receive

22   verification of the balance of that; correct?

23   A.   I received that on November 17th --

24   Q.   Okay.

25   A.   -- in an e-mail from Mr. Wallace, forwarded from

1    Mr. Erickson of Aspen Country Day School.

2    Q.    Now, Mr. Wallace does have some medical problems;

3    correct?

4    A.    That is my understanding.

5    Q.    And those medical problems could have an impact on

6    physical labor?

7    A.    I don't know directly.

8    Q.    Well, do you know whether Mr. Wallace is capable of

9    performing physical labor?

10   A.    I don't feel like I am in a position to make that

11   assessment.  I'm not a physician.

12   Q.    Well, wouldn't it be fair to understand that in order

13   for him to be looking for an appropriate job?

14   A.    I did not direct Mr. Wallace to seek any specific

15   type of employment.  I didn't direct him to seek physical

16   labor.

17   Q.    Well, most of the jobs that are unskilled and W2 jobs

18   are physical labor, are they not?

19   A.    I don't know that I agree with that.

20   Q.    It's difficult for anybody to find a job right now in

21   this economy; would you agree with that?  It is a

22   difficult job market?

23   A.    It has been a difficult job market, yes.

24   Q.    And having a felony would make it even more

25   difficult?

1    A.    For some individuals it may be.

2    Q.    And Mr. Wallace was doing everything he could to try

3    to make payments toward his restitution; correct?

4    A.    I don't know if I agree with that.

5    Q.    Well, the employment that would require Mr. Wallace

6    to -- that would allow Mr. Wallace to make more money was

7    not acceptable to you?

8    A.    Ultimately, after many months of back and forth with

9    Mr. Wallace, we determined that it would not be

10   acceptable.

11   Q.    And you indicated to Mr. Wallace that you would

12   rather him take a job at Wal-Mart, for example, or some

13   place like McDonalds, rather than make more money to pay

14   towards restitution?

15   A.    No, I did not make that statement to Mr. Wallace.

16   Q.    Well, what kind of job did you realistically think he

17   could get given that he has physical limitations, a felony

18   and the economy at this point?

19   A.    Well, Mr. Wallace presented himself to me as being

20   someone who had numerous contacts in the Aspen area.  And

21   he repeatedly stated it would not be a problem for him to

22   find employment; that he knew lots of people who were

23   willing to help him out.  He stated that repeatedly to me

24   during meetings that we had.  And in numerous e-mails, he

25   talks about the different people that he would go meet

1    with, and he indicated that he was going to seek out these

2    different opportunities.

3        I think that your question in regard to looking for

4    a job at McDonalds or Wal-Mart stems back to a discussion

5    that Mr. Wallace and I had when we were comparing what W2

6    employment looks like versus contractor employment, and

7    how the verification process for W2 employment is very

8    simple compared to 1099.  And I had said to him, you know,

9    that is a very simple process in the W2 realm.  It is

10   harder to do as far as 1099 contract work, but I had

11   indicated to him that I would try to accommodate him for

12   either.

13       MS. PIERCE:  Your Honor, may I have one moment?

14       THE COURT:  You may.

15   Q.  (BY MS. PIERCE)  Now, Mr. Wallace met with you on a

16   regular basis; correct?

17   A.   At the outset of supervision we met regularly, yes.

18   Q.   And he rarely, if ever, missed an appointment?

19   A.   I don't think he missed any appointments, no.

20   Q.   And in those discussions, Mr. Wallace would ask

21   sometimes if he was doing okay; if everything was

22   copacetic in his probation requirements; correct?

23   A.   He did.  We had appointments in May and June.  During

24   those periods he was working with Mr. Theune, and so

25   things were on track by and large, with the exception of

1    some of the documentation problems.  The next opportunity

2    that we had to meet was being in July, and that is when he

3    first started discussing this employment proposal with

4    Mr. Wall.

5            And, at that point, again, things were going along

6    -- there weren't any significant issues that had arisen,

7    apart, again, from some of the documentation matters we

8    have already talked about.  And we did not meet at the

9    beginning of August.  Then, when he came to meet me in

10   September, at that point he was already well aware of the

11   fact that we were having the issue of his working without

12   approval, and then things progressed from there.

13   Q.   And then during that period of time, after you met in

14   September and he was attempting to establish a contract,

15   was there a time that you were out of the office for

16   awhile and he continued to try to correspond with you?

17   A.   During what period?

18   Q.   I think it was October.

19   A.   No, I was not out of the office in October.

20   Q.   Okay.  Was there a period of time in September or

21   October that you were out of the office?

22   A.   I was out of the office for a week in September for

23   training, and we had corresponded.  In fact, you and I and

24   Mr. Wallace had corresponded the week prior to that.  That

25   was during the time that he was -- had missed the

1    September 9th deadline and was trying to get a contractor

2    agreement or some -- any kind of documentation from

3    Mr. Wall to present to me.  And I also advised you all

4    that I was checking e-mails while I was out of town.

5    Q.   And at that time you really didn't have any major

6    complaint with Mr. Wallace, except you were just awaiting

7    for documentation from him so you could approve his

8    employment; correct?

9    A.   Well, the complaint was that things were very

10   unstable in terms of his overall -- the overall picture

11   with him; that he was residing in Aspen, was proposing to

12   obtain a new residence at a higher rent rate without the

13   income to support it, and that he had no source of

14   approved income at that point.  So things from September

15   on, things were very unstable.

16   Q.   But after August of 2011, you had no evidence that

17   Mr. Wallace was actively working for Imago; correct?

18   A.   There were -- there was the e-mail -- there was the

19   information from Ray Wall that -- via that e-mail from

20   January, that he had continued to work as Mr. Wall states

21   in that e-mail.  That Mr. Wallace had continued and would

22   continue to perform work.

23        There was some information that Mr. Wallace

24   provided with his December monthly report, that was a

25   check that he had written to Pitkin County that was

1    consistent with a filing in Pitkin County that was tied to

2    one of the projects that Mr. Wallace had talked to me

3    about in September.  And it appeared that that was

4    additional involvement that he had with Imago and Aspen

5    Silver Water, and that was discussed in the violation

6    petition.

7        If I could also state, when I spoke with Ray Wall

8    on September the 9th, and Mr. Wall talked to me about the

9    work that Mr. Wallace had done in July and August, he

10   indicated to me that Mr. Wallace had, up to that point on

11   September 9th, been paid for most of the work performed up

12   to that point in time.

13       So it appeared to me that the funds that

14   Mr. Wallace was receiving in subsequent months seemed

15   inconsistent and seemed greater than what would be

16   expected as far as the residual income from the months of

17   July and August.  And that was a concern of mine.

18   Q.   But you had no evidence that he was doing anything

19   illegal or fraudulent in his employment or the previous

20   employment with Imago?

21   A.   There is no information that is being alleged, no.

22   Q.   Now, you recall that -- you just mentioned this as

23   well, that you and I exchanged e-mails; correct, about

24   what was happening?

25   A.   Yes.

1    Q.    And that around November 17th, we had contact with

2    each other by e-mail.  Do you recall that?

3    A.    No.  I am sorry, November 17th?

4    Q.    Around November 17th.

5    A.    Possibly.  I don't remember that one.  I remember

6    that we had communicated in September.  I don't

7    specifically remember November.

8    Q.    Do you recall e-mailing that there was no problem;

9    that you were just out of the office for awhile?  Do you

10   recall e-mailing?

11   A.    In November?

12   Q.    In November, around November 19th?

13   A.    I don't remember communicating that on November 19.

14   I wasn't out of the office around November 19th.

15   Q.    Do you recall any correspondence with me around

16   November 19th?

17   A.    November 19th was the date that I received the second

18   draft Imago document.  I don't remember specifically.

19   Q.    Do you recall indicating that you had some medical

20   issues that took you out of the office?

21   A.    At the beginning of November.

22   Q.    Okay.

23   A.    Yeah.  I was explaining to Mr. Wallace why he had not

24   yet heard back from me about where we stood in terms of

25   the discussion about the Imago employment.  And, I

1  apologize, I don't remember specifically what

2  communications you and I had.

3  Q.   Okay.

4       MS. PIERCE:  I think I'm about done, Your Honor.  I

5  just need a minute.

6       Your Honor, those are my questions.

7       THE COURT:  All right.  Any redirect?

8       MS. KAUFMAN:  Thank you.

9                **REDIRECT EXAMINATION**

10  **BY MS. KAUFMAN:**

11  Q.   Please look at Exhibit 9, page 10 -- excuse me, it's

12  page 9.  Exhibit 9, page 9.  That is the December report.

13  A.   Okay.

14  Q.   Do you have that?

15  A.   I do.

16  Q.   What is page 9 of Exhibit 9?

17  A.   It is a copy of an image of a check written from

18  Mr. Wallace's checking account to the Pitkin County

19  Treasurer on December 6, 2011, for $624.

20  Q.   And is there a notation on the bottom left of that

21  check?

22  A.   Yes.

23  Q.   What is that?

24  A.   It says "TDR," and what appears to be "Aspen Silver

25  Water."

1    Q.    What is Aspen Silver Water?

2    A.    Aspen Silver Water is one of the entities that is

3    managed and/or is a client of Ray Wall.

4    Q.    Did you go to Pitkin County and try to figure out

5    what this check was for?

6    A.    I did some research online.

7    Q.    What did you learn?

8    A.    I found a filing with the County that appeared to

9    correspond to that same date that was filed with the

10   Office of Planning and Zoning on behalf of Aspen Silver

11   Water.

12   Q.    And what type of a filing are you talking about; a

13   one-page deal or a report, or what is it?

14   A.    It is more than a hundred pages.

15   Q.    And have you provided that to the defense?

16   A.    Yes.

17   Q.    And what kind of a report is it?  Is it a report in

18   connection with the real estate planning and development

19   that was --

20   A.    Yes.

21   Q.    Was that consistent with the work that was described

22   by the defendant with Mr. Wall?

23   A.    Yes.

24   Q.    And so what is your position as to what this check

25   represents?

1    A.    My position is that it represents that he was still

2    involved with work with Mr. Wall and Aspen Silver Water as

3    of December 6th.

4    Q.    Is that -- is one of the descriptions of his job on

5    the November draft of the contract provided that list of

6    filing things with the County as one of the things he

7    would be doing --

8    A.    Correct.

9    Q.    -- in his employment with Mr. Wall?

10   A.    Correct.

11   Q.    Is that one of the reasons that you have drawn the

12   conclusion that he was still working for Mr. Wall in

13   December of 2011?

14   A.    Yes.

15   Q.    You have indicated on cross-examination that you have

16   no reason -- there is no allegation, obviously, that there

17   is any criminal activity going on in connection with his

18   employment with Mr. Wall; correct?

19   A.    Correct.

20   Q.    Is one of the reasons that you have to have

21   verification of income to determine whether or not a

22   convicted felon is involved in crime?

23   A.    That would be a reason, yes.

24   Q.    Is that one of the problems here, that you don't know

25   what the source of the money is?

1   A.   Yes, that is one of the problems.

2   Q.   Are there -- is Aspen a larger or smaller area than

3   Denver metro?

4   A.   Smaller.

5   Q.   Are there -- is Aspen a more secluded area or less

6   secluded than the Denver metro area?

7   A.   It is more secluded.

8   Q.   Would there probably be more job opportunities in

9   Denver than in Aspen?

10  A.   Yes.

11  Q.   Is that one of your concerns when the defendant moved

12  to Aspen?

13  A.   Yes.

14  Q.   Defense counsel on cross-examination asked you

15  questions about the defendant's physical condition;

16  correct?

17  A.   Yes.

18  Q.   I would address your attention to -- well, first of

19  all, did he ever talk to you or complain to you in a way

20  about an employer wanting him to work 40 hours when he

21  wanted to have a different schedule?

22  A.   Yes.

23  Q.   Which employer was that?

24  A.   Phil Theune.

25  Q.   And what did the defendant say to you about

1    Mr. Theune wanting him to work 40 hours?

2    A.    That Mr. Wallace wanted to work a different -- he

3    wanted to structure those hours in a different way so that

4    he could spend more time in Aspen, and Mr. Theune wanted

5    it to comport more with a traditional 40-hour work week to

6    have coverage at his law office.

7    Q.    And did the defendant suggest working three days a

8    week, 15-hours a day so he could have a four-day weekends?

9    A.    Yes.

10   Q.    What did you say to that?

11   A.    I told him that I thought it would be better -- best

12   for him to do what was being asked of him by his employer,

13   and to try to maintain boundaries with the employer given

14   that he and Mr. Theune were friends, and also he was

15   residing with Mr. Theune.  But I felt that the priority

16   was that he maintain stable employment, and that he follow

17   the instructions of what his employer wanted.

18   Q.    Was it shortly after that that the employment with

19   Mr. Theune ended?

20   A.    Shortly thereafter.

21   Q.    I would like you to look at what has been marked as

22   Exhibit 25, please.  Is it your understanding that the job

23   with Mr. Wall would require the defendant going out to

24   different properties in the Aspen area and doing his

25   research?

1    A.    Yes.

2    Q.    Where are these properties located?

3    A.    He advised me that they were in back country and/or

4    remote locations on Aspen mountain.

5    Q.    Who advised you that?

6    A.    Mr. Wallace did.

7    Q.    What is Exhibit 25?

8    A.    Exhibit 25 is a printout from Mr. Wallace's twitter

9    account.  Specifically, it is an entry that he made on

10   March 11th of 2012.

11          MS. KAUFMAN:  I move for its admission.

12          THE COURT:  Any objection?

13          MS. PIERCE:  No objection.

14          THE COURT:  Exhibit 25 is admitted.

15          (Exhibit No. 25 is admitted.)

16   Q.   (BY MS. KAUFMAN)  Is there a photograph there, and

17   what is the message?

18   A.    The message is at the bottom of page 2.  It is a

19   photograph of what appears to be taken at a ski area in

20   Aspen.  And what was posted with it states, "Another sick

21   day at Highland Bowl.  Thank you."  Then there is a

22   picture -- a link to the picture that's printed on page 3.

23   Q.    So this is the defendant's twitter --

24   A.    Yes.

25   Q.    -- publication?  And that was last month?

1   A.   Yes.

2          MS. KAUFMAN:  Thank you, I have nothing further.

3          THE COURT:  All right.  Thank you very much, you

4   may step down.

5          All right.  Counsel, it is 3:49.  We are scheduled

6   to go to 4:30.  How long are the rest of the witnesses

7   going to take?

8          MS. PIERCE:  I have two witnesses, plus

9   Mr. Wallace.  So I don't know if we can get all that done.

10          THE COURT:  Well, we will get it done today, so we

11   need to move it along.

12          Do you have any more witnesses?

13          MS. KAUFMAN:  No, Your Honor.

14          THE COURT:  All right.  Then let's move right to

15   your witnesses.  Who is your witness?

16          MS. PIERCE:  It is Ray Wall.

17          THE COURT:  All right.

18          COURTROOM DEPUTY:  Raise your right hand.  Your

19   attention, please.

20                          **RAY WALL**

21   having been first duly sworn, testified as follows:

22          COURTROOM DEPUTY:  Please have a seat.

23          Please state your name, and spell your first and

24   last names for the record.

25          THE WITNESS:  Ray Wall.  First name is R-A-Y.  Last

1    name is W-A-L-L.

2                    **DIRECT EXAMINATION**

3    **BY MS. PIERCE:**

4    Q.    Mr. Wall, what do you do for a living?

5    A.    Well, theoretically I am supposed to be retired, but

6    I haven't quite made it there yet.  But I am still an

7    attorney.  Currently I am licensed in Colorado and up in

8    New Mexico.  And so I have a few clients, mostly in

9    business and real estate.

10   Q.    And did there come an occasion where you met Ron

11   Wallace?

12   A.    Yes.

13   Q.    What was the context of that meeting?

14   A.    We had filed some litigation in Pitkin County to

15   establish access on some of my client's property up there,

16   and we needed to have some people served.  And I was in

17   touch with a law firm here in Denver.  And I didn't know

18   Ron at the time, but apparently he had been working for

19   them, or had some association with them.  And I used him,

20   then, to serve some parties in that case.

21   Q.    And did there come a time when you decided that maybe

22   you wanted to hire Mr. Wallace?

23   A.    Yes.

24   Q.    And when was that?

25   A.    Well, in the conversations I had with him, you know,

1    I discovered that he knew a lot of people in Aspen, and

2    that is where we were trying to get some of the

3    development done, and that he had good knowledge of

4    records and research of records and that sort of thing.

5    So we decided to use him, because we needed someone on the

6    ground there that we could rely on to go get some records,

7    get information for us, maybe talk to someone at the

8    county, that sort of thing, so --

9    Q.   Were you aware of his criminal history at that point?

10   A.   I don't recall for sure when I became aware of it.

11   But at some point I did become aware that he had a

12   conviction.

13   Q.   And was his proposed employment going to involve him

14   handling any money or anything that you thought would be a

15   risk to someone with his background?

16   A.   No, not at all.

17   Q.   Now, could you describe what your general agreement

18   was in July of 2011?

19   A.   Well, in the beginning, our agreement with him was

20   that he would just be paid a finder's fee or a bonus when

21   we sold some properties.  And we had a specific project.

22   My client had some parcels that were eligible for

23   transferable development rights.  And to obtain those

24   transferable development rights we had to file

25   applications and go through a process.

1        And we had to search records and come up with some

2    title information, because they have a merger provision in

3    the Pitkin County Land Use Code; that the County was

4    taking the position we just had one TDR, and we were

5    taking the position that we had three TDRs.  So, in that

6    time frame, that is when we began to use Mr. Wallace to

7    try to ferret out some of the documents that -- so we

8    could establish a fractional ownership of the middle

9    claim.

10   Q.   And his duties were involved mostly with research and

11   looking at records?

12        MS. KAUFMAN:  Objection, leading.

13        THE COURT:  Sustained.

14   Q.   (BY MS. PIERCE)  Could you restate what his duties

15   were specifically?

16   A.   Well, probably there were at least two phases of

17   his -- what we wanted him to do.  One was in the Pitkin

18   County, the records had gone from paper records to

19   microfiche to digital.  And so sometimes with these old

20   mining claims, it's hard to find those records.  You have

21   to do a lot of going to the records and trying to find

22   these old mining claims and how they had -- what the chain

23   of title had been.

24        So we had him working on that.  And then the other

25   aspect of it was more the people aspect of it, in dealing

1    with Pitkin County, the people in the planning department

2    that he had a relationship with.  You know, we would try

3    to get feedback about what we needed to do to accomplish

4    what we wanted to accomplish.

5    Q.    When was the work performed starting in July?

6    A.    As I recall, most of it was done during the summer.

7    The main thing I recall about it was, again, my client had

8    purchased the property and was under the impression that

9    perhaps he only had one TDR right for these midnight mine

10   claims.  And Ron's research and his communication with

11   Suzanne Wolff at the County, seemed to indicate that

12   perhaps my client had the right for three TDRs, which was

13   a significant amount of money.

14         And so that's what we concentrated on, and that was

15   mostly during the summer, as I recall.

16   Q.    So after August, did you make some payments to him?

17   A.    Yes.

18   Q.    And what were those payments for?

19   A.    Well, they were advances on what money he was going

20   to earn when we sold these TDRs, which we are confident

21   would be sold and will be sold.  And, also, there were two

22   other elements of that.  One, he had had some need -- he

23   expressed need for money.  And, two, then we became aware

24   of probation requirements, and so we were trying to help

25   him comply with his probation requirements.

1    Q.   Did you find the work he did for you valuable in July

2   and August?

3    A.   Yes.  Again, as I said, the main result was that we

4   discovered that we had three TDRs rather than one.

5    Q.   If he was not technically working for you after that

6   time, why did you make payments other than an advance?  Is

7   there any other reason you made payment to him during

8   those months; like September?

9    A.   Well, again, those were -- whatever money we gave to

10   him was an advance on what he would be entitled to when we

11   sell the TDRs.

12    Q.   Which was 5 percent?

13    A.   Five percent.  That was the initial agreement.  Then

14   it began to -- we had conversations with, or I did, with

15   his probation officer, and then we began to try to develop

16   a 1099 agreement.  Because I had told his probation

17   officer that, you know, we did not need a W2 employee.  It

18   was not that kind of work.  It was -- we just didn't want

19   to do that.

20       And she communicated to me that what he needed was

21   some sort of regular monthly income.  So then that is when

22   we began to talk about, well, we can do a 1099 agreement

23   for a certain amount of money.  And, again, that would be

24   an advance, though, on what he would be paid when we sold

25   the TDRs.

1  Q.   So that was designed to give him a monthly payment?

2  A.   Yes.

3  Q.   Regardless of what work he was performing?

4  A.   Say it again?

5  Q.   Regardless of what work he was performing those

6  months?

7  A.   It was for work he had already done primarily.  You

8  know, I had conversations with him during that period of

9  time.  I don't recall any -- like I assigned any

10  particular task to him to go out and do anything, other

11  than we did have him record TDR applications once.  But,

12  other than that, I don't recall any assigned tasks.

13  Q.   So, more or less, it was follow-up conversations?

14  A.   Communications.  If we had a question about some of

15  the documents.

16  Q.   Did you do everything that you thought you could to

17  comply with Mr. Wallace's probation, for purposes of

18  fashioning an employment?

19  A.   You know, at the time -- you know, as you look back

20  on it now, I see that it was probably a bigger deal than

21  what I thought it was at the time.  And, you know, I was

22  under the impression that we were doing what we needed to

23  do.  Although, you know, our position was not -- we were

24  not his caretaker, and we were not going to, you know,

25  just do everything that was required.

1      But we tried to be cooperative with the probation

2   department and come up with an agreement that would be

3   acceptable to the probation department and would help

4   Mr. Wallace, because he had, in fact, you know, done the

5   work that will increase revenue for my client.

6          MS. PIERCE:  Your Honor, if I could have a moment.

7   Q.   (BY MS. PIERCE)  At the time you were having

8   discussions with Mr. Wallace and his probation officer,

9   Ms. Oppenheimer, did you anticipate future projects?

10  A.   Yes.  And I had some discussions with Mr. Wallace

11  concerning these projects.  As I recall, we didn't have

12  specific duties that he would go out and do at that time,

13  but we discussed the parameters or the scopes of those

14  projects; one being the Keno project, which the County had

15  down zoned that property.  We had litigation.  We lost in

16  the trial court.  It is currently on appeal.

17         And that's where we developed this concept of

18  having the Ski in Ski Out, something that would be more

19  compatible with the county, and maybe they would accept it

20  more compatible with the use of the land, because it was

21  right next to the ski patrol property.  So we had some

22  discussions with him, but didn't assign him tasks to go

23  out and do anything in particular.

24  Q.   So that particular corporation was not created only

25  for Mr. Wallace to have employment?

1    A.    No, not at all.  Actually, the -- part of it was to

2    reserve the name, because that's kind of the concept, and

3    we're still looking, you know, to work toward that end of

4    creating a Ski in Ski Out facility there that could be

5    used in the winter, that would be compatible with the ski

6    code, because they don't want vehicles going up Summer

7    Road.

8          And because of the down zoning we have gone from

9    AFR-10 to R/R.  So all that can be placed up there now

10   would be a cabin, and then, perhaps, some other buildings

11   where people could come up and spend the night and you

12   physically can ski in and ski out.  And I had some

13   conversation of this concept with Ron, because he knows a

14   lot about the ski industry or what that area is like.

15         MS. PIERCE:  Those are my questions, Your Honor.

16         THE COURT:  Thank you.

17         Cross-examination.

18                        **CROSS-EXAMINATION**

19   **BY MS. KAUFMAN:**

20   Q.    Good afternoon, Mr. Wall.  On the projects that you

21   said that the money was advances to Mr. Wallace, have you

22   sold those properties?

23   A.    No.  Those were the TDRs I was talking about.

24   Q.    Excuse me?

25   A.    Go ahead.

1    Q.    What is a TDR?

2    A.    Transferable development right.

3    Q.    Have they been sold?

4    A.    No.

5    Q.    And how many different ones of them were there on

6    which you were paying him advances?

7    A.    In the beginning, when we started evaluating that

8    project to sell TDRs, it appeared we for sure could get

9    one TDR.   And then, through some of the research that Ron

10   did and his conversations with Ms. Wolff, then it became

11   apparent that we were entitled to three, or at least that

12   was our opinion.

13        And we currently have gathered more information,

14   presented that to the County Attorney, and we are awaiting

15   a decision on whether or not they are going to accept our

16   three applications.

17   Q.    I take it from your testimony that Mr. Wallace was

18   able to discuss these concepts with you; the TDRs and the

19   history of the properties and the mining rights; is that

20   correct?

21   A.    To some extent, yes.

22   Q.    And he is somebody that did help you significantly

23   with your business?

24   A.    Well, some aspects of it, you know, he did not help

25   with.   But with the TDRs and searching the records, he did

1    help a lot with that.

2    Q.    You have somebody else doing that now?

3    A.    No.  We have completed that phase; that particular

4    project.  Now we're dealing with Mr. Neely and the County

5    Attorney's Office.

6    Q.    When did you learn that Mr. Wallace was a convicted

7    felon?

8    A.    You know, I don't recall.  It was sometime when we

9    began our relationship with him.  But I don't recall when

10   that was.

11   Q.    Who did you learn that from?

12   A.    I do not recall.

13   Q.    Was it from him?

14   A.    You know, I do not recall.  I do recall learning that

15   information, and I was somewhat concerned about it,

16   because I have a pretty low tolerance for people that

17   commit crimes.

18   Q.    What has he been convicted of, do you know?

19   A.    Say it again?

20   Q.    What was he convicted of?

21   A.    You know, I don't know.  I have never seen the

22   charges, other than now after we have been going through

23   some of this process, it was, I think, mail fraud and

24   maybe -- I don't know the exact charge, but it was

25   appropriating other folk's money.

1    Q.    Did you understand the scope of his conduct?

2    A.    I am sorry, I'm kind of old, and I can't hear.

3    Q.    Did you understand the scope of his crime of

4    conviction?

5    A.    Generally, yes.

6    Q.    How large of a crime was it in your view?

7    A.    Economically, it was a very large crime.

8    Q.    How large?

9    A.    I saw that restitution was like 10- or 11 million.

10    So that is pretty significant.

11    Q.    Were you aware that his probation had been revoked

12    and his supervised release revoked also prior to your

13    working with him?

14    A.    No.

15    Q.    Was it Mr. Wallace's idea, the $1,500 or 2,000 a

16    month that was set forth in the contract?

17    A.    You know, I don't recall for sure.  The 2,000 a

18    month, I remember I had some conversation with his

19    probation officer.  And that amount, I know that she

20    wanted him to have a set amount each month.  And I'm not

21    saying that she set the amount.  It may have been

22    conversations I had with Ron how we came up with that

23    amount.  I don't know for sure.

24           And I know one of the parameters there would be,

25    though, I kind of had an idea of how much he would be paid

1    once we sell the TDRs.  So we did not want to exceed that

2    amount.

3    Q.   But when you set the amount, you didn't know how much

4    hours he would be working; is that fair to say?

5    A.   That's correct.  It was not based on hourly work.

6    Q.   And you wouldn't be able to supervise him

7    individually from your home in New Mexico, I take it?

8    A.   No.

9    Q.   Is that right?

10   A.   No.  It was not -- that was not my role to supervise

11   him.

12   Q.   There was never a signed contract, was there?

13   A.   No.  I think we submitted some proposals, but we just

14   never could come to an agreement on it.  And, finally,

15   actually, my client sort of got tired of the whole

16   business and said -- that is when I sent the letter and

17   said if you do anything in the future, it will be on a

18   specifically assigned basis, and that sort of ended the

19   relationship.

20   Q.   And the letter was with your client or with the

21   defendant?

22   A.   I think it was an e-mail.

23   Q.   With whom are were you communicating in the e-mail?

24   A.   I think I communicated with his probation officer via

25   e-mail something to that regard.  And I had spoken with

1    Ron.  And I don't know whether I had sent him an e-mail or

2    letter that said that no further work would be performed

3    unless it was on a specifically assigned basis.  Knowing

4    that we had to have some sort of agreement, we were

5    getting involved with the probation requirements, and my

6    client just said it was getting a little too complicated.

7    Q.   Are you still paying him?

8    A.   No.

9    Q.   When did you stop paying him?

10   A.   I would have to -- I don't have the checks here in

11   front of me.  But from my best recollection, I would say

12   probably in December.

13   Q.   Did you make direct deposits to his account, or did

14   you give him checks?

15   A.   I think -- I know some of the deposits I would go to

16   the Bank of Albuquerque, which is associated with the Bank

17   of Colorado, and I would make the deposit there for him.

18   Then it would go to his account here.

19   Q.   Why did you do that?

20   A.   Just go up to the drive-up window.  And I had his

21   account number, and I would deposit a check to his

22   account.

23   Q.   Is that typical that you have account numbers of

24   people that are working for you?

25   A.   I don't have anyone in that category at this point in

1    time.  So I cannot say whether it is typical or atypical.

2    I am not doing -- have not done it with anyone else.  But

3    I haven't -- I don't have any employees, either.  That is

4    what we were trying to avoid, too.

5    Q.   Fair to say that he is the only person whose bank

6    account number you had that you just went and deposited

7    money into?

8    A.   Yes.

9    Q.   Whose idea was that?

10   A.   I think Mr. Wallace.  You know, he was transmitting

11   funds, so he suggested that that is the way we could

12   transmit funds.

13   Q.   That would be his preface?

14   A.   I don't know if it was preference, but it probably

15   had to do with timing, sometimes getting deposit made.

16   Q.   It wasn't your idea, it was his idea?

17   A.   I don't recall for sure.  I think I was pretty much

18   following his lead.

19   Q.   Okay.  What was the source of funds that you gave

20   him?

21   A.   From Imago, the LLC.  There may have been some funds

22   from Aspen Silver Water, the other LLC.

23   Q.   And what was the source of funds to Imago?

24   A.   Either they would be placed in Imago by

25   Mr. Blackwell, or in some cases, I may have placed funds

1    in there for -- and then Mr. Blackwell would reimburse me
2    later.
3    Q.    Was anybody else an owner or have a partial interest
4    in Imago?
5    A.    No.  Mr. Blackwell was the sole owner.  Well, I have
6    to qualify that, though, because when he purchased the
7    property, he purchased the property, and the LLC were
8    created by some other gentleman in Aspen.  And I was not
9    involved in it at that time.  And they may still have some
10   claim of ownership.  Our position is that they have no
11   ownership.  And we have advised them they have no
12   ownership.  But that has not been judicially determined.
13   Q.    Do you know a Mr. Yeager?
14   A.    Yeager?  The name sounds familiar, but I don't.
15   Q.    What about -- were the funds that you transferred to
16   the defendant's account, were they only from Imago, or
17   were they also from the other entities; Silver Water --
18   Aspen Silver Water?
19   A.    They could have been.  It could have been.  I would
20   have to look at the transactions to say.  I don't recall
21   for sure, but they could have been.  But I think most of
22   them probably were from Imago.
23   Q.    So Mr. Blackwell, who decided it was too much trouble
24   to work with this defendant, still allowed you to transfer
25   funds from his Imago account to his personal account for

1    advances; is that your testimony?

2    A.    That is money that -- yes.  And he had not -- at that

3    point in time, said, well, it is too much trouble, you

4    know.  We didn't want to discontinue the relationship with

5    him, but trying to come up with an agreement that would

6    meet the requirements of probation, we just -- that didn't

7    seem to be going anywhere, and we just kind of -- what we

8    decided was we'll kind of go up to the end of the year,

9    and then that's it.

10          And, again, that is from money, though, that

11   he's -- you know, will come out of his advance when the

12   TDRs are sold.

13   Q.    But they haven't been sold yet?  So the owner,

14   Mr. Blackwell, was willing to pay him $1,000, $2,000,

15   $3,000 a month on a contingency that might not

16   materialize; is that your testimony?

17   A.    No.  That contingency will materialize.  Those TDRs

18   will be sold.  There is a market for them.  We are talking

19   about a significant amount of money; much more than what

20   was advanced to him.

21   Q.    Have you been trying to sell them?

22   A.    Say it again?

23   Q.    Have you been trying to sell them?

24   A.    We have had calls on them, but we cannot sell them

25   until we get the final approval from the County, which we

1    do not have at this point.

2    Q.   Mr. Wallace did some work for you in December, fair

3    to say, in which he filed a pleading in connection with

4    the Aspen Silver Water and paid the advance -- at least

5    advance the check for $624; correct?

6    A.   Yes, when he filed the TDR papers.

7    Q.   So he did that for your entity?

8    A.   For the LLC, yes.

9    Q.   Could you please look at -- there should be a book in

10   front of you, Exhibit 24.  And there are tabs towards the

11   end.

12   A.   What tab?  Excuse me.

13   Q.   24, sir.

14   A.   I am looking at Exhibit No. 24.

15   Q.   Very well.  Do you recognize the e-mail from Ray

16   Wall?

17   A.   That would be from me.

18   Q.   Yes.  Do you recognize that?

19   A.   I see my name, yes, on it.

20   Q.   Is this your e-mail?

21   A.   Huh?

22   Q.   Did you make this e-mail?  Did you send this e-mail?

23   A.   I am trying to see what the -- it says from.  It is

24   from me.  So I would not deny that.

25   Q.   Well, is that your e-mail address,

1      judgewall@gmail.com?

2      A.    Yes.

3      Q.    And this Is dated December 2, 2011?

4      A.    Yes.

5      Q.    Did you send -- you don't recall sending this e-mail?

6      A.    No.  But I don't dispute I sent it.

7      Q.    Does it look like your e-mail address?

8      A.    It is, yes.

9      Q.    Let's look at the next pages of the same document.

10     If you would turn forward through the pages.  The first

11     page is a check.  Do you see that?

12     A.    I see the check, yes.

13     Q.    Is that your check?

14     A.    Yes.

15     Q.    Is that your signature?

16     A.    Yes.

17     Q.    Did you write the check?

18     A.    Yes.

19     Q.    On what account is it drawn?

20     A.    That was Imago.

21     Q.    I notice that this doesn't have -- this is like a new

22     check.

23     A.    Yes, it is some that when --

24     Q.    Without a return address; correct?

25     A.    -- these were checks that when the account was

1    opened, the bank gave to us that didn't have the Imago

2    address or anything on it.

3    Q.    And the next check, is that your signature also, page

4    3?

5    A.    I am looking at page -- the Bank of America check?

6    Q.    Yes.  The pages are down in the bottom right-hand

7    corner circled.

8    A.    Oh, I see it.  Page 3.

9    Q.    Is that your signature?

10   A.    Yes.

11   Q.    And on what account is that drawn?

12   A.    I would have to see -- I can't see that account

13   number, but I would have to match up the account numbers.

14   But I think that would be from Imago.

15         THE COURT:  All of these checks are the same

16   account.  Because we have to speed things up, they are all

17   account number, matching up to the first check, which is

18   439004264691.  I would assume that all of these checks are

19   drawn, although they have no indication of who the account

20   holder is or an address, are all drawn, based on

21   Mr. Wall's testimony, from the Imago account.

22         MS. KAUFMAN:  Thank you.

23         THE COURT:  We need to move it along.

24   Q.    (BY MS. KAUFMAN)  Did you ever receive any funds from

25   anyone other than your client, Mr. Blackwell, or one of

1   his entities, to relay to or send to or deposit to

2   Mr. Wallace?

3   A.   Not that I recall.

4   Q.   Well, would that be something that you would recall?

5   A.   You know, I rely on accounting and not my memory.

6   And I do not recall.  It would not be -- you know, I am

7   fairly certain it didn't happen.  But, again, the

8   documents would be the final say on that.

9   Q.   So you can't say for sure that someone didn't give

10  you money to pass on to Mr. Wallace?

11  A.   I can say that for sure, yes.  No one gave me money

12  to pass on to Mr. Wallace.

13  Q.   Can you say for sure that nobody put money into this

14  account to pass on to Mr. Wallace?

15  A.   Not -- for that purpose, no.  I can say that did not

16  happen.

17  Q.   What do you mean, "for that purpose"?

18  A.   You mean just to be a conduit?

19  Q.   Yes.

20  A.   Just to get money to Mr. Wallace, no, that would not

21  happen.

22  Q.   So all of the money -- the source of all of this

23  money, from your testimony, is your client, Mr. Blackwell?

24  A.   Yes.

25          MS. KAUFMAN:  One moment, Your Honor.

1           Thank you.

2           THE COURT:  Any redirect?

3           MS. PIERCE:  Your Honor, just briefly.

4                        **REDIRECT EXAMINATION**

5    **BY MS. PIERCE:**

6    Q.   With regard to the December 5th filing in Aspen, did

7    you consider him to be working for you on that day?  Did

8    you consider that to be work?

9    A.   I just simply considered it something that we needed

10   to get done right away.  And he was there and available,

11   and I asked him to do it.  I didn't really contemplate

12   whether that was a violation of, you know, probation or

13   anything.  I really didn't think about that.  That is

14   probably my fault.

15          MS. PIERCE:  Thank you, Your Honor.

16          THE COURT:  All right.  Thank you very much, you

17   may step down.

18          May this witness be excused?

19          MS. PIERCE:  Yes, Your Honor.

20          THE COURT:  Thank you very much, you may be

21   excused.

22          Who will your next witness be?  Ms. Pierce, who is

23   your next witness?

24          MS. PIERCE:  We are getting him.

25          THE COURT:  Who?

1          MS. PIERCE:  Mr. Phil Theune.

2          COURTROOM DEPUTY:  Please raise your right hand.

3          Your attention please.

4                          **PHILIPP THEUNE**

5    having been first duly sworn, testified as follows:

6          COURTROOM DEPUTY:  Please be seated.

7          Please state your name, and spell your first and

8    last names for the record.

9          THE WITNESS:  Philipp Charles Theune.

10   P-H-I-L-I-P-P, Charles, standard spelling, last name

11   T-H-E-U-N-E.

12                     **DIRECT EXAMINATION**

13   **BY MS. PIERCE:**

14   Q.   Mr. Theune, what do you do for a living?

15   A.   I am an attorney.

16   Q.   And how long have you practiced?

17   A.   Just over 20 years.

18   Q.   And how do you know Mr. Wallace?

19   A.   I met Mr. Wallace in approximately 1993, just after I

20   started practicing.  He became a client.  And I have known

21   him and represented him and his family in various things

22   over the last 20 years.

23   Q.   And did there come a time where Mr. Wallace became

24   employed by you?

25   A.   There did.  After he was released from Englewood, the

last revocation, he needed a job, and he came to work for
me at my law office as a runner or gofer, if you would
like.

Q.    And how long did he work for you?

A.    I would have to say close to 6 months, around about.

Q.    And where was he living at the time?

A.    He was living in my house.

Q.    And did he receive mail at your house?

A.    He did.

Q.    Now, in your dealings with Mr. Wallace, have you
become familiar with his work ethic?

A.    I have.

Q.    And have you become familiar with his personality?

A.    I have.

Q.    Could you describe his work ethic?

A.    I believe Mr. Wallace has a good work ethic, although
sometimes a little scattered.  Sometimes his focus is not
necessarily on what I wanted to have done.  But sometimes
he doesn't -- sometimes he doesn't understand the focus
that I want to have on a project.  Although he works very
hard, and when we do finally get across the point, he
works very hard on that.  He is a hard worker, but
sometimes unfocused.

Q.    And do you have an opinion about his communication
skills?

1    A.    Communication?

2    Q.    Sharing information.

3    A.    Again, Ron shares information, although sometimes I

4    don't think it is the information necessarily that you are

5    looking for.  Ron, having known him for 20 years, both as

6    a friend and recently as an employer and, of course, for a

7    lot of that time as a client, as well, Ron is, I would

8    say, a little different than most people.  He's -- when

9    you deal with certain things, he's very detail oriented,

10   for instance, in his business dealings with wine.

11            I mean, he knows more about wine than most people

12   have probably forget over the course of his life.  But

13   there are other things he is very unfocused about, and he

14   has detail problems in a lot of areas dealing with details

15   and keeping focused on what he should be focusing on, in

16   my opinion.  But in some areas, he's extremely focused, as

17   I say, in some things.

18            I am not sure, as far as communication goes,

19   sometimes I'm not sure that Ron actually hears what is

20   said to him the way most people would understand it.

21   Sometimes he hears --

22            MS. KAUFMAN:  Objection, lack of foundation.

23            THE COURT:  Sustained.

24   Q.    (BY MS. PIERCE)  Well, you've had experience in

25   communicating with Mr. Wallace?

1    A.   Mr. Wallace and I have communicated a great deal over

2    the last 20 years.  I have known him for a great deal.  I

3    have represented him in several different areas.  He's

4    lived in my house for extended periods of time.  I've

5    stayed at his house when I go up to the Aspen area in the

6    past years.  Sometimes we worked very closely together on

7    projects for long periods of time.  So I think I do have a

8    great deal of foundation as to his communication skills.

9    Q.   Did you have the occasion to give him instruction on

10   occasion?

11   A.   I have.

12   Q.   And what did you observe when you gave him

13   instructions?

14   A.   That you have to be extremely pointed and detailed in

15   what it is you are looking for so that he and you are on

16   the same page.  If you leave things open to

17   interpretation, you will not get the result that you are

18   looking for.

19   Q.   Have you had the occasion to observe Mr. Wallace

20   during his probation this last go around, or during his

21   supervised release?

22   A.   I have had occasion to observe him since he has been

23   placed on probation originally.

24   Q.   And have you had the occasion to observe him trying

25   to comply with probation or his attempts to comply with

1    probation?

2    A.    I have, because he worked in my office and lived in

3    my house for an extended period of time, trying during

4    that period.

5    Q.    And what did you observe?

6    A.    That Mr. Wallace tries very hard to comply, but I

7    think, as I said, sometimes he misses the details.  He's

8    very focused on repaying -- paying his restitution.  But

9    sometimes I think that overrides everything else that he

10   does.  He's trying so hard to comply with restitution, I

11   think that sometimes he maybe loses focus on smaller

12   things.

13   Q.    Have you observed Mr. Wallace failing to disclose

14   income of any kind?

15   A.    I have never known him to fail to disclose his

16   income.

17          MS. KAUFMAN:  Objection, lack of foundation.

18          THE COURT:  Sustained.

19   Q.    (BY MS. PIERCE)  You paid Mr. Wallace; correct?

20   A.    I did pay Mr. Wallace over a course of time for work

21   he did for me.

22   Q.    Did you always pay him with a paycheck?

23   A.    I am not sure I understand exactly what you mean by

24   that.  If you are asking me if I paid him with a paycheck

25   that had taxes deducted and a W2 situation, in the

1    beginning, there may have been one or two checks that were

2    not that way.  Then once I got a payroll system set up in

3    my office, he did get paid that way.

4    Q.    Were there occasions where he had expenses that

5    needed to be paid?

6    A.    Where he did?

7    Q.    Yes.

8    A.    That -- yes, there were situations.  I remember one

9    time, I think his wife needed a transmission fixed on the

10   Volkswagen, and I let him use my credit card, or I phoned

11   my credit card up to the garage and asked them to allow

12   that to happen.  I think another time he needed to

13   register his car, and I let him use my company debit card

14   for that.

15          MS. PIERCE:  Your Honor, I think I am about done.

16          No more questions, Your Honor.

17          THE COURT:  All right.  Cross-examination?

18          MS. KAUFMAN:  No questions, thank you.

19          THE COURT:  All right.  Thank you very much.  You

20   may step down.

21          THE WITNESS:  Thank you.

22          THE COURT:  How long is Mr. Wallace's testimony

23   going to take do you anticipate?

24          MS. PIERCE:  Probably about 20 minutes, Your Honor,

25   I hope.

1      THE COURT:  I don't think my staff had planned on

2  it.  Is everybody available Monday morning at 9 o'clock?

3      MS. PIERCE:  Your Honor, I have an 8 o'clock in

4  Jefferson County.

5      THE COURT:  When do you think you will be done with

6  that?  Unfortunately, I have a trial next week that is

7  gone, so I am pretty much open.

8      MS. PIERCE:  I turned my phone off, Your Honor.

9  Your Honor, I am available in the afternoon.

10     THE COURT:  All right.  We can do it beginning at

11  1:30?

12     MS. KAUFMAN:  Fine.

13     THE COURT:  All right.  So let us continue this

14  hearing until 1:30 Monday, April 16th.  And we will hear

15  from Mr. Wallace, and then I will hear brief argument from

16  the parties, and then we will conclude at that point.

17     MS. KAUFMAN:  Thank you.

18     THE COURT:  All right.  Thank you very much.  Court

19  will be in recess.

20     (Court is in recess at 4:32 p.m.)

21

22

23

24

25

1

2           R E P O R T E R ' S   C E R T I F I C A T E

3

4           I, Darlene M. Martinez, Official Certified

5   shorthand Reporter for the United States District Court,

6   District of Colorado, do hereby certify that the foregoing

7   is a true and accurate transcript of the proceedings had

8   as taken stenographically by me at the time and place

9   aforementioned.

10

11

12

13          Dated this 7th day of May, 2012.

14

15

16

17          _____

18          s/Darlene M. Martinez

19          RMR, CRR

20

21

22

23

24

25