1        IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2

Criminal Action No. 08-cr-00409-CMA
3

UNITED STATES OF AMERICA,
4

5        Plaintiff,

vs.
6

RONALD PHILLIP WALLACE,
7

8        Defendant.
_____

9

                  REPORTER'S TRANSCRIPT
10       SUPERVISED RELEASE VIOLATION HEARING, DAY 2

11  _____

12        Proceedings before the HONORABLE CHRISTINE M.

13  ARGUELLO, Judge, United States District Court for the District

14  of Colorado, commencing at 2:02 p.m., on the 16th day of April,

15  2012, in Courtroom A602, Alfred A. Arraj United States

16  Courthouse, Denver, Colorado.

17
                          **APPEARANCES**
18        LINDA KAUFMAN, Assistant United States Attorney, 1225

19  17th Street, Suite 700, Denver, CO  80202, for plaintiff.

20        LYNN PIERCE 720 Kipling Street, Suite 201, Lakewood,

21  CO  80215, for defendant.

22

23

24  Proceeding Reported by Mechanical Stenography, Transcription
            Produced via Computer by Kara Spitler, RMR, CRR,
25        901 19th Street, Denver, CO, 80294, (303) 623-3080

P R O C E E D I N G S

(In open court at 2:02 p.m.)

THE COURT:  You may be seated.

Back on the record in case no. 08-cr-00409-CMA, encaptioned United States of America vs. Ronald Phillip Wallace.

Counsel, would you enter your appearances.

MS. KAUFMAN:  Good afternoon.  Linda Kaufman for the United States.

THE COURT:  Good afternoon.

MS. PIERCE:  Good afternoon, Your Honor.  Lynn Pierce appearing on behalf of Mr. Wallace, who stands next to me.

THE COURT:  And who is half an hour late.  This hearing was scheduled to start at one-thirty, not two o'clock.

MS. PIERCE:  Your Honor, I wish to offer his apology and my apology, and I-70 was closed because of an accident.

THE COURT:  And why was I not informed of this earlier as opposed to when the hearing was supposed to start?

MS. PIERCE:  When I came in, I advised the courtroom deputy that --

THE COURT:  At one-thirty.  If it had been closed for two hours, we should have had notice an hour and a half before the hearing.

MS. PIERCE:  He was hoping to get here at one-thirty. Unfortunately it took longer than expected.

1           THE COURT:  All right.  You may be seated.

2           I believe we left off, Ms. Pierce, it was your

3  presentation of evidence.  You may call your next witness.

4           MS. PIERCE:  Yes, Your Honor.  Thank you, Your Honor.

5           Call Mr. Wallace.

6           THE WITNESS:  Is it okay if I bring this up there?

7           THE COURT:  You may take it up if you wish.

8           THE COURTROOM DEPUTY:  Your attention, please.

9                 (**RONALD WALLACE, DEFENDANT, SWORN**)

10          THE COURTROOM DEPUTY:  Please be seated.

11          Please state your name and spell your first and last

12  names for the record.

13          THE WITNESS:  Ronald Phillip Wallace, R-O-N-A-L-D

14  W-A-L-L-A-C-E.

15          THE COURT:  You may proceed.

16          MS. PIERCE:  Thank you, Your Honor.

17                        **DIRECT EXAMINATION**

18  BY MS. PIERCE:

19  Q    Mr. Wallace, where do you live right now?

20  A    In Snowmass Village, Colorado.

21  Q    And when did you live there?

22  A    November 1 -- the end of October, first of November, 2011.

23  Q    Now, you are -- you have reviewed the complaint --

24  A    Uh-huh.

25  Q    -- regarding your violations for supervised release.

1  A    Correct.

2  Q    Correct?

3       And with regard to the first one, the failure to

4  follow instructions with regard to your employment with

5  Mr. Theune, have you reviewed that?

6  A    Yes.

7  Q    And can you describe what you are -- what you think was

8  going on the first few months of your employment with

9  Mr. Theune?

10 A    I worked for Mr. Theune in -- when I was released to

11 probation in April, May, and June.  That is full-time.  And he

12 paid me with payroll checks.  I was working as -- like his

13 receptionist, personal assistant, executive assistant.  And

14 they had some payroll glitches on cutting checks on their

15 payroll, so my checks weren't -- I believe one of them or two

16 of them were paid with company checks rather than payroll

17 checks.  But --

18 Q    Did you disclose your income?

19 A    Yes.  100 percent.

20 Q    And did you ever have any discrepancy that you noticed with

21 regard to your reports and the documentation?

22 A    No.  There was no discrepancy in the income I reported was

23 100 percent exactly what I made.

24 Q    Were there occasions, looking back at this, that you might

25 have been missing some checks, copies of checks that were

1  delayed?

2  A    The -- some of the information, if there was a problem with

3  having a copy of it, I supplied within a number of weeks

4  afterwards so there was copies of everything.  However I was

5  paid, whether it was the regular payroll or the company check,

6  but all of that was supplied.

7  Q    Did you ever fail to report any income at any point during

8  your supervised release?

9  A    No.  Not at all.  Just the opposite.  100 percent

10 transparency, literally every nickel that I received.

11 Q    Taking you back to September in your supervision -- first

12 of all, what were you doing in July and August?

13 A    I was working for Ray Wall, LLC, doing research for them.

14 Q    And how did you come to be introduced to Mr. Wall?

15 A    Through Phil Theune's office where I worked at, did some

16 work with Ray Wall in their office as well.  And I was

17 introduced because I lived, I lived up in the Roaring Fork

18 Valley for a long time, and I was helpful with information that

19 I had.

20          So in the months of April, May, early June, they would

21 ask for my input and eventually on June 11, Mr. Wall was going

22 to Aspen, and he asked if I could meet him there that day, and

23 that was when I met him was that day.

24 Q    And when you were working with Mr. Theune or Mr. Wall, did

25 you have any contact with any funds of any kind?

1    A    No.  None whatsoever.

2    Q    And you weren't authorized to, to handle any kind of funds

3    that involved the offices or any shareholders of any companies

4    or anything like that?

5    A    Correct.  I had nothing to do with whether it's investors,

6    clients' money, any of those, or sign on any accounts, so, no.

7    Q    So you reviewed the conditions of your supervision, both

8    the original and the subsequent --

9    A    Correct.

10   Q    -- additionals, correct?

11   A    Uh-huh.

12   Q    Were there any inconsistencies in that that you felt?

13   A    I believe no. 2 and no. 6, which I discussed with

14   Ms. Oppenheimer, no. 2 states about having a regular paycheck

15   and like a W-2 or possibly 1099-type of employment.  But then

16   no. 6 describes employment of being self-employed and

17   describing any business accounts I have, so there was a, a

18   little confusion in that, that it could be taken either way.

19   Q    So when you discussed that situation with Ms. Oppenheimer,

20   what was your understanding with regard to what you were trying

21   to do with Mr. Wall?

22   A    Well, with Mr. Wall or just all the employment, seemed like

23   that we were treading on a delicate situation.  We discussed

24   back and forth at length of how to get from point A to point B

25   without an actual firm -- it was -- nothing was -- it was

1  basically like on 1099, as an example, the 1099 question was, I

2  was told that was okay.  But it was a little bit conflict in

3  what it said in no. 2.  But as long as there was full

4  disclosure, it seemed to be that was all right.

5  Q    Did there come a time when Ms. Oppenheimer told you that

6  she no longer wanted you to continue working with Mr. Wall?

7  A    Yes.  On September 9.

8  Q    Okay.

9        And at that point what did you do?

10 A    I told Mr. Wall that I couldn't work with him until they

11 had resolved a working agreement that was approved by

12 Ms. Oppenheimer.  And, and I said that I just, I couldn't work

13 anymore for you.

14 Q    And during that time frame after September 9, did you do

15 any more work for Mr. Wall?

16 A    No, I did not.

17 Q    Did you have any contact with him?

18 A    Yes.

19 Q    What was the nature of that contact?

20 A    He would call me occasionally to ask me questions based on

21 the research that I had done in July and August and early

22 September for them.

23 Q    And what exactly did you do?  Describe what you did in July

24 and August.

25 A    The main thing was is that they had some properties on the

1  back side of Aspen Mountain, a total of 26 different

2  properties.  And they didn't know the value of the ones on the

3  back side of Aspen Mountain.  My job was to figure out if there

4  was possibility of being revenue out of those properties.

5        And so I did the research, a lot of it in Pitkin

6  County, as well as down here, at Phil Theune's offices, because

7  they had a lot of records there.  And I was trying to find out

8  the value or if there was additional development rights and

9  development rights are called TDRs, and I discovered in my

10 research that they have the ability to do at least three TDRs,

11 which meant the properties were worth somewhere in the 600 to

12 $900,000 range.  They originally thought the property was worth

13 a hundred to $200,000.

14 Q   Did you ever have any other contact with a law firm in

15 Denver while doing your research?

16 A   Yes, I did some research for them at a law firm called

17 Steenrod.  It's in the lower downtown area, and they represent

18 the person that sold all the properties to Imago or Ray Wall's

19 client, and they had a tremendous amount of records because

20 that particular person is -- what do you call it --

21 conservancy, or the person has Alzheimer's really bad and so

22 has dementia.

23 Q   Now, again in those job duties, did you have control over

24 any funds or access to any funds?

25 A   No, no funds whatsoever.

1  Q   Now, in taking you back to September and through December,

2  did you get any payments from Mr. Wall?

3  A   Yes.  They paid me in September.  October 15, I believe

4  November 2, and December 2.

5  Q   And what were those payments for?

6  A   They realized that I had made a lot of money for them.

7  Even though they hadn't exercised some of the TDRs, but they

8  realized it was worth a tremendous amount.  They had agreed to

9  pay me 5 percent of whatever that amount was.  They felt that

10 by paying me something -- it was two reasons.  One was they

11 felt that if they -- Ms. Oppenheimer had expressed that she was

12 very concerned that I have consistent income.  So they felt by

13 cutting a check every month, showing that the check would be

14 cut was a good thing.  And that that would look good for them,

15 that they would be complying with what she had asked for.

16        And then besides that, they were looking at not

17 wanting to lose me while I was waiting for my job to be

18 approved.  So -- and they felt that that was inevitable from

19 their discussions with Ms. Oppenheimer.  So they kept cutting

20 me the check, thinking that, well, they're going to owe me a

21 tremendous -- at least $10,000 minimum.  So that if they cut me

22 those checks, that was a way for them to keep me on the side so

23 that I would, once it was approved, I would stay and work for

24 them rather than if they didn't cut me any money at all, then I

25 would have -- I would be looking for other employment at other

places.

Q    Did you disclose all of those payments?

A    Yes.

Q    And were you paying restitution from those payments?

A    Yes.

Q    Now, taking you back to when you first entered a plea in California, Judge Marshall was your judge?

A    Uh-huh.

Q    Did Judge Marshall indicate that there was anything particularly important with regard to your sentence?

A    Paying the restitution was really important.  That was a major part of it.  We had done a proposal in the, at the sentencing of paying $6,000 a month.  It was a proposal based on what my income was at that time as a minimum.  And that was a big factor in my sentencing.  And she was very supportive of the work that I was doing in real estate development at the time in Aspen and that was before the market went south.  So, yes, very much.  So that was a big component and she was very supportive.

Q    When you first started working after your sentence, did you have any problems, with probation or with supervised release?

A    Not my knowledge.  I was on an ankle bracelet for the first 24 months, and I think I got late back to my house once that was 15 minutes late once.

Q    Were you working during that whole time?

1  A   Yes, I was working in the development business in Aspen;

2  but by the end of '07 and '08, we were looking for new

3  projects, and the market kept getting softer.  I was able to

4  pay the $6,000 a month, if I remember correctly, through

5  May 2009, I believe.

6  Q   And do you recall when your supervision was transferred to

7  Colorado?

8  A   In, was it April, May of 2009, right around that area.

9  Q   And did you notice anything changed after that?

10 A   Yes.  I was violated literally the week after it was

11 transferred.

12 Q   And what was your understanding as to why you were

13 violated?

14 A   I believe I was violated for paying my restitution payments

15 late, 'cause I had paid -- I had gotten behind a number of

16 months, and then I had paid five months in advance, and I was

17 told that I needed to pay it monthly like clockwork and that

18 paying large lump sums didn't work out.  And that was the main

19 reason, if I remember correctly, for the violation was that.

20 Q   And at that point no one had challenged your verification

21 of employment?

22 A   No.  None whatsoever.

23 Q   Okay.

24        Now, the second time that you came back to the court,

25 what was your understanding of that violation?

1  A   It was related to my work in that I had not disclosed

2  exactly or the communication between Ms. Dohanic and I was not

3  totally clear, and so my understanding was that she was -- my

4  lack of employment -- and she had a good point -- was that my

5  employment was -- I had, if you want to use the slang term, had

6  drank the real estate tea, and I had believed that the Aspen

7  market was going to come back and come back and I kept thinking

8  in three months, it would get better and better, and at the

9  time I should have looked for some other means of making some

10 income.  Her, I believe, point at the time was that I really

11 needed to pursue that and pursue it sooner, and I hadn't.

12         And then the other part of it was that at that time

13 my, my friend that I was working for, Randy Egan, had set up a

14 real estate business and my father-in-law had paid, basically

15 invested with Randy in that business and Randy paid me a salary

16 so I could pay my $6,000 a month which was very important to

17 me, to make sure I met that.  And it was a poor investment for

18 my father-in-law, because he ended up, you know, not being paid

19 back and losing that money.

20         And then my violation also on that was because I

21 didn't disclose and was not totally transparent, that I should

22 have gone to Miss Dohanic and said to her, you know, here's

23 what's going on, is this okay, can I do that, and I didn't do

24 that.  So.

25 Q   Now, in this latest situation, employment situation, does

1    your father-in-law or anyone else, any other close associate,

2    have anything to do with how you're paid?

3    A    No.  I was -- Mr. Ray Wall and his client, who I know a

4    little bit, he spoke to him a number of times, but I'm not

5    intimately close with him, always dealt with Mr. Wall, I had

6    just met them in the spring, early summer of 2011.  Has nothing

7    to do with any family members of mine or friends or anything to

8    that nature.  Was based on my performance of doing the research

9    work I did that showed increased of income or the potential of

10   income phase-out was inevitable because of the work that I had

11   done.

12   Q    Now, let's talk about your failure to obtain approval or

13   failure to notify of change of address.  Did you at one point

14   have, you know, a residence in Denver?

15   A    Yes.  1521 Steele Street at Mr. Phillip Theune's house.

16   From the time I was released from FCI Englewood, I believe that

17   was April 7, and I had that as a residence.  I kept that

18   residence until the end of October 1 or November of 2011.

19   Q    And why did you keep a residence in Denver?

20   A    I was going back and forth for work I was doing for Ray

21   Wall, and I didn't know for sure until I was approved with my

22   employment exactly what was going to happen with me because

23   with the -- it was a catch 22.  If I didn't have employment

24   approved and income, then it was going to be difficult for me

25   to have a place to live in Aspen.  So I was kind of caught

1  where I kept the address up there, thinking that -- kept the

2  address down here, at 1521, thinking that, you know, well, I

3  plan on moving to Aspen, I plan that it was going to get

4  approved, but I didn't want to -- well, I couldn't really move

5  until I got it approved officially.  So.

6  Q   And were you spending time up there to be with your family?

7  A   Yes.  My estranged wife I guess is the best way to describe

8  it, is, lives there, and my 16-year-old son and my daughter who

9  goes to college in Gunnison, and she's back and forth.  So,

10 yes.

11 Q   Looking back on the communications that you had with the

12 probation department and the conditions of your supervised

13 release, do you have an idea as to how you could comply?

14 A   Yeah.  I think that, that the -- well, first of all, I

15 was -- I was, I think, overall -- gave too much information and

16 was totally transparent, reporting literally every little nook

17 and cranny, whether it was e-mail or notes to the monthly

18 report of everything and anything, asking did I did things

19 okay, where I think I took up an awful lot of time with

20 probation department, not even knowing it until realizing it

21 now, and so I think I was a burden on them.

22        And I believe that Mr. Wall has suggested a -- just

23 today sent a letter to the court that a system of how to make

24 this work where I would have my employer literally reporting

25 whether it's to the court or to probation department so that

1  there was total transparency and it would come from my employer

2  and something to that nature, which I think would work well and

3  also being paid as a W-2 employee from that employer.

4  Q   Now, you have two children?

5  A   Yes.

6  Q   And are -- how old are they?

7  A   16 and 18.

8  Q   And where are they right now?

9  A   Torren today is in British Columbia, but he lives in

10 Snowmass Village at the condominium there.  And Saren lives in

11 Gunnison at the dorm there.  She's a freshman at Western State.

12 Q   And is your son involved in professional skiing?

13 A   Yeah.  He's on the U.S. Olympic team and the U.S. ski team.

14 Q   And is he going to be in the next Olympics?

15 A   Yeah, he's there for free skiing, half pipe, he's there,

16 no. 1 in the world rank, and he's their hope for a gold medal.

17 Q   And do you play a significant part in his life as far as

18 him dealing with his, his, his skiing and his, his, all of his

19 schooling that he needs to have?

20 A   Yeah.  His education is really complicated because he

21 travels so much.  So I work closely with Aspen High School,

22 with a tutor, and he does on-line school as well as, through

23 BYU, and I work closely with him with that.  Just it's an

24 enormous amount of work, and he's -- his travel schedule is

25 just intense.  So to get the schooling in, to make sure that he

1  can get through high school properly, yes, it takes -- it's a

2  big job.

3  Q    During the period of time that you were under the

4  supervision of Ms. Oppenheimer, or Ms. Dohanic, did you try to

5  comply with the conditions of your supervised release?

6  A    Yes.  I did everything I could.  I thought that I was

7  complying.  I had no -- I've seen in a number of these reports

8  here, I state in the closing of them, you know, is there

9  anything I've done wrong, is there anything I can do to

10  improve, and I constantly asked verbally or in writing that.

11  And I had believed that I hadn't done any violations at that

12  point, and so from the -- and I think there are warm e-mails,

13  or at least my side, being very open and embracing.  I felt

14  that things were very positive.

15          So from my point of view, on December 16 when

16  Ms. Oppenheimer called me, I was shocked.  I had no idea that

17  when she said I was being violated that -- what I was being

18  violated for, and I stated that very clearly, that I just what

19  was it for, how could I be violated because I had no idea I had

20  done anything wrong.

21  Q    Is there anything else that you think is important for the

22  Court to know about your efforts to comply with the probation

23  department that I haven't asked you?

24  A    No.  I think that, you know, basically I've done everything

25  I could to work with them.

1    I have, you know, Crohn's disease, but also got

2  cellulitis this winter and spent two weeks in Aspen hospital

3  getting i.v. and antibiotics, and that lingered on for three or

4  four months, so it's been health-wise a lot of work, and most

5  of the things that I've done for my health is that I do a lot

6  of meditation, lots of exercise, and a very careful diet which

7  has changed my Crohn's disease considerably because of working

8  so hard on that.

9    And I have to take this last summer a drug called

10 Prednisone which is an old-fashioned steroid that sometimes

11 they give people for arthritis or allergies, but it has

12 terrible side effects, and I had to take a high dose of that

13 for almost six months.

14    And so -- but -- and the only other thing I can think

15 of is just that the situation was described at FCI Englewood

16 for me with my Crohn's disease was much different than that

17 they had described to whether it was Ms. Oppenheimer or

18 Ms. Kaufman.  The treatment that I got, as one example, is they

19 use a 2-inch needle with iron four days a week that is a very

20 archaic way of giving an iron infusion to someone, so I have

21 big scars in my rear end from that; and it was very painful,

22 whereas they could have just done iron infusions like they do

23 at chemotherapy places.  That's the normal way to do that, to

24 have someone -- because I bleed internally because of the

25 Crohn's and I lose iron.

1        And so that's just one example, and I can go into many

2    more; but my situation there, I had lost 50 pounds in the first

3    two weeks I was there, and the only reason I survived as well

4    as I did was diet, meditation, and exercise.

5        MS. PIERCE:  Those are my questions, Your Honor.

6        THE COURT:  Miss Kaufman.

7                        **CROSS-EXAMINATION**

8    BY MS. KAUFMAN:

9    Q   Good afternoon, Mr. Wallace.

10       You never filed any reports of mistreatment, medical

11   mistreatment, while you were in prison the last time, did you?

12   A   I complained --

13   Q   Did you file --

14   A   -- to management.

15   Q   Excuse me.  Did you file any reports?

16   A   I don't know how the reports.  I did complaints, but I

17   don't know that there's a specific --

18   Q   You haven't reported that to the court, have you?

19   A   No, I was actually threatened by a person named, is it

20   Ippilito, who is the medical director there that if I was to

21   complain any farther, that they would put me in a cage, which

22   they did for 24 hours, a metal cage that they only gave me a

23   tin can and it was on a cement floor, and so to be exact, they

24   intimidated me and I was intimidated.

25   Q   Who was that person that made that threat to you, sir?

1  A    Ippilito.

2  Q    What's his first name?

3  A    I believe Mark.  He was the medical director.  He's a

4  physician's assistant.  He's not an M.D., but he was the

5  medical director at FCI Englewood.

6  Q    So are you saying that when Dr. Pelton told probation

7  department that in fact you had done better while you were in

8  custody the last nine months, he was just lying?

9  A    Done better.  What -- please describe to me what "better"

10 is.

11 Q    Are you saying that when Dr. Pelton told probation that you

12 improved your condition with Crohn's while in custody, are you

13 saying that he was lying to her?

14 A    No.  I'm saying that my condition did improve there, but in

15 spite of the way that I was treated.

16 Q    All right.

17       So your condition did improve while you were in the

18 facility?

19 A    Correct.

20 Q    I take it from your testimony that you thought you were

21 complying throughout this whole period of supervised release

22 and the period of time that we're looking at here, April

23 through March of the last year; is that your testimony?

24 A    I believe that on April or is it -- the latter part of

25 April, I was told that I didn't comply when I had reported

1  being pulled over on I-70 like four or five days afterwards and

2  I was told that I had to do that within three days, I believe.

3  And I was told that I wasn't complying then.

4         And then the next time that I was told that, that if I

5  didn't do -- stop working for Imago, on the 9th of September,

6  that then I would be in noncompliance and that I needed to stop

7  working for them.  And so that was the next time that that was

8  stated to me.

9  Q    How old are you, sir?

10 A    That's what?

11 Q    How old are you?

12 A    55.

13 Q    And as I understand it from reading the report from

14 California, you ran a company called Rare Wines LLC?

15 A    Yes.

16 Q    And that was from 199- -- opened in '94, and you ran that

17 until about 2003; is that correct?

18 A    Approximately.

19 Q    And you had employees working under you at that time?

20 A    Yeah.  Varied from seven to 19 employees.

21 Q    And that involved advertising rare wines and futures in

22 wines, both throughout the United States?

23 A    Worldwide and it was two different businesses under one

24 umbrella.  One selling Bordeaux futures and one selling old

25 rare wines.

1   Q    You understood, then, the conditions that were read to you

2   in April of 2011, that you were not to obtain employment until

3   that employment was approved by the probation department?  Did

4   you understand that condition?

5   A    Yes.

6   Q    Your testimony is that you did not do any work whatsoever

7   for Mr. Wall, Mr. Blackwell, or Imago after September 9?

8   A    Correct.

9   Q    But you knew before September 9 that you were not supposed

10  to work with them without approval, correct?

11  A    I felt that I had approval.  I had, in many instances,

12  communicated with Ms. Oppenheimer and there is e-mail after

13  e-mail and monthly reports that, as well as the meeting on

14  September 5 that are not -- July 5 that, that I was working and

15  I said -- stated that I wanted to do this work and she said, go

16  for it.

17          And so, no, I did not get in writing an official

18  approval, but I had stated very clearly many, many times that I

19  was doing this research project for these people and that we

20  expected to have a contract by the 20th through the 23d of

21  August and that didn't happen, and ultimately she gave the

22  ultimatum on September 9 to -- that without a contract, an

23  agreement that she approved, that it couldn't go on any

24  farther.

25  Q    You indicated, Mr. Wallace, that -- I'm looking at

1  Exhibit 1.  Would you turn to that, please.

2  A    Uh-huh.

3  Q    Exhibit 1 in the book before you.  Page 5.

4  A    Yes.

5  Q    Your testimony is that no. 2 condition and no. 6 condition

6  of the additional conditions are contradictory?

7  A    I'm sorry.

8  Q    Page 5.

9  A    Exhibit 1, what page?

10 Q    Additional conditions of supervision.  I believe it's on

11 page 5 of Exhibit 1.

12         Is that your testimony, that those are the two

13 conditions that are inconsistent?

14 A    There is a bit of a conflict there because no. 2 implies

15 one type of work and no. 6 implies that access to all and any

16 business records, client list, and other records pertaining to

17 operation of any business owned in whole or in part by the

18 defendant, and this was specifically Ms. Oppenheimer brought

19 this to my attention.

20 Q    You didn't own Imago, did you?

21 A    No.

22 Q    All right.

23         So that paragraph 6, then, didn't apply to you, did

24 it?

25 A    It implies to other types of employment and --

1  Q   You did not own any -- have any ownership interest in

2  Imago, did you?

3  A   No, I did not.

4  Q   Therefore, you were not working for yourself, correct?

5  A   I did not work for myself.

6  Q   Please look at Exhibit 9, page 9.

7  A   Yes.

8  Q   And that's a check that you wrote in December of 2011,

9  correct?

10 A   Correct.

11 Q   And that relates to the TDR for Aspen Silver Water?

12 A   Correct.

13 Q   And that relates to a filing that was filed on that date,

14 correct?

15 A   Yes.

16 Q   By you, correct?

17 A   I dropped off the check.  It was actually filed by

18 Mr. Wall.

19 Q   Did he mail it in?

20 A   No.  I believe it was electronically done.

21 Q   He didn't come with you when you delivered the check and he

22 delivered the report?

23 A   No, because they can do everything electronically in Pitkin

24 County.  Just not the check.

25 Q   I'd like to show you what's been marked as Exhibit 29.

1    A    Uh-huh.

2    Q    This is a report that correlates with the check filed for

3    the Aspen Silver Water, correct?

4    A    I believe so.  But I don't know that -- I was asked to drop

5    off a check.  And I did.  And I don't know all the details of

6    this particular --

7    Q    Well, Mr. Wallace, just I'm not asking you if you know all

8    the details.  Do you recognize this as the report that was

9    filed on or about December 5, 2011, in connection with this

10   check.

11   A    This was their filing, correct.

12   Q    And you see --

13           MS. KAUFMAN:  I move for its admission.

14           THE COURT:  Any objection.

15           MS. PIERCE:  Well, I don't know exactly what form this

16   was filed.  I can't tell if it was electronically filed.  I

17   can't tell if it was mailed in.  I think there is an

18   insufficient foundation.

19           MS. KAUFMAN:  He's admitted --

20           THE COURT:  Overruled.  It will be admitted.

21       (Exhibit 29 admitted.)

22   BY MS. KAUFMAN:

23   Q    When you look on the first page, Mr. Wallace, you see where

24   it says "via hand delivery"?

25   A    Yes.

1  Q    Thank you.

2        It's true, is it not, that you told Mr. Wallace to

3  make direct deposits of money into your account?

4  A    I'm sorry.  Could you please state that.

5  Q    It's true that you told Mr. Wall, Wall to make direct

6  deposits into your account?

7  A    I don't recall the exact conversation on how the discussion

8  of how he was going to do it other than the fact that it needed

9  to be in compliance with the probation department.  And to make

10 sure there was lots of documentation.  So I don't recall if I

11 stated, you need to put this into my account this way, direct

12 deposits, or how exactly it was stated.  Ultimately it was done

13 in a way where there was total transparency.

14 Q    Do you recall him testifying on Friday that you're the one

15 that told him to make the direct deposits into his (sic)

16 account?

17 A    I believe he asked me, how should we do this --

18 Q    Excuse me, sir, would you answer the question.  Do you

19 recall him testifying on Friday that you're the one that told

20 him to make direct deposits into your account?

21 A    I don't recall exactly how it was stated.

22 Q    You're not saying, are you, sir, that after September 9,

23 you were uncertain that you were not approved to work for Imago

24 or any, any work associated with Mr. Wall, Mr. Blackwell or

25 Imago or Aspen Silver --

1  A    Correct, I am aware that I was not working for them after

2  September 9.

3  Q    So that after September 9, you started putting on your

4  monthly reports that all money that was coming from them was

5  from work you had done in July and August, correct?

6  A    Correct.

7  Q    You didn't use the phrase that it was an advance.  Is that

8  correct?

9  A    I have to look at every one of the correspondence.  There

10 must be at least 20 of them.

11 Q    Well, we've looked at all of the monthly statements as of

12 Friday.  And you saw them Friday.  Fair that none of them have

13 you saying that it was an advance?

14 A    I did not state in those particular statements you're

15 talking about that this was an advance.

16 Q    Are you saying that you told -- there are other e-mails in

17 which you state it was an advance?

18 A    I don't recall off the top of my head that it was an

19 advance.  It was stated as an advance; I don't know.

20 Q    Well, Mr. Wall came and testified under oath that it was an

21 advance.  Is he . . . whose money is it that you were

22 receiving?

23 A    It was money paid to me that they felt I had earned that I

24 had done and so it was money paid to me from Imago LLC or Ray

25 Wall, I don't know their exact financial dealings; and for work

1  that I had done in July and August, research for them.

2          And they feel that --

3  Q   Are you saying, sir, you don't understand the confusion

4  that you caused the probation department by not clearly

5  identifying the work that you were doing and the source of

6  income?

7  A   On . . . I believe I very clearly stated it in one of the

8  reports here, that made it very clear, so there was no

9  misunderstanding, very specifically about the income so that

10 there wasn't a misunderstanding.  Let me find that one.  'Cause

11 I had highlighted it.

12          On October 5 --

13 Q   What exhibit are you looking at, sir?

14 A   I'm looking at the notes on page 5 --

15 Q   Please look at the exhibit number by the tab.

16 A   Yes.  Getting there.  Exhibit No. 6.  Page 5.  No. 6.  I

17 state very clearly there of exactly work I did, the amount of

18 money expected income, and that's what I was being paid from.

19 Q   This is after September 9, correct?

20 A   You had previously asked if I had said anything to the

21 nature of this and described it during any of this period of

22 time.  And so, yes, this was described as it was in many times,

23 and you just asked that I had never stated clearly if there was

24 an advance or where the money was coming from.  And I am

25 showing you right here on October 5, 2011, very clearly how

1  that is stated.  Unless you don't understand.

2  Q   So what you told probation was in the future, I will have

3  an opportunity to receive my 5 percent when they sell the TDRs,

4  correct?

5        Was that what this money was to come from?

6  A   Yeah.  That was their, as I stated earlier, yes, that's --

7  this is money is coming from that income as they make it.

8  Q   But when you reported your income, you did not say this is

9  an advance on the sale of the TDRs, did you?

10  A   I didn't state it exactly that way.  But I stated what's

11  listed here, no. 6, and I think that's fairly clear, isn't it?

12  Q   That will be to the Court to decide.

13        You haven't mentioned -- excuse me -- the other

14  entity.

15        You were given permission to work for Saint Johns

16  Trust, correct?

17  A   Correct.

18  Q   Do you recall the last hearing we had in this courtroom,

19  sir, June 10 of 2010?

20  A   I recall.

21  Q   And do you recall that one of the conditions that you were

22  deemed to have violated was failure to obtain permission --

23  prior approval for your work?

24  A   Correct.

25  Q   And do you recall saying, and I quote, on that date, I

1  understand exactly what needs to be done now?

2  A    Yes.

3         MS. KAUFMAN:  I have nothing further.  Thank you.

4         THE COURT:  Any redirect?

5         MS. PIERCE:  Just briefly, Your Honor.

6                   **REDIRECT EXAMINATION**

7  BY MS. PIERCE:

8  Q    Do you see any difference between this situation and the

9  last situation with regard to your employment?

10 A    Absolutely.

11 Q    What is the difference?

12 A    The difference last time that I was here was my

13 father-in-law funding a business so I could make -- I wanted to

14 make money so I could pay my restitution, and I didn't disclose

15 that and was not transparent and, and this particular

16 situation, I have been to the other end, totally transparent

17 with declaring every nickel, literally, or if I was given a $20

18 lunch from Phil Theune, it's listed, everything.  Just to an

19 extreme of trying to be transparent, be so honest that there

20 would never be a problem with anything not being honest and

21 transparent.

22 Q    Now, with regard to your employment with Mr. Theune, did

23 you commence that employment as you were getting approved?

24 A    I'm sorry.  Say that again.

25 Q    Did you commence that employment after you were approved or

in conjunction with getting approval?

A    With Mr. Theune?

Q    Yes.

A    I would have worked there when I was in the halfway house, and so when I started April 7, I never, I don't believe she gave me approval officially in writing for another week after that.  But I was working there from the 7th till the --

Q    And you eventually got approval for that?

A    Yes.

Q    And did you eventually get approval for the work at the Aspen Country Day School?

A    Yes.

Q    And did you consider this new employment opportunity to be a similar situation, where you could get approval as you were starting it?

A    Yes.  We discussed this at length, that I was doing research for this on September 5, and I -- I mean July 5.  We discussed at length about what I was doing in July and August. Ms. Oppenheimer was gone from, I believe it was July 12 to August 11, I think was when she was on vacation.  So consequently she was gone for a big period in the middle of that.

         But we discussed it on July 5 of what I was going to be doing and that I would be getting a employment contract of some sort of agreement between the 20th and the 24th of

1  August when the owner of Imago and Ray Wall were supposedly

2  coming to Aspen, that was the plan, but their travel plan

3  changed, and so my initial or what I stated to her, that we

4  would have that, I did everything in my power to do a

5  presentation to Mr. Wall and the owner of Imago so that that

6  could be consummated and could be done on a timely fashion.

7       And I had fulfilled my end of it.  They didn't show

8  up, for a number of reasons.  And obviously I felt terrible

9  because I had made commitments to Ms. Oppenheimer that we would

10 have this between the 20th and the 24th of August, we would

11 have this agreement done.  And I had done everything I was

12 supposed to do, and I kept her in the loop in my July report

13 and early August.  I stated in there exactly what I was doing,

14 very detailed.  So I thought that we were in total

15 communication with this.  I had no idea that we weren't.  So.

16       There's -- regarding the first part of August with

17 Mr. Saint John, he, he was a client of Ray Wall's, and I had

18 been asked to help with his software company, to do some

19 research for him; but because his software company, we

20 couldn't -- I don't know the description exactly, but I think

21 it's called an -- it's an IP address or it's the intellectual

22 property and we couldn't get a confirmation on that, that he

23 actually had that, so we were put in the position -- we meaning

24 Ray Wall and myself -- that by the end of August, first of

25 September, we had to step back and say -- and he had came to

1  us, whatever it was, the end of July, first of August, saying I

2  need to have you do this right now, do this research; and then

3  it ended up we couldn't do the work for him because he couldn't

4  provide us with an assurance about his software and we felt

5  uncomfortable, so we bowed out at the end of August, so it was

6  a very short-lived time frame, and it's big mistake on my part

7  that I know Ms. Oppenheimer was out of town and I didn't have a

8  contact person, but it still was moot responsibility that I

9  should have contacted supervisor, somebody else and said,

10  here's the situation what's going on, they need me immediately,

11  could you call, could you talk to them, and I didn't do that.

12  And that's my fault.

13            And as it ended up, Mr. Wall credited Mr. Saint John's

14  account, and Mr. Wall is including that $1700 on my 1099 as

15  income from him.  Because he wanted to make the situation

16  right.  But it is my fault.

17            MS. PIERCE:  Nothing further, Your Honor.

18            THE COURT:  All right.  Thank you.

19            You may step down.

20            Anything further?

21            MS. PIERCE:  Not from us, Your Honor.

22            MS. KAUFMAN:  Nothing further, Your Honor.

23            THE COURT:  Do the parties wish to make some brief

24  closing argument?

25            MS. KAUFMAN:  Yes.

1     THE COURT:  Okay.  You may proceed.

2                      **CLOSING ARGUMENT**

3     MS. KAUFMAN:  At this point, what I think is the focus

4  of this hearing is whether or not the defendant has breached

5  the trust of the Court, having been placed for a second time on

6  supervised release and after a prior revocation of probation.

7  I think that the evidence is clear that he has violated the

8  conditions of his supervised release; and frankly, I think part

9  of the analysis here is a credibility issue, and I would state

10  that it's difficult for the Government to place much

11  credibility on this defendant's testimony and I have some

12  issues with his witness Mr. Wall as well, and I'll get to it in

13  just a minute.

14          He was shown substantial, substantial leniency in this

15  case from the outset, having received a probationary sentence

16  on a sophisticated business crime.  It went on for a number of

17  years in which he was selling futures of high-end, select,

18  custom wines Bordeaux and so on and he misappropriated millions

19  and millions of dollars.  The Guidelines calculated at that

20  time even gave him a break of stipulating that the loss was

21  only between 2.5 and 7 million, when it was in fact closer to

22  14 million.

23          And today the restitution I think is still 11 million.

24  There were over 50 victims, people that have suffered because

25  of his very deliberate and very sophisticated fraud.

1    He was then given -- transferred to Colorado, given a

2 chance here; and incredibly, he is now sort of putting the

3 blame on the fact that everything was fine in California but

4 once he hit Colorado, there were difficult people to deal with.

5 He seems to forget that he admitted all of the violations the

6 first time around and was violated on his probation.  He

7 admitted that.  That was proven.  That was 2009.

8    I was here again in 2010, as was this Court and the

9 same probation office, in which he again violated the Court's

10 trust by violating additional terms of supervised release.

11 That year he did not admit, but we put on evidence.  And I can

12 remember very clearly in this courtroom when Mr. Egan was on

13 the stand, and it was only through the Court's own

14 cross-examination as well as mine that we got to the bottom of

15 what was going on and where the source of the money was coming

16 from for the $5,000 a month, quote, unquote, income from

17 Envision LLC to this defendant.  And it turned out, only

18 through cross-examination of Mr. Egan on the stand, that that

19 money was being siphoned, essentially, from his father-in-law

20 to make it all look like he had a job consistent with his

21 probation.

22    He learned a lesson from that.  Mr. Wall, as far as

23 I'm concerned, incredibly testified to the following series of

24 events:  That Mr. Wall has a client named Mr. Blackwell who has

25 a company named Imago that even though there was no W-2

employment and even though there was no 1099 contract signed

between Imago, Mr. Wall, and/or Mr. Blackwell and this

defendant, that they valued his input so highly for a mere

research that he had done in July and August that they

continued to pay him well into the end of the year and I think

maybe even into this year, but the record will clarify that.

That Ray Wall paid him on an account which, in Ray

Wall's testimony, was a new account.  Well, I note that the

checks in that Exhibit 24 start in May of 2011 and they go

through, I think, January of 2012, and yet the series numbers

of those checks are all within a short number, 997, 998, 999.

Apparently they were using that, quote, unquote, new account

only for checks to Mr. Wallace.  No wonder we're suspect.  I'm

more suspect, I think, than anybody about the source of that

money.

And incredibly, from the Government's position,

incredibly, Mr. Wall testified that that was for advances for

something that they had promised this man, a 5 percent return

on the sale -- on the sale of these, I think they're called

TDRs, advances on that, that have not yet been realized by his

client but yet he is using his client's money to pay this man

an advance.

This is -- to expect -- to expect that this person who

has been given conditional release -- he was lucky not to be

imprisoned from 2007 on.  To expect the probation and the Court

to swallow that is ludicrous. The Government doesn't buy it. And the wasted resources that this man has put the probation department and this Court through because he simply refuses, he refuses to follow the rules that were clearly explained to him.

This is a person who I think it is clear from his own testimony today has made it through years of talking, talking, talking. He seems to think that if he is pleasant and polite to probation in his responses, that that's all that matters. We're not in kindergarten. This, this isn't an exercise in who can be more polite. He was told the conditions. He's an intelligent man. He's run a business.

He's -- talk about his character under 3553, his character is manipulative, and I think perhaps the simplest example of that is the very last violation, and that is the violation in which Miss Dohanic had told him in no uncertain terms, meet me on February 8 in a particular place. And it was one of those days that he could show up at any time apparently or number of hours of the day. And what did he do, manipulator that he is, and pleasant as he is, call the next day and say, what time, what day was that, the next day. Of course it was the day before. That is just an example of how this man operates. And I say that because that's a characteristic of this person highly relevant under 3553.

It's ludicrous for him to come in now and say, here's how I think this ought to work, here's how we can make it

right.  I was here June 10, 2010, when he said exactly, as I said in my cross-examination, when he stood here and told the Court, I understand exactly what has to be done now.

The Guidelines, I note 2007, not that this even needs be followed, but just for the Court's information, if the Court hadn't noticed, was 70 to 87 months for the crime.  That included an acceptance of responsibility and a stipulated loss of less than it was.  The issue is not here whether he has maliciously intended to defraud the Court or abuse the Court's trust but whether he knowingly did.  And the burden is by a preponderance of the evidence under the statute.

It is not unusual that people that have been convicted, convicted of white collar crimes are friendly.  That is how they get what they want.  The Court under the law, as we see it, can sentence this man to consecutive time on the seven counts that he pled guilty to many years ago now, under 18 U.S.C. 3584(a), and that's true even if he had been given, and he was given concurrent time, at the time, and even if, and he was given concurrent sentences of supervised release.  Under United States vs. Dees, Third Circuit.

The Guideline here, maximum for each of the seven counts, is nine months per count times seven would be a sentence of 63 months.  The minimum, a sentence of three months per count would be 21 months, or the Court could do anything, anything that the Court deems reasonable up to two years times

seven for each of the counts consecutive under 18 U.S.C.
3583(e)(3). The Tenth Circuit Court of Appeals has set forth
its standard; that is, the Court must make a reasoned judgment
that is reasonable on the record before it. And that would be
the standard of review.

This Court has heard this case for three different
hearings over a period of about four years. And I leave the
ultimate decision as to the sentencing in the Court's sound
discretion.

Thank you.

THE COURT: Miss Pierce.

MS. PIERCE: Thank you.

### CLOSING ARGUMENT

MS. PIERCE: Your Honor, I would argue that the
record's not clear as to what exactly he did to violate his
probation. Or his supervised release. That a lot of the
allegations are, are vague. There was constant contact between
Mr. Wallace and his probation officers and Mr. Wall. And it's
unfair to categorize him just like any other -- to just say
that he's like a typical white collar defendant. That's, I
would argue to the Court that that is unfair to generalize to
that extent; that he has not shown that he is a typical white
collar defendant. He is a level 1 criminal history. He
managed to be adult for quite a long time before he was charged
in this case.

1          He had, he did have a lenient case in the California

2     court.  And I would point out that I don't know how appropriate

3     it is for the U.S. attorney's office to try to undo that by

4     putting him under extreme, you know, extreme microscope is what

5     they're doing.

6          I would argue that he did do well on his supervised

7     release up until the point he came to Colorado.  Now, I'm not

8     saying people are difficult here.  That's not the argument.

9     But it was a different set of expectations, apparently.  And he

10    was given the impression by the sentencing -- the original

11    sentencing court that it was, it was very, very important for

12    him to pay restitution.  That was extremely important.  That

13    was one of the reasons he was given release into the community.

14    And he did do that fairly well for the first year and a half.

15         Then when he had trouble paying his restitution is

16    when he started to get into trouble, and that was in Colorado.

17         THE COURT:  How much he has paid back in restitution?

18         MS. PIERCE:  I think it's about 70,000.

19         THE DEFENDANT:  What's that?

20         MS. PIERCE:  How much have you paid in restitution?

21         THE DEFENDANT:  150,000.

22         THE COURT:  Okay.

23         Over the past five years?

24         THE DEFENDANT:  Uh-huh.

25         MS. PIERCE:  Yes.

1       THE COURT:  Right.

2       MS. PIERCE:  And the incident with the last violation,

3  he really believed that it was more important for him to pay

4  his restitution than the fact that he was working for a company

5  that was an investment company for his father-in-law, you know,

6  technically I think.  He felt like that would be okay with the

7  court.  Understand that that was ultimately not okay.

8       And he definitely gets that he needs to be completely

9  transparent about the source of funds, and that's exactly where

10  we are today.  He was transparent about the source of his funds

11  and employment.  And for several months there was a

12  back-and-forth -- and there's plenty of e-mails in the, in the

13  exhibits to support this -- that Mr. Wall, Mr. Wallace, and

14  Ms. Oppenheimer were communicating back and forth.  And in

15  every time they would try to comply, then there would be an

16  additional requirement or maybe a clarification of a

17  requirement.  Not saying that Miss Oppenheimer acted in bad

18  faith.  I think she acted in good faith.  We're not alleging

19  that.  But it was just a very complicated situation, where they

20  kept trying to conform with her requests and then they would

21  not give her exactly what she wanted.

22       There was also an issue about Mr. Wall being busy and

23  not necessarily paying attention to the situation like he

24  should have.  And I think that was to Mr. Wallace's detriment

25  because he was trying to keep everything together and make sure

that the contract was created and approved by Ms. Oppenheimer.
And they did come up with a couple of drafts of that contract.

Now, the Court had the opportunity to hear
Mr. Wallace' testimony, and I would submit to the Court that he
is not a manipulative person, that he is a little bit
different, he's a little bit scattered in the way he thinks.
Mr. Theune testified knowing him for 20 years that you really
have to be careful when you tell him, give him direction
because you have to be very specific because he tends to be a
big-picture sort of person and sometimes will do everything but
the exact thing you're asking him to do.

And that has been an ongoing issue that he's had with
probably anyone that's dealt with him and given him direction.
But I do think it is relevant whether it's managers, I think
that is relevant because that is relevant as to whether it is
willful.  And I would submit to the Court that he tried to do
everything in his power to comply.  He does have some deficits
in organization.  He does have some deficits in being able to
understand how to structure certain things or tasks that he is
given.

But he is not malicious, and this was not willful.
And it would be unfair to punish him to this extent based on
what the Court has heard in this case.  That he, he was -- made
himself, his whereabouts known at all times, he disclosed every
single piece -- I mean, everything, including lunches that he

might have gotten.  He was so careful to disclose everything

that it was probably very annoying and cumbersome, but that is

just part of his personality and the way that he deals with

information.

Your Honor, I would just ask that the Court consider

him as an individual and a human being and not generalize and

put him in a certain category with other people that the Court

has seen.  I don't think that's fair, 'cause he is an

individual.

Your Honor, he would like to be heard briefly.

THE COURT:  All right.

THE DEFENDANT:  Your Honor, if -- excuse me -- in the

last -- gosh, this been going on a couple years, that when my

credibility was questioned here, was that I was audited by the

IRS, their chief counsel here, for 2000 through 2005.  And on

March 13 -- this is the signed document from their chief

counsel here in Denver, they had originally alleged that I owed

for the 2000 through 2005 $12,000,000 in back taxes.  It came

out through this audit, which was an enormous amount of time

and energy, and I did this all myself, not with attorneys or

accountants, came to the audit where I owed $0, and this

document signed by them says that, and actually ended up with a

tax credit.

And these are really smart attorneys, accountants,

with the IRS; and to do what I did there, for one, it was

1   during those years, 2000 through 2005, where if there was bad

2   things, funny business, whatever you want to call it, it would

3   have come out, and I'm sure they would have told me how much

4   money I owed.

5            As it turned out, it turned out to be the opposite.

6   And Miles Fuller, who is one of the heads of IRS, chief

7   counsel, it's -- I mean, I was grateful that it worked out the

8   way it did.  But I mean, it was a lot of work, and my

9   credibility in the sense, I think, is very high from that.

10           And then when it comes to this whole matter, there

11  is -- I mean, I've been trying to be so transparent with

12  literally anything and everything, and when it came to my work

13  of what I thought that I was doing the right thing with

14  Ms. Oppenheimer, my e-mails back and forth with her until

15  sometime in the fall where, you know, I was sending e-mails

16  telling how grateful I was and how this is working out and how

17  much I like working with her, I had no idea that there was an

18  issue or a problem.

19           And I just, I would like to do whatever it takes to

20  work things out; and Mr. Wall, there's a big opportunity there

21  with him to make a lot of money and it's very legitimate and he

22  would bend over backwards to do whatever it takes with the

23  Court and probation to transparency of, you know, whatever it

24  takes.  And so I just, I would love to have the opportunity to

25  show the Court now that the economy's getting better and that I

1  can do this and that I can pay a lot of money in restitution

2  and do the right thing.  'Cause that's what I want to do.  And

3  just that's the way of life.  So thank you.

**RULING**

5         THE COURT:  All right.

6         There's been substantial evidence presented indicating

7  that this defendant thinks he is not bound by the orders of

8  this Court, and he willfully violates them as he sees fit.

9  This defendant always has excuses for why he has failed to

10 comply with the conditions of his supervised release, and

11 perhaps if this were his first violation, the Court might be

12 more inclined to give him the benefit of the doubt on his

13 fairly incredible stories.

14         But this is not the first violation; this is not even

15 the second violation.  This is the third time this defendant

16 finds himself before this Court for failure to comply with the

17 terms of his supervised release.  Based on this experience and

18 because his testimony is contradicted by the documentary

19 evidence and the testimony of the probation officer, whom the

20 Court found to be very credible, the Court finds that the

21 testimony of the defendant regarding his reporting of

22 information to the probation office is totally incredible.

23         The fact of the matter is that this defendant does not

24 comply with conditions of supervised release when he doesn't

25 feel like it.  Other times he goes through the motions as if he

1  is complying, but he turns in only one information he feels

2  like turning in or he turns in information that is

3  nonresponsive or irrelevant to the information that the

4  probation office has asked him to submit.

5          With respect to the failure to maintain employment and

6  failure to give information to the probation office, the

7  testimony is very clear that this probation officer explained

8  those conditions in detail to this defendant.  Although the

9  defendant claims that he, quote, thought he had approval, end

10  quote, the record is clear that the probation officer never

11  approved any of the employment subsequent to the original

12  employment, and the evidence is also clear that the probation

13  officer never gave any oral approval.  Probation office always

14  informed the defendant that he needed to submit this specific

15  information that was requested.

16          The fact of the matter is that the probation

17  officer -- the fact of the matter is that the defendant did not

18  provide to the probation officer the information that she

19  needed to be able to make a determination as to whether this

20  employment should be approved or not approved.  Although

21  defendant attempts to describe his promises to provide

22  documentation and his failure to comply with those promises as

23  merely overoptimistic statements, throughout the course of the

24  past three years, it's clear to the Court that the defendant

25  avoids compliance by making promises about forthcoming

documentation and never following through or following through

with incomplete or irrelevant information. Furthermore, the

falsification of reports he did submit demonstrates willfulness

of the defendant's conduct.

The defendant was specifically informed that he had to

obtain approval from the probation officer before performing

any work for Ray Wall, Bruce Blackwell and/or Imago LLC.

Defendant's witnesses, Ray Wall testified that most of the work

performed by defendant was done during the summer months,

before August. Yet defendant never submitted the documentation

needed to obtain authorization from the probation officer, and

he proceeded to perform that work, before obtaining the

authorization.

Mr. Wall testified that beginning in August, Mr. Wall

made advances to defendant on future income he was expected to

earn when they sold certain assets, which, according to

Mr. Wall, to this date haven't yet to be sold. In his monthly

reports, the defendant falsely represented these advance

payments for being work performed in July and August. And the

Court would reference Exhibit 6, which dealt with September, a

receipt of $1200; Exhibit 7, October, $3300; Exhibit 8 for the

month of November, $2,109, Exhibit 9 for December, $3,250.

The defendant testified that they agreed to pay him --

I guess Imago or Mr. Wall, or Mr. Blackwell, I'm not sure

whom -- agreed to pay him 5 percent of whatever profit they

might earn on the sale of the TDRs, but I have to see any

documentation of any such agreement. I was waiting for that to

be presented. I didn't see it.

With respect to the second, eighth, and 12th claims,

that he failed to inform the probation officer that he moved,

failed to follow instructions with respect to income received,

and failed to report to the probation officer as directed,

there's always an excuse by this defendant as to why he did not

follow the directions of the probation officer.

Mr. Wall testified that the direct deposits or

transfers of money to Mr. Wallace's account were made at the

direction of the defendant, despite the instruction that he not

receive income via financial institution wire slash intrabank

transfers or deposits into his bank account by other

individuals.

Although defendant does call in either immediately

before or after missing his meetings with the probation

officer, the fact of the matter is that throughout the past

three years that he has been supervised by this court, he has

not made any real effort to comply with the meetings that he

needs to have with his probation officer except, I guess, from

April till this time, he had met with the probation officer

regularly while he was here in Denver. He has wasted both this

Court's time and the probation officer's time, because he has

simply not taken seriously his conditions of supervised

1  release.

2          I find incredible the argument that the defendant's

3  brain just functions differently from everybody else's.  If it

4  were that nonfunctional, no one in their right mind would be

5  willing to pay him as much as he has been paid purportedly for

6  consulting or research.  Whatever that means.  In terms of the

7  work that he's done.  Defendant has not submitted the required

8  information or he submits only sketchy and incomplete and

9  irrelevant information because he does not want to be monitored

10 by the probation officer.

11         Based on the evidence presented via both the verified

12 petition of the probation officer and the testimony of the

13 probation officer, the Court finds that the Government has

14 established by a preponderance of the evidence that the

15 defendant knowingly violated the conditions of his supervised

16 release as alleged in the probation officer's petition with

17 respect to the following violations.  And I group them not in

18 the order that they are, but according to the substance of

19 those.

20         So under employment violation, no. 1, he failed to

21 follow the instructions of the probation officer to provide

22 verification of his employment and income for June 2011 and

23 July 2011, a grade C violation.

24         3.  He failed to obtain approval from the probation

25 office for contract employment with Ray Wall and/or Bruce

Blackwell and/or Imago -- and that's I-M-A-G-O -- LLC, in or about July of 2007 and August 2011, a grade C violation.

4.  He failed to obtain approval from the probation officer for employment, contract employment, with Saint Johns Trust on or about July 2011 and August 2011, a grade C violation.

5.  He failed to follow instructions of the probation officer that he provide verification of all income and moneys received for August 2011, September 2011.  Actually, I think there was a change on that one.  Hold on.

Actually, no, I already made the change, and it was not to that.

So, 5, he failed to follow instructions of probation officer that he provide verification of all income and moneys received for August, September, October, November, and December of 2011, grade C violation.

6.  He failed to follow instructions of the probation officer that he provide verification of his employment and income from Aspen Country Day School, Aspen, Colorado, for September, October, November, December 2011, a grade C violation.

7.  He failed to work regularly between July 2011 and March 12, 2012, a grade C violation.

9.  He failed to obtain approval from the probation office for employment with Ray Wall and/or Bruce Blackwell

and/or Imago, LLC, and/or Aspen Silver Water, LLC, in

December 2011 through January 27, 2012, a grade C violation.

        10.  He falsified monthly written supervision reports

by submitting on or about November 5, December 5, and

December 29, 2011, monthly written supervision reports for the

months of October, November, and December 2011, respectively,

which indicated that he received income from Imago, LLC, during

those months for work he performed in July 2011 and August 2011

when in fact he received income from Imago, LLC, and/or Aspen

Silver Water, LLC, and/or Ray Wall and/or Bruce Blackwell

during those months, as advances apparently now, for a

5 percent contract that he somehow is entitled to receive

advances for, just despite the fact that the property has not

yet, to this date, been sold.

        11.  He failed to follow instructions of the probation

officer to search for full-time employment by applying for no

less than 18 jobs per week and provide verification of his

employment search.

        Other violations.

        2.  He failed to notify the probation officer at least

ten days prior to his moving from 1521 Steele Street, Denver,

Colorado, to 26 Smith Loop, Apartment A2, Carbondale, Colorado,

on or about August 1, 2011, a grade C violation.

        8.  He failed to follow instructions of the probation

officer that he not receive income via financial institution

wires slash interbank transfers or deposits made into his bank

account by other individuals between November to December 2011,

a grade C violation.

12.  He failed to report to the probation officer as

directed on February 8, 2012, a grade C violation.

The Court finds that all of these conditions of

supervised release have been violated and that all of these

violations are grade C violations.  The defendant's

criminal-history category is I, which results in a range of

imprisonment of three to nine months, under the policy

statements issued by the Sentencing Commission.

At this time I will hear argument with respect to what

sentence should be imposed.

Ms. Pierce.

MS. PIERCE:  Your Honor, I would argue that he should

have a sentence at the bottom of the Guideline range and that

given that he has been on, you know, attempting to pay

restitution and has made a fairly substantial payment towards

restitution, that the Court should consider and that that also,

Mr. Wallace is a unique individual and I think would be unduly

harsh to send him to prison for the higher end of the Guideline

range, just unnecessary under the circumstances.

I would ask that the Court sentence him to three

months and then release him.

Thank you.

1          THE COURT:  All right.

2          Miss Kaufman.

3          MS. KAUFMAN:  Well, under 3553, that would really not

4   be showing much respect for the criminal justice system, since

5   he's already served nine months the last time he was revoked.

6   I think that this case, because of the repetitive nature of

7   this, I mean just hearing him on the stand today, makes it

8   clear that his MO is exactly as the Court has indicated in its

9   ruling, and that is that he floods, he floods the record, he

10  floods the probation office with words and documents that will

11  talk around in circles but avoid just complying with the

12  conditions.  He is wasting everybody's time, and I'll throw in

13  the U.S. attorney's office's time in that as well.  Other

14  people need help and will accept help on probation, on

15  supervised release.  This man will not.

16          I think a sentence to the top of the Guideline range

17  consecutive, seven counts, seven times nine is 63 months in

18  prison, would be a gift, frankly, and I think that would be

19  very fair.  I also think that based on my research and based on

20  the really thorough report done by probation department,

21  including references to case law, that the Court would be

22  authorized to vary upward so long as, and the Court has,

23  indicated its very reasoned and reasonable opinion.

24          Thank you.

25          THE COURT:  All right.

1    Miss Oppenheimer, does the probation office wish to be

2  heard?

3    MS. OPPENHEIMER:  I have nothing further, Your Honor.

4    THE COURT:  Does the defendant wish to be heard

5  further?

6    THE DEFENDANT:  Yes.

7    THE COURT:  You may.

8    THE DEFENDANT:  Your Honor, I feel like, for one, I

9  have not, as Ms. Oppenheimer has said, I've broken no laws

10 whatsoever in this, since whatever, I was released.  I know

11 that I have gone out of my way.  I mean, obviously it's, you

12 don't believe me, but I just, you know, I have a family, I have

13 broken no laws.  I just want to work, and I would just -- you

14 know, I don't know what it's going to take 'cause it seems like

15 this just keeps going around and around.  And all I want to do

16 is just work.  I don't want to -- I mean, I feel terrible.  So

17 I'm -- I just ask for your mercy, and I would like to just get

18 on with my life here because I'm not, you know, I'm paying tax,

19 I'm doing everything I'm supposed to do, I thought.  And that's

20 all I want to do.  And, you know, whatever it takes to do that.

21    And I'm sorry that obviously I don't have your

22 confidence and, you know, it's not meant -- there is no scams

23 here.  There's nothing like that.  I just want to, you know,

24 work and go forward and pay restitution and I have a lot of

25 talents that I think other people feel I have and, you know, it

would be one thing if I broke some laws but just I don't -- in

this last whatever it is, you know, of these probation

violation, I, as Ms. Oppenheimer said, have not broken any

laws.  It's all just technical.  And, you know, all I want to

do is make money, pay the restitution, you know, work for

people like Ray Wall or Phillip Theune that I know have lots of

credibility that I don't, you know, I don't want to be put in

the position where I'm questioned at all.  But, thank you.

             THE COURT:  All right.

             You may remain at the podium.

             THE DEFENDANT:  Okay.

             THE COURT:  Based on the evidence presented, it has

been established by a preponderance of the evidence that the

defendant has violated the conditions of supervised release as

alleged in the probation officer's petition.  The violations

admitted by the defendant are grade C violations, and

defendant's criminal-history category is I, which results in a

range of imprisonment of three to nine months under the policy

statements issued by the Sentencing Commission.  The Court has

reviewed the recommendations of the probation officer and has

considered the Chapter 7 policy statements in the Sentencing

Guidelines as well as the factors specified in 18 United States

Code section 3583(e).

             The approach adopted by the Sentencing Commission with

respect to supervision violations is that a violation failure

1  to follow the Court's imposed conditions of supervised release

2  is a breach of trust.  This Court is charged with sanctioning

3  primarily the defendant's breach of trust while taking into

4  account, to a limited degree, the seriousness of the underlying

5  violations and the criminal history of the violater.

6       In this case, the underlying violation was very

7  serious, an involved conviction of seven counts of fraud in

8  excess of $11 million from more than 150 victims.  In February

9  of 2007, the sentencing court in the central district of

10  California calculated the defendant's Guideline range, and I

11  believe it was 70 to 87, but somewhere in report I saw 57 to

12  71, so I'm not sure which it was.

13       MS. OPPENHEIMER:  Your Honor, the copy of the

14  statement of reasons that I have indicates 57 to 71 months.

15       THE COURT:  Okay.  It's one or the other of those.

16       Yet that court imposed an extremely light sentence of

17  five years of probation.  According to the statement of

18  reasons, the court imposed a variant sentence to provide the

19  defendant with needed medical care in the most effective

20  manner, 3553(a)(2)(D), and to provide restitution to any

21  victims of the offense pursuant to 18 United States Code

22  section 3553(a)(7).

23       The defendant testified that he was aware that payment

24  of the -- rather, that receipt of the light sentence that he

25  was -- that was imposed on him was in part because of the

restitution and that was a big component of why he received

probation.  The defendant's compliance with supervision and

repayment of restitution thus were the crux of his sentence and

the defendant was aware that there was and is a high

expectation that defendant closely abide by all conditions

imposed by the Court and that he make every effort to repay

restitution.  Or to pay restitution.

The defendant is before this Court for his third

revocation hearing related to his third supervision term.

Although this Court afforded him a significant opportunity to

remain in the community in the interests of his medical

condition and based on his promise to pay restitution, the

defendant's noncompliance began almost immediately.

In December 2008 a violation petition was filed

reporting violation conduct commencing in March 2007 and

spanning through December 2008.

Now, during his testimony today, the Court -- the

defendant would have this Court believe that that is just

because Colorado was enforcing things more, and I think that

may be true.  Seems to me that he was in violation while he was

in California and nobody paid any attention to him.

After I imposed three months of imprisonment and I

told him that he needed to comply with the terms of his

supervised release, he commenced supervised release in

September of 2009.

In March 2010, a violation petition was again filed, reporting conduct that was -- that commenced in October 2009 and spanning through March 2010 and which was similar to what he had failed to comply with in the prior violation period. I sentenced him at that point to nine months, thinking that would teach him that he needed to comply. He served nine months' imprisonment on the supervised-release revocation.

He commenced his current term of supervised release in April of 2011. This Court has admonished this defendant several times. I admonished him at his last revocation hearing about the Court's expectations for compliance for his next supervision term. Nevertheless, defendant's noncompliance began almost immediately and has continued fairly unabated.

The defendant has repeatedly violated this Court's trust by flagrantly disregarding the standard and special conditions of supervision. During his three supervision terms, he has failed to comply with basic components of supervision, such as submitting monthly reports and reporting to the probation officer. Now, this last time around, he did submit his monthly reports. But he failed to provide the information that the probation officer told him needed to be in those monthly reports and the documentation that he needed to submit. So he complies to a certain extent but then he manipulates it so that he's not really giving much information that is what is required under the terms of his supervised release.

He has not made it a priority to obtain verifiable employment that garners reliable income. As of today, the defendant has been on supervision for a total of approximately 48 months, between the three terms of supervision, and he effectively has been noncompliant during the majority of those 48 months. Simply put, this defendant has willfully failed to comply with the conditions of his release despite knowing that failure to comply would or could result in his imprisonment.

The probation officer's focus on the defendant having consistent, gainful, and verifiable employment is directly tied to the fact that he owes more than $11 million in restitution. As I noted earlier, the defendant's offenses of conviction involved more than 150 victims. The defendant's payment of restitution was a central priority of his sentence and supervision, and the defendant admitted that he knew that was why he got such a light sentence. To date, however, he says he's repaid $150,000. According to the report, he's only paid $127,102, of the more than 11 million.

As I understood, he was put on probation because he told the court he could pay 6,000 a month back. Over the course of the last five years, that number should be more than double, almost triple actually, of what he's paid back. And he's only paid it back when I've imposed conditions and required him to submit the financial information.

A review of the payment records indicates that some

victims have received small amounts of restitution, while many

have not received any restitution.  Apart from his obtaining

sporadic employment with Aspen Country Day School, the

defendant has not demonstrated a willingness to obtain

employment consistent with his supervision conditions so that

he can repay his victims.

Pursuant to 18 United States Code section 3583(e)(3),

because the underlying offenses were class C and D felonies,

the defendant can be required to serve up to two years of

imprisonment per underlying count.  In this case, there were

seven underlying counts.  Section 3584 grants district courts

discretion in choosing between consecutive and concurrent terms

of imprisonment.

The probation office indicates that it did not charge

defendant with a supervision violation pertaining to willful

nonpayment of restitution because the defendant has made

nominal efforts to pay a minimal amount during his current term

of supervision.  Therefore, although this is not a situation in

which 3614 applies -- and that provision provides that the

Court may resentence a defendant to any sentence which might

originally have been imposed in situations where a defendant

knowingly fails to pay a delinquent restitution obligation --

although that statute is not applicable, it does reinforce the

seriousness of a restitution obligation.

Given the nature and circumstances of the underlying

offense; the overly lenient sentence of probation that was
imposed by the sentencing court; the defendant's repeated,
flagrant, and willful disregard of the condition of supervision
in order to avoid repayment of his restitution obligation; and
the fact that the Court has already tried with no success other
types of sentences, the Court is inclined to sentence the
defendant at the higher end of the Guideline sentence.

In an unpublished opinion, the Tenth Circuit has
acknowledged that while its precedent has not specifically
addressed the issue of whether a court can impose consecutive
sentences for supervised-release violations, it has
consistently assumed that such a position is tenable. United
States vs. Morris, 313 F.Appx. 125, Tenth Circuit, 2009,
unpublished case.

In Morris, the Tenth Circuit first recognized that the
Third, Fourth, Fifth, Seventh, Eighth, Ninth, and Eleventh
circuits have agreed with the proposition that 3584(a) applies
not only to the imposition of a defendant's initial sentence
but also to a sentence imposed upon revocation of supervised
release. In other words, a district court may impose
consecutive sentences of revocation of concurrent sentences of
supervised release, and I'm not going to cite all the case law
there because you go to Morris, and they'll give you the case
cites for those seven circuits.

The Tenth Circuit went on in Morris to find that

1   Morris' argument was frivolous and held that a district court

2   in _Morris_ -- that the district court in _Morris_, upon revoking

3   Morris' supervised release, was not precluded from imposing

4   consecutive sentences on his convictions of bank fraud and wire

5   fraud, merely because Morris had originally been sentenced to

6   concurrent terms of supervised release for the two fraud

7   convictions.  In so holding the Tenth Circuit relied heavily on

8   the analysis set forth by the Third Circuit in _United States_

9   _vs. Dees_, D-E-E-S, 467 F.3d 847, a 2006 case.

10          Quote, 18 U.S.C. section 3584(a) controls and permits

11  a district court to impose consecutive terms of imprisonment

12  upon revocation of supervised release, even when the sentences

13  for the underlying crimes ran concurrently.  No fewer than six

14  other circuits have agreed with the proposition that

15  section 3584(a) applies to not only the imposition of one's

16  initial sentence but also to a sentence imposed upon revocation

17  of supervised release.  Nothing in section 3584(a) states or

18  implies that the statute does not extend to revocation

19  proceedings.  A district court has full authority under 35 --

20  section 3584(a) to sentence a defendant consecutively for

21  violations of supervised release.

22          The court also stated, quote, Every court of appeals

23  to address the issue has concluded that section 3584(a) applies

24  not just to initial sentencing, but also extends to revocation

25  proceedings, end quote.

1  Quote, because neither section 3583(e) nor

2  section 3624(e) limit section 3584(a), the district court had

3  full discretion to sentence Dees according to the latter

4  statute, end quote.

5  Likewise, in United States vs. Moran, 380 F.Appx.786,

6  a Tenth Circuit 2010 unpublished case, the Tenth Circuit held

7  under 18 U.S.C. 3584, A district court has discretion to impose

8  consecutive sentences after revocation of supervised release.

9  In the instant case, defendant originally was

10 convicted of seven counts of fraud.  The instant violation

11 petition alleges 12 violations.  Several of the violations

12 regard multiple months and patterns of ongoing violative

13 conduct.  The defendant is charged with making false statements

14 in the context of his monthly reports regarding his employment.

15 This Court has been quite patient with Mr. Wallace and

16 has twice warned him that if he did not comply with the

17 conditions of supervised release, he would be facing

18 significant prison time.  Yet the defendant chose to ignore

19 those advisements and finds himself before this Court on his

20 third revocation proceeding.  The current violations,

21 particularly in the context of the defendant's overall history

22 of noncompliance, are egregious and warrant substantial

23 incarceration.

24 In United States vs. Tedford, T-E-D-F-O-R-D,

25 405 F.3d 1159, Tenth Circuit, 2005 case, the Tenth Circuit held

that the district court was entitled to consider the resources
of the probation office in imposing a sentence above the
advisory revocation guideline range.  The district court stated
that it would, quote, Be a waste of the limited resources of
the probation office to have to continue supervision over a
defendant who has repeatedly violated the terms of supervised
release, end quote.

The Tenth Circuit held that the district court
recognized the futility of continued supervision, a
consideration implicit in the congressional grant of authority
to revoke one's supervised release under 18 United States Code
section 3583(e)(3).  The defendant's conduct on supervision in
this case has shown little regard for the Court's orders.  His
past behavior during his prior supervision demonstrated the
same, and there's no indication that he would perform any
differently should supervision be reimposed.  The defendant has
demonstrated that he is not amenable to the supervision, and
the Court believes that further supervision would be a waste of
the probation office's and court's resources.

Consistent with United States vs. Tedford, the Court
believes that the futility of further supervision supports a
sentence above the advisory revocation guideline range.  The
advisory Guidelines recommended a sentence of three to nine
months for these violations of supervision.  The advisory
Guideline range on the underlying convictions was either 70 to

1    87 months or 57 to 71 months.

2         For all of the previous -- the reasons previously

3    stated and, one, given the nature and circumstances of the

4    defendant's recent violations, including their duration,

5    complexity, seriousness, and similar nature to his violations

6    in his prior supervision terms; second, given the substantial

7    breach of trust to the Court that defendant's violations

8    present; third, given that supervision is the crux of the

9    court's sentence in the original case or the underlying case;

10   fourth, given that the defendant's pattern of almost

11   uninterrupted compliance while on supervision during the

12   current term and two prior terms; fifth, given that defendant's

13   violation conduct is underlain in large part by deception and

14   manipulation similar to the conduct in the underlying offenses;

15   and sixth, given the fact that the sentences imposed up to this

16   point have not had sufficient deterrent effect and that it

17   appears a more substantive sentence is necessary to adequately

18   deter this defendant, pursuant to 18 United States Code

19   sections 3553(a) and (c), 3583(e), and 3584(a) and (b), it is

20   therefore ordered and adjudged that the defendant's supervised

21   release is revoked, the defendant is sentenced to the custody

22   of the Bureau of Prisons for a period of nine months on each of

23   the seven underlying counts of conviction, four, five, six,

24   eleven, twelve, 15, and 20, such sentencing to run

25   consecutively for a total sentence of 63 months.

1          The defendant is ordered to pay the balance of the

2     restitution outstanding.  No term of supervised release

3     following imprisonment is imposed.  Subsequent to service of

4     the revocation sentence, the defendant's payment of the

5     restitution obligation will be monitored by the financial

6     litigation unit of the United States attorney's office pursuant

7     to 18 United States Code section 3612 and 3613.

8          Now, Mr. Wallace, in June of 2009, I revoked your

9     supervised release for the same types of violations that you

10    are currently before me on.  At that time I imposed a light

11    sentence of only three months' incarceration on each count to

12    be serve concurrently, because I believed that you were a smart

13    man and that such a minimal sentence would be all that would be

14    needed to get you to comply with the terms of your supervised

15    release.  I was wrong, because only nine months after being

16    released from the Bureau of Prisons, you were again brought

17    before me for the same types of violations.

18         Based on your behavior and disregard for the terms of

19    your supervised release, a second time I imposed a sentence at

20    the top of the Guideline range of nine months, with the hope

21    that nine months would be adequate to deter you from similar

22    future violative conduct and that would be enough to get you to

23    comply and comply timely and fully with the terms of supervised

24    release that were imposed.

25         Mr. Wallace, each time you appeared before me, I

advise you that if you did not comply with the terms of your
supervised release and you found yourself before this Court
again for failure to comply with the terms of supervised
release, I would not be so lenient in sentencing.  Apparently
you did not believe me.  And it is clear that you do not think
the rules apply to you.  You continue to resist supervision
efforts to accurately identify your ability to pay restitution.
You have disregarded instructions from your probation officer
to obtain employment and provide documentation of your receipt
of a paycheck, which denotes your earnings, hours worked, and
tax withholding; in other words, to provide verification for
being paid for the work that you have supposedly performed.

You failed to make appointments or to keep
appointments with the probation officer and to keep your
probation officer informed of your whereabouts.  You failed in
this case not to file reports, but you filed reports that were
really essentially meaningless in terms of what you were
supposed to report.  And now you have begun falsifying those
reports.  You have been given numerous opportunities to comply
with the conditions of your supervised release, but you fail
and refuse to do so.

A considerable amount of time and energy and effort
have been expended on supervising you.  I told you before that
you just do not -- did not seem to appreciate how fortunate you
were that instead of being sent to prison for the 57 to 71

months calculated under the Sentencing Guidelines for your

underlying fraud charges, you were found guilty and the judge

in your case imposed only two years of home confinement and

five years of probation. I have explained to you several times

that your supervised release was subject to certain terms and

conditions that you seem to think are discretionary on your

part. And despite the fact that you were told that your

violation of any condition of your probation could result in

revocation of that probation and imprisonment, you have been

basically noncompliant with your supervised release since that

supervision commenced in February of 2007.

For the reasons previously stated, the Court believes

that a sentence of custody to the Bureau of Prisons for a term

of 63 months, with no term of supervised release to follow such

imprisonment, is a sentence that is sufficient but not greater

than necessary to accomplish the goals of sentencing.

Mr. Wallace, you are advised that you have the right

to appeal this sentence. If you desire to appeal, a notice of

appeal must be filed with the clerk of the court within 14 days

after entry of judgment or the right to appeal will be lost.

If you are not able to afford an attorney for appeal, I will

appoint one to represent you. If you request, the clerk of the

court must immediately file a notice of appeal on your behalf.

Title 18 United States Code section 3143 states that

the court shall order that a person who is awaiting execution

of a sentence be detained unless the court finds by clear and
convincing evidence that the person is not likely to flee or
pose a danger to the safety of any other person or the
community if released under section 3142(b) or (c). Given the
length of the sentence imposed and the defendant's noncompliant
behavior, the Court has concerns about the likelihood that this
defendant will flee. Thus, it is my intent to remand him to
the custody of the United States marshal.

The Court is aware that the defendant suffers from
Crohn's disease. The Court also notes that the presentence
investigation report indicates that Dr. James Pelton, the
Bureau of Prisons' regional medical director at the federal
correctional institute in Englewood, Colorado, where the
defendant was incarcerated as a result of the two prior
revocations of supervised release, is familiar with the
treatment of the defendant. Dr. Pelton indicates that the
Bureau of Prisons has the ability to manage the defendant's
medical needs for any future incarceration.

As such, the Court intends to recommend that the
Bureau of Prisons, should the Court remand the defendant, that
the Bureau of Prisons or the marshals office, whichever it is
at this stage of the proceedings, actually place him at FCI
Englewood.

Miss Pierce, would you like to make any argument to
dissuade me otherwise?

1    MS. PIERCE:  Your Honor, we were hoping that he could

2    self-surrender.  He's always appeared in court and he's always

3    surrendered himself in the last two cases, and we ask that the

4    Court consider that.  I think that that's the recommendation of

5    the probation department as well.

6         THE COURT:  Miss Kaufman, what's the Government's

7    position?

8         MS. KAUFMAN:  All I can say is that I don't think he

9    has failed to appear in the past.

10        THE DEFENDANT:  Can I --

11        THE COURT:  Yes, Mr. Wallace.

12        THE DEFENDANT:  I have not, have not -- I've always

13   shown up for everything.  And there is no reason that I won't

14   do this, you know, if it's what the probation asks was 30 days,

15   I believe, to self-surrender, and I would really appreciate it

16   if I could get my affairs in order.  'Cause 63 months is a long

17   time, and it would be a huge help to me.  There is -- you know,

18   I've never, ever not shown up for anything to do with this

19   whole affair.  I've always been --

20        THE COURT:  You've also never been facing a 63-month

21   sentence.

22        THE DEFENDANT:  Yeah, I understand what you're saying.

23   But I have never -- I mean, all the way along the way here, I

24   have always 100 percent of the time shown up for whatever I had

25   to and it's the same thing with this.  I just -- I beg you for

your mercy for that. It would be a huge thing for me because I
would like to see my family. I would like to just get my
affairs in order. Please.

THE COURT: The Court is concerned that the
manipulative behavior and the source of these funds that
continue to be paid to this defendant are unknown and as such I
would remand the defendant to the custody of the United States
marshal because I believe that he is at risk of flight, facing
a sentence as lengthy as the Court has imposed. So I remand
the defendant to the custody of the United States marshal until
he is delivered to the custody of the Bureau of Prisons.

I do recommend that the United States marshals make
arrangements to house the defendant at FCI Englewood until
designated to an institution by the Bureau of Prisons.

Is there anything further to be brought to the Court's
attention?

MS. KAUFMAN: No. Thank you, Your Honor.

THE COURT: Is there anything further?

MS. PIERCE: Your Honor, he -- we're just trying
figure out what to do with his car.

THE COURT: I need to know if there's anything further
with respect to me.

MS. PIERCE: No, Your Honor. No, Your Honor.

THE COURT: All right. Thank you very much. The
Court will be in recess.

1     (Recess at 3:53 p.m.)

2              REPORTER'S CERTIFICATE

3        I certify that the foregoing is a correct transcript

4  from the record of proceedings in the above-entitled matter.

5  Dated at Denver, Colorado, this 14th day of May, 2012.

6

7                    s/Kara Spitler_____
                       Kara Spitler

8  WITNESSES

9    RONALD WALLACE

10       Direct Examination By Ms. Pierce        126

11       Cross-examination By Ms. Kaufman       141

12       Redirect Examination By Ms. Pierce     152

13            GOVERNMENT'S EXHIBITS

14  Exhibit     Offered  Received  Refused  Reserved  Withdrawn

15  29         147     147

16  CLOSING ARGUMENTS

17    By Ms. Kaufman              156

18    By Ms. Pierce               161

19  COURT'S RULING               167

20

21

22

23

24

25