**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**


Criminal Action No. 08-cr-00409-CMA


**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**RONALD PHILIP WALLACE,**

**Defendant.**

_____


**REPORTER'S PARTIAL TRANSCRIPT**
**(Revocation of Supervised Release Hearing)**
_____


        Proceedings before the HONORABLE CHRISTINE M.
ARGUELLO, Judge, United States District Court, for the
District of Colorado, commencing at 1:55 p.m. on the 10th
day of June, 2010, Alfred A. Arraj United States
Courthouse, Denver, Colorado.



              **A P P E A R A N C E S**

**FOR THE PLAINTIFF:**
LINDA S. KAUFMAN, Assistant U.S. Attorney, 1225 17th St.,
Suite 700, Denver, CO 80202

**FOR THE DEFENDANT:**
LYNN A. PIERCE, Butler, Landrum & Pierce, P.C., 720
Kipling St., Suite 201 Lakewood, CO 80215

# I N D E X

**WITNESSES:**                                                                          **PAGE**

### PROBATION OFFICER DENISE DOHANIC
DIRECT EXAMINATION BY MS. KAUFMAN                       5
CROSS-EXAMINATION BY MS. PIERCE                          10
REDIRECT EXAMINATION BY MS. KAUFMAN                  20
RECROSS-EXAMINATION BY MS. PIERCE                      26

# E X H I B I T S

**NO.**                                                                                 **ADMITTED**

..........................................

**No.**                                                                                 **REFUSED**

..........................................

```
1                           JUNE 10, 2010

2              (Proceedings commence at 1:55 p.m.)

3              THE COURT:  Court calls Criminal Case No.

4    08-cr-409, encaptioned the United States of America v.

5    Ronald Philip Wallace.

6              Counsel, would you enter your appearances.

7              MS. KAUFMAN:  Good afternoon, Your Honor, Linda

8    Kaufman for the United States.

9              THE COURT:  Good afternoon.

10             MS. PIERCE:  Good afternoon, Your Honor, Lynn

11   Pierce appearing on behalf of Ronald Wallace, who appears

12   next to me.

13             THE COURT:  Good afternoon.

14             All right.  We are here today for another hearing

15   on a petition alleging violation of supervised release.

16             Ms. Pierce, would you and Mr. Wallace please

17   approach the lectern.

18             Ms. Pierce, does Mr. Wallace intend to admit or

19   deny the allegations of the petition?

20             MS. PIERCE:  Your Honor, he would deny the

21   allegations in the petition.

22             THE COURT:  All right.  Ms. Kaufman, are you ready

23   to proceed?

24             MS. KAUFMAN:  We are.

25             THE COURT:  All right.  You may proceed.
```

1          MS. KAUFMAN:  Your Honor, the United States calls

2     Denise Dohanic.

3          COURTROOM DEPUTY:  Your attention, please.

4          THE COURT:  Ms. Pierce.

5                **PROBATION OFFICER DENISE DOHANIC**

6     having been first duly sworn, testified as follows:

7          COURTROOM DEPUTY:  Please be seated.

8          Please state your name, and spell your first and

9     last name for the record.

10         THE WITNESS:  Dennis Dohanic, D-E-N-I-S-E

11    D-O-H-A-N-I-C.

12         MS. KAUFMAN:  Your Honor, I have one request.  I

13    would ask that if the defense is considering calling the

14    individuals in the back of the courtroom as witnesses in

15    this hearing, that they be sequestered.

16         MS. PIERCE:  No objection, Your Honor.

17         THE COURT:  Would anyone who is going to be a

18    witness in the case please step out of the room and go

19    back into one of the waiting rooms.

20         How long do you anticipate this is going to take,

21    because I did not set this -- we started half an hour

22    late.  I have a 2:30, and then I have a 3:30.

23         MS. KAUFMAN:  My direct will be very brief.

24         MS. PIERCE:  I don't think mine will be very long,

25    Your Honor.

1          THE COURT:  All right.

2                    **DIRECT EXAMINATION**

3     **BY MS. KAUFMAN:**

4     Q.    Please state your name and your occupation.

5     A.    Denise Dohanic, U.S. Probation Officer.

6     Q.    And, Ms. Dohanic, are you the probation officer that

7     has been assigned to supervise the defendant in this case?

8     A.    Yes, I am.

9     Q.    And are you the supervision officer that has filed

10    the sworn petition?

11    A.    Yes.

12    Q.    Is everything in that sworn petition true?

13    A.    Yes.

14    Q.    Specifically, was the defendant released from a

15    sentence of incarceration based on his violations of

16    probation to your supervision in September of '09?

17    A.    Yes.

18    Q.    And did you meet with him and explain the conditions

19    of probation in September of '09?

20    A.    Supervised release, yes.

21    Q.    Excuse me, supervised release.  Did he at that time

22    still owe over $11 million in restitution?

23    A.    Yes.

24    Q.    Was it a condition of the supervised release that he

25    pay $6,000 a month in restitution?

1    A.    Yes.

2    Q.    Was he informed of that?

3    A.    Yes.

4    Q.    Did he pay his restitution in October?

5    A.    He did.

6    Q.    Did he pay in November?

7    A.    No.

8    Q.    Did he pay a double payment in December of '09?

9    A.    Yes, he did.

10   Q.    That being $12,000?

11   A.    Yes.

12   Q.    Did he pay any payment since then?

13   A.    No.

14   Q.    Was he ordered to provide tax returns for the 2007

15   and 2008 tax years?

16   A.    Yes.

17   Q.    Did he provide them when he was ordered to do so?

18   A.    No.

19   Q.    Did he subsequently provide them?

20   A.    Yes, he did.

21   Q.    Was he ordered to provide them as of October 2, '09?

22   A.    Yes.

23   Q.    When did he provide them?

24   A.    He did not provide them until 16 days later.  If I

25   can refer to my report.

1    Q.    That is fine.   Sixteen days after that date?

2    A.    Yes.

3    Q.    Those are the tax returns?

4    A.    Yes.

5    Q.    Was that the financial statement?

6    A.    I am sorry.   He provided the financial statement

7    approximately 16 days later.   He did not provide --

8    Q.    In October?

9    A.    Yes.

10   Q.    When did he provide the tax returns?

11   A.    April 27th of 2010.

12   Q.    And were those, on the face of them, apparently

13   prepared in October -- excuse me, April of 2010?

14   A.    Yes.

15         THE COURT:   May I ask, these are the same tax

16   returns that he was performing on violation last summer?

17         MS. PIERCE:   Yes, Your Honor.

18   Q.    (BY MS. KAUFMAN)   Was he required to maintain

19   employment beginning in September of '09, as approved by

20   you?

21   A.    Yes.

22   Q.    Did he maintain employment from the period of the

23   petition; that being September of '09 through March of

24   '10, as approved by you?

25   A.    No, it was not approved by me.

1    Q.    Explain.

2    A.    He was employed by the same employer, Terroir Homes,

3    when he got out of incarceration.  He informed me that

4    that employment was going to change in October.  He

5    informed me of that.  I was not notified until December

6    that that employment had changed by an employment contract

7    dated October 1.

8    Q.    And with what company was that?

9    A.    That was with Envision.

10   Q.    Has he provided -- have you requested or required

11   that he provide pay stubs?

12   A.    Yes.

13   Q.    Has he done that?

14   A.    No, he has not.

15   Q.    Would you have approved any employment in which he

16   was not providing pay stubs?

17   A.    No.

18   Q.    Since that December change of employment -- has he

19   worked since September of '09, do you know?

20   A.    He has indicated to me that he is working.  He has

21   provided some letters from his employer that he is

22   working.  But I do not know how many hours he worked, what

23   his compensation is, and what those projects consist of.

24   Q.    Did he provide you or did someone provide you a

25   contract dated October of '09 -- October 1st of '09 with

1    Envision that set forth the agreed upon pay for that job?

2    A.    Yes.

3    Q.    And was that -- was he to be paid an annual salary

4    that broke down to about $19,000 a month?

5    A.    Yes.

6    Q.    Was part of his compensation with that also numerous

7    payments or payments by the employer of such things as

8    health care, health insurance, education for him and his

9    family, extracurricular activities for him and his family,

10   ability to visit private clubs, all paid for by the

11   employer?

12   A.    Yes.  Those are outlined on page 9 of the violation

13   report.

14   Q.    And is that -- are those things -- were those things

15   also in the employment agreement identified as income?

16   A.    Yes.

17   Q.    As part of the compensation?

18   A.    Yes.

19   Q.    Have you ever been provided with a breakdown of what

20   amenities he has received as compensation?

21   A.    No.

22   Q.    Has he submitted monthly reports as directed?

23   A.    No.

24   Q.    Did he fail to file the monthly reports as directed

25   on time in October, November and February?

1    A.    Yes.

2    Q.    Did he consistently visit you and meet with you as

3    you directed him to?

4    A.    No.

5    Q.    Did he fail to do that in November, December,

6    February twice, and March of 2010?

7    A.    Yes.

8    Q.    Did you notify him in advance of each time when he

9    was to meet with you?

10   A.    Yes.

11   Q.    Are more details about your allegations and the

12   supporting evidence that you -- upon which you base your

13   allegations set forth in your probation report?

14   A.    Yes.

15   Q.    And have you had a chance to review that report for

16   accuracy?

17   A.    Yes.

18   Q.    And is it your testimony that the statements you have

19   made in your report are also accurate?

20   A.    Yes.

21          MS. KAUFMAN:  Thank you.

22          THE COURT:  Ms. Pierce?

23          MS. PIERCE:  Thank you, Your Honor.

24                      **CROSS-EXAMINATION**

25   **BY MS. PIERCE:**

1    Q.    Good afternoon, Ms. Dohanic.  Now, you said that he

2    was employed, but you could not verify his employment?

3    A.    Yes.

4    Q.    Didn't you talk to his employer, Mr. Egan, at one

5    time?

6    A.    I did.

7    Q.    And that was not sufficient to verify that he was

8    employed?

9    A.    Mr. Egan told me he was employed.  He had since not

10   provided verification of him being paid for that work that

11   he did for his employer.

12   Q.    So the kind of business that they were doing was

13   project-type business; correct?

14   A.    Yes.

15   Q.    And that that was -- that is his skill set, is it

16   not; dealing with projects and business ventures and that

17   kind of thing; correct?

18   A.    That is what he has told me, yes.

19   Q.    And in that kind of business, they don't usually get

20   a regular paycheck; is that your understanding?

21   A.    I do not know.

22   Q.    Is there anything he could have provided you, short

23   of a regular paycheck, that would have satisfied that,

24   given that he was paid in lump sums and as the business

25   proceeded?  Is there any other way he could provide that

1    to you, other than a regular paycheck?

2    A.    He provided me an employment contract, and the

3    employer gave me letters.  But those conflicted, as far as

4    what he was actually being paid.  So the paycheck would

5    have verified hours worked, income received, and taxes

6    withheld.  So that would be a verifiable way.

7    Q.    Now, he did provide to you bank account statements;

8    correct?

9    A.    He did.

10   Q.    Both his statements, and where the money was

11   transferred or deposited; correct?

12   A.    Yes.

13   Q.    As well as the account where it came out of; correct?

14   A.    I am sorry, restate that.

15   Q.    The account from which he was paid was also disclosed

16   to you; correct?

17   A.    On his deposit slips, it would indicate a deposit.  I

18   do not believe it indicated where it came from.

19   Q.    You don't recall him providing account information

20   from the business that showed money taken out?

21   A.    No.

22   Q.    Okay.  Now, could he have provided that to you, or if

23   he did provide that to you, would that be something that

24   would be sufficient to show the source of his income?

25   A.    If he provided that to me, yes, I would look at that

1    and take that into consideration.

2    Q.    Okay.  Now, you said that he changed employment

3    from -- he went from the previous business and he started

4    working for Envision; correct?

5    A.    He was working initially for Terroir Homes.

6    Q.    Then he changed to Envision?

7    A.    Yes.

8    Q.    And since he started working for Envision and

9    actually had some contractual opportunities, he's

10   indicated to you that he is going to now get a paycheck, a

11   salary; correct?

12   A.    He has indicated that to me, yes.

13   Q.    And that salary would be 5,000 a month, maybe a net

14   of 4,000, approximately, after taxes; correct?

15   A.    Yes.

16   Q.    Now, he did file his taxes after a delay; correct?

17   A.    Yes.

18   Q.    And you did receive a letter from the accountants

19   that were working on these taxes?

20   A.    Yes.

21   Q.    And the accountants had been given this task to

22   prepare these taxes prior to him being violated; correct?

23   A.    Yes.

24   Q.    And that -- is it fair to say that he had a lot of

25   things going on that maybe an accountant would deem

1    necessary in order to prepare the taxes?

2    A.    I can't answer that.

3    Q.    He doesn't have an accounting background, does he,

4    that you know of?

5    A.    Not that I am aware of.

6    Q.    So was it that you were expecting him to prepare it

7    himself, or -- in a situation where he has a complicated

8    tax situation, and he needs accountants to prepare that,

9    is it your position that regardless of whether the

10   accountants need more time, he needs to file something in

11   that period of time?

12   A.    No.  He was directed, though, to provide income tax

13   returns, and he did not do that.

14   Q.    But when he was directed to provide them, they

15   weren't yet available because the accountants needed

16   additional time; correct?

17   A.    Yes.  He did not -- he did not secure these

18   accountants until after he was released from imprisonment

19   to prepare the taxes.

20   Q.    Well, if he secured them after he was released, is it

21   fair to say that while he was in custody it would be

22   difficult for him to arrange accountants to prepare his

23   tax returns?

24   A.    Yes.  The taxes, though, were due when he was under a

25   term of probation, as well.

1    Q.    But after the last violation, he did commence

2    preparing -- getting these tax returns prepared, and he

3    kept you informed of the status of these tax returns;

4    correct?

5    A.    Yes.

6    Q.    So is it fair to say that you don't really have any

7    information that would lead you to believe that he

8    intentionally delayed these taxes -- the preparation of

9    these tax returns; correct?

10   A.    No.  He has been -- he has been informed, you know,

11   that he needs to have these taxes filed.  And this has

12   been over a year that he has been instructed to do that.

13   And yet he has not -- this is the second accountant firm

14   that he has contacted to do his taxes during this time.

15   Q.    Did you ever have an occasion to talk to the

16   accountants?

17   A.    No, I did not.

18   Q.    So you don't -- you don't have any information as to

19   why it took them so long to prepare the taxes?

20   A.    No.

21   Q.    Now, you said you reviewed an employment contract,

22   and it had a number of things, including some amenities,

23   including health care and a car?

24   A.    Yes.

25   Q.    Correct.  But that was not sufficient to show his

1    income?

2    A.    On a monthly basis.

3    Q.    Okay.  Now, with regard to him failing to appear at

4    an appointment, isn't it true that he contacted you,

5    either before or around the time he was supposed to

6    appear, when he failed to appear, to advise you of a

7    reason, an emergency that he had with his daughter?  On

8    one occasion, his daughter had a migraine.  Didn't he

9    contact you and tell you that he had complications in

10   getting to your office?

11   A.    I recall that he had called on one occasion in that

12   respect.  I don't remember what time it was or which

13   appointment it was.

14   Q.    And he also faxed you information, told you what was

15   happening; that he was having difficulty making an

16   appointment; correct?

17   A.    Yes.

18   Q.    So he didn't just ignore the appointments, he tried

19   to contact you and make other arrangements; correct?

20   A.    He called to indicate that he was having problems

21   getting to that appointment.

22   Q.    So he didn't just ignore the appointment?

23   A.    No.  That was on one occasion.

24   Q.    On other occasions he faxed things to you to advise

25   you as to why he needed to reschedule or what

1    complications he was having getting to the appointment?

2    A.    Again, I don't recall exactly which ones.  Perhaps he

3    could have done that on another occasion.

4    Q.    And it's probably a four hour turn around for him to

5    come to your office and go back home; correct?

6    A.    Yes.

7    Q.    So it is not as if he could just drive down the

8    street at a moment's notice.  I'm not saying you didn't

9    give him notice, but it was somewhat of a burden to have

10   to drive that far; correct?

11   A.    I don't know if it would be called a burden.  I make

12   that drive a lot, too.

13   Q.    I am sure you do.  Now, he does have health problems?

14   A.    Yes.

15   Q.    You are not disputing that he has significant health

16   problems?

17   A.    No.

18   Q.    And are you aware that when he went to the FDC last

19   time, they did not treat him properly, so that his

20   medication wore off when he left FDC.  Are you aware of

21   that now?

22   A.    I contacted the Regional Medical Director after

23   Mr. Wallace came out of the Bureau of Prisons, and they

24   had indicated that he did not have any medical problems

25   while he was incarcerated.  He provided me a letter from

1     one of his doctors here that indicated Mr. Wallace was

2     having problems because of his treatment in the Bureau of

3     Prisons.

4     Q.   Well, there was a medication that he needed that they

5     decided to stop when he entered FDC; correct?

6     A.   That is what his doctor indicated.

7     Q.   He is currently getting his treatment in the Aspen

8     area.  Is he currently being treated -- are you familiar

9     with whether he is getting treatment in the Aspen area?

10    A.   The last letter I got for medical information from

11    Mr. Wallace was in January of 2010, and that was from a

12    Keith Hughes, Medical Doctor.

13    Q.   Okay.  And where was he located?

14    A.   I don't recall.

15    Q.   Okay.  So he does need ongoing treatment for his

16    disease?

17    A.   That is my understanding.

18    Q.   And is it your understanding that he has Crohn's

19    Disease?

20    A.   Yes.

21    Q.   And are you aware that he is on 30 milligrams a day

22    of prednisone at this time?

23    A.   Again, the last information I received from his

24    doctors was in December of 2009; that provided me a list

25    of his medication.  It did indicate prednisone.  I don't

1    recall how many milligrams.

2    Q.    Now, you got to know Mr. Wallace over the last few

3    years; correct?

4    A.    Yes.

5    Q.    And is it fair to say that he is a little bit

6    eccentric?

7    A.    In what regard?

8    Q.    That he's -- his personality.  He is a little bit

9    different.  He seems to maybe talk about things that

10   aren't relevant sometimes and not really understand the

11   point that is being made.

12   A.    I can't say that he doesn't understand the point that

13   is being made.  He does tend to repeat himself at times.

14   Q.    Okay.  Is it fair to say that it is difficult

15   sometimes to communicate with him?

16   A.    As far as him understanding, or as far as him --

17   Q.    Expressing himself, and you understanding him or vice

18   versa?

19   A.    I think we have an understanding of -- I think he

20   understands what is being said, and I understand what he's

21   communicating.

22   Q.    But when he speaks with you, he appears to not

23   understand because of what he says?

24   A.    No.

25   Q.    Are there occasions where he tells you things that

1  you don't need to know?

2  A.    Yes.

3  Q.    And are there occasions where he doesn't seem to be

4  able to give you the information you request?

5  A.    There have been occasions where I have instructed him

6  to do things, and he has not followed through with that.

7  Q.    Have you been in contact with his wife?

8  A.    I spoke with his wife back in February.

9  Q.    And you discussed his work schedule and his illness

10  with her?

11  A.    Yes.

12        MS. PIERCE:  Your Honor, just one moment, please.

13  Q.    (BY MS. PIERCE)  Just one more question.  You know,

14  isn't it a fact that Mr. Wallace retained the accountants

15  in June of 2009, and you were notified by him of that?

16  A.    Pardon me?

17  Q.    He retained the accountants in June of 2009, and you

18  were notified at the time?

19  A.    That is prior to his term of supervised release in

20  this case?

21  Q.    Yes.

22  A.    I don't recall.

23  Q.    You don't recall.

24        MS. PIERCE:  I have nothing further, Your Honor.

25                    **REDIRECT EXAMINATION**

1    **BY MS. KAUFMAN:**

2    Q.    The October 1, 2009 contract that you have described,

3    and the paragraph within that that describes the various

4    payments that his employer agreed to make in addition to

5    his salary, were those broken down by amounts, or were

6    they just generically stated that the employer will pay

7    medical expenses, education expenses, country club and so

8    on?

9    A.    There was no dollar amount assigned to those.

10   Q.    And did you ever receive any dollar amounts as to

11   what he was getting --

12   A.    No.

13   Q.    -- in payment?  You testified on cross that you

14   received this employment contract and also letters from

15   his employer, but they were conflicting?

16   A.    Yes.

17   Q.    Explain, can you, the conflicts?

18   A.    The employment contracts indicate that he would be

19   paid 220- -- $228,000 a year, payable on the 30th day of

20   each month.  And that employment contract was received in

21   January.  In December, I got a letter from his employer,

22   which indicated that he had hired the defendant in

23   October.  It does not make any specific indication in

24   regards to how he was going to be paid, but it did talk

25   about paying for the restitution.

1          There was another letter received by the employer

2    on May 18th, and that letter indicated that there were a

3    couple of projects that were going to be starting, and

4    that he could guarantee that Mr. Wallace would be paid

5    $4,000 a month net after taxes, starting June the 1st,

6    plus benefits, as an employee of the firm.

7          The last communication I received was on June 7th,

8    a letter dated June 4th, and that indicated that

9    Mr. Wallace would be paid a gross monthly amount of

10   $5,000, with a net of $4,000 a month.

11   Q.    And, in the meantime, in about April of 2010, did the

12   defendant also make a statement to you that he wasn't

13   getting paid income; it wasn't income, they were loans

14   from his employer?

15   A.    Yes.  We discussed the prior restitution payments,

16   because previously he had indicated that those payments

17   were income for work that he had done, but delayed

18   payments.  In April, he had indicated that those were

19   actually -- those restitution payments were actually loans

20   that he was getting from the company.

21   Q.    And did you receive a letter in May of 2010 from the

22   employer indicating that the employer had, in fact, paid

23   taxes on this employee?

24   A.    Yes.  That was in June.

25   Q.    In June, just recently?

1  A.    Yes.

2  Q.    And was that consistent or insistent with the

3  information you learned from the Colorado Department of

4  Labor relating to this defendant?

5  A.    That was inconsistent.

6  Q.    What did you learn from the Department of Labor?

7  A.    I did two requests for information.  One was in

8  September, and that indicated that he had earned income

9  for 2005, 2006 and 2007 with Aspen Devco, with Randy Egan

10  as the owner of that company.  And in May of 2010, a wage

11  inquiry indicated no reported wages for the defendant in

12  2008 and 2009 or 2010.

13  Q.    So that part is inconsistent with what Mr. Egan wrote

14  to you this month?

15  A.    Yes.

16  Q.    Is it important for you, as a supervisory officer, to

17  be able to legitimately evaluate the actual income this

18  individual is earning and the actual amenities that are

19  being paid for him -- expenses that are being paid for him

20  by another entity, as well as other expenses he has to pay

21  on his own?

22  A.    Yes.

23  Q.    Why is it important?

24  A.    In order to be able to assess the income and

25  liabilities on a monthly basis and, therefore, be able to

1  assess his ability to pay a court-ordered restitution.

2  Q.   Did the defendant ever file a complaint with you

3  about his medical treatment during the period of his

4  incarceration last year?

5  A.   No.

6  Q.   Was it only after he was out that he then started

7  talking about how bad it had been or how they had harmed

8  him?

9  A.   Yes.

10  Q.   There were questions about whether or not you think

11  the defendant is eccentric.  Has this defendant made

12  supervision difficult for you?

13  A.   I think that he has made supervision difficult for

14  himself.

15  Q.   In what way?

16  A.   Because he continues to violate his supervision by

17  not providing verifiable employment information, income

18  information, not making appointments, being late for

19  appointments, not submitting his monthly reports on a

20  timely basis.  Those are all things that are expected

21  under supervision.

22       MS. KAUFMAN:  Thank you.

23       THE COURT:  I want some clarification.  In the

24  October letter that you got from the new company,

25  Envision, is that right --

         1              THE WITNESS:  Yes.

         2              THE COURT:  -- was there an indication as to how

         3    much he would be paid, or was it all in terms of they will

         4    pay medical, they will pay his children's educational

         5    tuition?  Is there a dollar amount attached to that?

         6              THE WITNESS:  There was no dollar amount attached.

         7              THE COURT:  And if I understood correctly, in

         8    January the salary was set to be $228,000 a year?

         9              THE WITNESS:  Yes.  I received that, Your Honor, in

        10    January, but the employment contract was dated October

        11    1st.

        12              THE COURT:  Okay.  So do you have any information

        13    as to what he was paid between October and December?

        14              THE WITNESS:  Other than what he reported, Your

        15    Honor, on his monthly reports.  And, again, that was not

        16    verified.  And that is on page 12 of the violation report.

        17              THE COURT:  Okay.  And then four months later, in

        18    May, the 228,000 went down to 48,000?

        19              THE WITNESS:  Yes, Your Honor.

        20              THE COURT:  And one month later it went back up to

        21    60,000; so 5,000 a month?

        22              THE WITNESS:  5,000 a month.

        23              THE COURT:  Same employer?

        24              THE WITNESS:  Yes.

        25              THE COURT:  Any change in duties or any explanation

1    of why it reduced so drastically?

2         THE WITNESS:  No, Your Honor.  The defendant has

3    made statements to me about the poor economy and his

4    employer's inability to pay.

5         THE COURT:  All right.

6         MS. KAUFMAN:  Thank you.

7         THE COURT:  Anything further with this witness?

8         MS. PIERCE:  Your Honor, I just have a few

9    questions to follow up on that, if I could.

10        THE COURT:  All right.

11        MS. PIERCE:  Your Honor, I don't know if you want

12   to address this right now.  I do have a couple witnesses,

13   and I was thinking if we could continue it, and we would

14   release Ms. Dohanic so she wouldn't have to come back.

15        THE COURT:  She will have to be here.

16        MS. PIERCE:  Thank you.  I just wanted to throw

17   that out as a possibility.

18                   **RECROSS-EXAMINATION**

19   **BY MS. PIERCE:**

20   Q.   Now, he did tell you his employment changed, and the

21   structure of his employment was changing; correct?

22   A.   In respect to?

23   Q.   The type of work he would be doing.

24   A.   I am not sure I understand your question.

25   Q.   Well, the original contract was to do some kind of

1    development. And now he's doing some kind of consulting.

2    Those are different types of employment; correct?

3    A.   He has indicated that he is doing consulting, and he

4    has done project development. He has not made it clear

5    that those duties have changed significantly.

6    Q.   Well, he indicated that what he's doing -- he did

7    indicate to you that what he is doing now is consulting.

8    And he has a salary rather than a bonus or ongoing income,

9    like he did previous to now; correct?

10    A.   That is what his employer's letter states, yes.

11    Q.   So now that he has a salary, that -- his employment

12    is being structured differently than in the past, where he

13    would get a big payment and then he wouldn't get paid for

14    awhile and he would get sporadic payments; correct?

15    A.   That is what he has said.

16    Q.   And he did pay close to 90 percent of his restitution

17    over the last 3 years; correct?

18    A.   I have indicated what -- I can't give you the

19    percentage, but there is indicated what he has paid in

20    restitution.

21    Q.   And usually if he fell behind he would catch up the

22    next month correct, or the next few months?

23    A.   No. He has not made a payment since December of '09.

24    Q.   But up to '09, that is the way he would do it, up

25    through '09; correct?

1    A.    He was ordered to make a payment 30 days after his

2    supervision commenced, which he did in October.   He did

3    not make a payment in November.   He made a double payment

4    in December.   And then he's made no payment since that

5    time.

6    Q.    So has it become apparent to you that he has

7    difficulty coming up with the full amount of restitution

8    as it stands right now; $6,000 a month?

9    A.    I really cannot assess that because the defendant has

10   not provided to me on a monthly consistent basis his

11   income and liabilities.   And, therefore, I cannot assess

12   his true ability to pay restitution.

13   Q.    He did give you copies of some of the transfers from

14   the business account to his personal account, though,

15   showing income; correct?

16   A.    He has given me bank statements, and he has given me

17   handwritten statements in regards to his income.

18         MS. PIERCE:   Your Honor, one moment.   I think I am

19   about done.

20         Your Honor, I'm done.   Thank you.

21         THE COURT:   All right.   You may step down,

22   Ms. Dohanic.

23         I have a 3:30 and, I am sorry, a 2:30 change of

24   plea and a 3:30 show cause hearing.   We started half an

25   hour late here.

1          And, Ms. Pierce, I need to tell you, if you want to

2    speak to your client before a hearing, you need to get

3    here earlier.  I am going to continue this hearing until 4

4    o'clock after my 3:30.  So we will be in recess on this

5    case until 4 o'clock, and then I will expect you back here

6    so we can conclude this hearing.

7          Court will be in recess.

8          (Proceedings resume at 3:56 p.m.)

9          THE COURT:  You may be seated.

10         Ms. Kaufman, anything further?

11         MS. KAUFMAN:  No, thank you, Your Honor.

12         THE COURT:  All right.  Ms. Pierce?

13         MS. PIERCE:  Yes, Your Honor.  We would call Stace

14    Wallace.

15         COURTROOM DEPUTY:  Your attention, please.

16         (Testimony of S. Wallace and R. Egan contained in

17    separate transcript.)

18         MS. PIERCE:  No further testimony, Your Honor.

19         THE COURT:  All right.  I am going to go ahead and

20    allow you 10 minutes each of argument based on the

21    testimony presented here with respect to, one, whether

22    there have been violations.  And, actually, we will

23    address first whether there have been violations and

24    whether that has been proved by a preponderance of the

25    evidence.  So I will allow you both 10 minutes.

1        Ms. Kaufman?

2        MS. KAUFMAN:  Your Honor, I rely primarily on the

3   testimony of Ms. Dohanic.  And, as she testified, she did,

4   not only the petition under oath, but also her report.

5   And, again, it is verified, the veracity of the truth of

6   her statements in the report.  I think the violations have

7   been proven.  I don't think there is any question that the

8   violation have been proven.  Thank you.

9        THE COURT:  All right.  Ms. Pierce?

10       MS. PIERCE:  Your Honor, I think that there is

11   insufficient evidence to show that he has violated the

12   conditions willfully; that there might be some Grade C

13   technical violations but, Your Honor, clearly it wasn't

14   willful.  And I would ask that the Court not find that he

15   violated those conditions.

16       First of all, with regard to the tax returns, he

17   did everything in his power and within his means, which is

18   apparently limited at this point in getting those taxes

19   done.  Has the probation department in the loop on what

20   was happening with those taxes.  Eventually did get those

21   taxes, which were extremely expensive, because they were

22   fairly complicated.

23       He was not, himself, qualified to prepare those

24   taxes and file something, and that could have been a

25   potential legal problem for him had he tried to do that.

1   So I would argue that the failure to file the tax returns

2   on time, and other allegations related to that, I would

3   argue that they have not been shown, and that the Court

4   should find he did not violate that condition.

5        Also, Your Honor, I would argue that with regard to

6   making appointments with his probation officer and

7   complying with all of the other requirements of reporting,

8   he has done everything in his ability to do that.  And the

9   difficulty is that he is a little bit different, as far as

10  the way his brain works.

11       And I think what was happening -- and she somewhat

12  conceded this, but I think that it was, you know, somewhat

13  unclear, that he would give her things that she didn't

14  necessarily ask for, and it would seem there was a

15  disconnect in communication.

16       So I would also ask the Court find he did not

17  violate any of the other conditions of probation, and that

18  he did not violate anything willfully.  Thank you, Your

19  Honor.

20       THE COURT:  All right.  Based on the evidence

21  presented, both via the verified petition of the probation

22  officer and the testimony of Ms. Dohanic, the Court

23  believes that it has been established by a preponderance

24  of the evidence that the defendant has violated the

25  conditions of his supervised release as alleged in the

1    probation officer's petition.

2         With respect to the failure to pay restitution as

3    directed, the defendant had agreed, and that has not been

4    modified.  He was to pay $6,000 a month toward his

5    court-ordered restitution.  That was to be paid by the 5th

6    of each month.  The testimony was that he paid October.

7    He missed November.  And then he paid two payments in

8    December, which were supposedly for November and December,

9    and he has paid nothing since.

10        The issue was raised that he didn't have the money

11   to pay it, and that is why the reporting was necessary.

12   Mr. Wallace -- the probation officer sought this

13   information in order to make a determination as to whether

14   those payments could be modified.  Mr. Wallace, I believe,

15   willfully failed to provide any information that was

16   necessary to this probation officer to do her job, and as

17   a result, Mr. Wallace is in violation of the payment of

18   restitution as directed.

19        With respect to the failure to provide the

20   probation officer with the federal and state income tax

21   returns and the financial statements that were requested,

22   while the Court understands that the tax returns were not

23   apparently finalized until April of this year, the

24   testimony of Ms. Wallace is that they did not have the

25   funds to do so, is belied by the fact that this family was

1    still spending substantial amounts of money for rent.

2            If I recall correctly, it was in the neighborhood

3    of now $3,000 per month.  Private school tuition, I

4    believe, was being paid.  Maybe that wasn't being paid any

5    more.  But there were substantial expenditures being made

6    by this family that could have been applied.

7            It has not been -- no evidence has been produced as

8    to what those tax returns actually cost to produce.  So

9    the Court believes or finds that by a preponderance of the

10   evidence there has been sufficient evidence to indicate

11   that those federal and state income tax returns could have

12   been done at an earlier date and were not done on a timely

13   basis.  We are talking about tax returns for 2007, 2008.

14           Those were the tax returns that I dealt with with

15   you, Mr. Wallace, a year ago in this hearing.  And it is

16   not an excuse that you spent 3 months in prison that you

17   couldn't get these done or ordered at that time.  So,

18   therefore, the Court finds you in violation of the second

19   claim in the petition.

20           With respect to the failure to maintain employment

21   approved by the probation officer, the testimony was very

22   clear that this probation officer never approved any of

23   the employment subsequent to the original employment.  The

24   probation officer was not provided the information that

25   she would need to be able to make a determination as to

1    whether this employment should be approved or not.

2            And the Court will state that it finds Mr. Egan's

3    testimony totally non-credible, and that he has been --

4    the Court believes he has been manipulated into this by

5    Mr. Wallace.  No moneys were there for this Envision

6    entity.  The entity wasn't even formed until 3 months

7    after the alleged employment agreement.

8            And the Court finds, essentially, that the

9    incorporation of Envision, which had no assets of its own,

10   and which was used merely as a means of funneling money to

11   Mr. Wallace in violation of this Court's order, and to

12   avoid it being reported to the probation office, is a

13   willful violation.

14           So the Court finds the defendant to be in willful

15   violation of the third claim, which was failure to

16   maintain any employment approved by the probation officer,

17   and failure to provide the probation officer with the

18   necessary information.

19           With respect to the failure to submit monthly

20   report forms as directed by the probation officer, the

21   Court finds that there has been substantial information to

22   indicate that this defendant just thinks he's not bound by

23   the orders of this Court, and willfully violates them.  He

24   turns them in when he feel like it, he doesn't turn them

25   in when he doesn't feel like it.  And I don't buy this his

1   brain isn't functioning.  If he is able to earn 228,000,

2   surely he could do the simple reports that are needed to

3   be produced.  And he failed to submit those on a timely

4   basis, and I think he did it because he didn't want to be

5   monitored by the probation office.

6        With respect to the fifth claim; the failure to

7   report to the probation officer as directed, there is

8   always an excuse by this defendant as to why he can't make

9   it.  And, yes, he does call in, either immediately before

10  or after the fact, but the fact of the matter is, is that

11  he does not appear to be making any real efforts to comply

12  with the meetings that he needs to have with his probation

13  officer.  He's wasted this probation officer's time.  He

14  doesn't seem to be taking this seriously, and the Court

15  finds that he has violated the -- he has failed to report

16  to the probation officer as directed in violation.

17       Therefore, the Court finds that all of these

18  conditions of supervised release have been violated.

19  These violations are Grade C violations.  The defendant's

20  criminal history category is I, which results in a range

21  of imprisonment of 3 to 9 months under the Policy

22  Statements issued by the Sentencing Commission.

23       At this time I will hear argument with respect to

24  what the sentence should be.

25       Ms. Kaufman?

1       MS. KAUFMAN:  Your Honor, I came into the hearing

2  today with the feeling that the real issue here is

3  credibility.  I have suspected that we are not getting to

4  the truth of the matter, and the significance of that is

5  this man concocted a scheme and defrauded people to the

6  tune of over $11 million, and yet he begged in California

7  to not be sent to prison under the guidelines, and

8  received a substantial downward departure.

9       He begged to be put on strict supervision.

10  However, the con artistry that went into that crime has

11  shown itself again here today in the courtroom.  This idea

12  that his "employer," is an entity that is created so that

13  funds can be funneled secretly from a relative to make it

14  appear to the Court -- to the Court and the probation

15  department, that he is working, that he is earning money,

16  that he is a good member of the community, that he is no

17  longer a danger to the community, this is outrageous.

18       The witness that just got off the stand is probably

19  by far one of the worst witnesses I have seen in my

20  career.  He had -- there was no money in this company.

21  The defendant knew it.  He has been misleading the

22  probation department and the Court all along.  This is

23  outrageous.  And it is the same thing -- it is the same

24  sort of thing he did in his crime.

25       I don't know how this is different than a fraud on

1    the Court. And I would ask for the maximum. Whatever the

2    Court wants to do. However, the maximum, as far as he has

3    to be incarcerated again. This is outrageous. But not to

4    let him off the hook, there has to be an extended period

5    of supervised release after the fact. And he's no

6    different than the rest of us, he is going to have to

7    follow the conditions. Thank you.

8         MS. PIERCE: Your Honor, we are here for Grade C

9    violations. And, simply put, he is under the gun to pay a

10    lot of restitution in this case, and that has been, to

11    some extent, his downfall in his desperation to earn that

12    money. What he should have done maybe last time when he

13    was in court is he should have said, look, I can't do it.

14    I can't pay that much money. He should have brought that

15    to the Court's attention and should have dealt with it

16    back then.

17         I think, in some respects, maybe he was deluded

18    into thinking it would be okay. And he continued to

19    attempt to earn that kind of money. And the best thing he

20    knows how to do is business. Your Honor, there is no

21    evidence that the business that he was involved in was

22    doing anything illegal. I would say there is no evidence

23    of that at this time. I mean, there is some speculation,

24    but there is no evidence of that.

25         His father-in-law was a bona fide investor of the

1    company, and he, Your Honor, I would argue that he was not

2    perpetrating a fraud on the Court by virtue of having his

3    father-in-law be an investor.  He was a small investor.

4    The other investors were supposed to be a lot more

5    substantial.  However, but because of the economy and

6    everybody having difficulty doing business, especially

7    development, they changed the focus of that company, and

8    now it is going to be a much more reliable source of

9    income; an income in which he structured to get paid 5,000

10   per month, with a net 4,000, and that he would be getting

11   a regular paycheck.

12        I ask the Court to consider that Mr. Wallace has

13   two children and a wife to support.  He has had to try to

14   deal with this very serious illness that has been very,

15   very much a distraction.  His leg -- one of his legs looks

16   like an elephant leg; it is so wide and full of fluid.

17        And, Your Honor, I would argue to the Court that if

18   the Court gives him any time, that in-home detention is

19   sufficient.  If you can give him a year, give him a year

20   of in-home detention.  Give him a chance to show that he

21   can do this by the book, and have a job with a regular

22   paycheck and continue to pay restitution -- a lesser

23   amount of restitution because of the nature of the

24   economy, but he could pay restitution.

25        If the Court sends him to prison at this point,

1    then he's going to lose all of the opportunity that he has

2    right now, and he is going to be starting over at a much

3    less amount.  His wife and his children are going to be

4    suffering, and it's not going to be helpful to the

5    community or, I would argue, it is not helpful to the

6    victims in this case.

7          The best thing for all involved, the community and

8    the victims, is for him to continue working and let him

9    attempt to do that and show the Court that he can play by

10   the rules.  I would ask that if the Court gives him any

11   time, that the Court sentence him to in-home detention.

12   Thank you.

13         THE COURT:  All right.  Ms. Dohanic, do you wish to

14   be heard at all?

15         PROBATION OFFICER:  Yes, Your Honor.  Your Honor,

16   as far as terms of supervised release are concerned, I

17   would ask that the Court -- or I am recommending a

18   modification on Condition No. 2, which indicates that the

19   defendant shall be employed and the defendant's employment

20   shall be approved by the U.S. Probation Officer.  I would

21   add to that sentence, "prior to any employment

22   commencing," based on the testimony here today.  Also

23   adding a condition that indicates "Any employment

24   contracts that the defendant enters into shall be with a

25   company or organization that has funds to meet the salary

1    requirements of the defendant."  Again, based on the

2    testimony here today from his employer.  That's it, Your

3    Honor.

4        THE COURT:  All right.  Thank you.

5        MS. KAUFMAN:  Excuse me, Your Honor.  I have one

6    recommendation for a condition, as well.

7        THE COURT:  All right.

8        MS. KAUFMAN:  That is, it seems to me that based on

9    the October 1st contract, since the defendant was ordered

10   to disclose all funds, moneys that came into his

11   possession, they created this contract that essentially

12   bulked up on the non-fund amenities.  In other words,

13   under that contract, he was able to get his insurance

14   paid, his medical bills paid, his children's education

15   paid, his country club paid, his gasoline paid, so on and

16   so on.  And, technically, under the terms of the

17   supervised release prior to that, he was only required to

18   present -- to report moneys obtained or funds.  So it

19   should include moneys and other benefits.

20       THE COURT:  Okay.  All right.  Mr. Wallace, do you

21   wish to address the Court before I impose sentence?

22       THE DEFENDANT:  Yes.

23       MS. PIERCE:  Your Honor, briefly before he starts,

24   one other thing.  I just thought of this.  But when he

25   went to FDC last time, he felt like he did not get the

1  proper treatment, and that is a definite concern.  He had

2  a very bad reaction after leaving there because they

3  stopped him on some very important medication that he was

4  taking, and that medication takes a long time to kick in.

5  And by the time he left it had completely lost its effect

6  and then he relapsed.

7      So that is one concern we have.  And I know I can

8  write a letter to wherever, if he goes, if he is

9  incarcerated, write a letter, but I wanted the Court to be

10  aware of that.  And I am hoping that nothing like that

11  would happen again.  He would like to address you.

12      THE DEFENDANT:  Your Honor, first of all, I realize

13  that one of the main things or problems is my

14  communication with the probation department and my lack of

15  communicating properly to them within their rules.  And I

16  understand exactly what needs to be done to communicate

17  properly with them.

18      With regard to my employment, I am working very,

19  very hard, and just want to work and pay restitution and

20  just to make ends meet to support my family.  My rent is

21  $1,400 a month now.  So my goal, and what I have been

22  trying to do, is just have a solid income with as much

23  money as possible that I could pay as much restitution as

24  possible, and lowered my cost of living down to virtually

25  nothing.

1          And so my -- and we have done that.  And so with

2    regard to this, I mean, I'm humbly asking you that I

3    really -- my health has been really bad since leaving --

4    being incarcerated last summer.  And I had terrible

5    attacks with intestinal blockages in October, which is all

6    documented to Ms. Dohanic, and that was due to the poor

7    treatment there where they didn't give me the proper

8    Crohn's Disease meds.  And it was a 3-month delay when it

9    got out of my system.

10          But, anyway, I wish -- I guess I am begging for

11   your mercy, in that all I would like to do is work and

12   give me a chance to work.  You know, two years' home

13   detention, whatever.  I mean, I have proven before that I

14   did that very successfully.  And I have a regular job, and

15   I have a regular income.  And that's what I want to do is

16   just work.  And I have a very good job right now.  So

17   thank you.

18          THE COURT:  Okay.  You may stay up there,

19   Mr. Wallace.

20          The Court, having reviewed the recommendation of

21   the probation officer, having heard the argument of

22   Ms. Kaufman, Ms. Pierce, and having heard the statement of

23   the defendant, the Court has considered the Chapter 7

24   Policy Statements and the Sentencing Guidelines, as well

25   as the factors specified at 18 United States Code Section

1    3583(e).

2        The Court finds by a preponderance of the evidence

3    that the defendant has violated the conditions of

4    supervised release as alleged in the probation officer's

5    petition and, therefore, orders that the defendant's

6    supervised release is revoked.

7        The defendant is sentenced to the custody of the

8    Bureau of Prisons for a period of 9 months on each of

9    Counts 4, 5, 6, 11, 12, 15 and 20, to run concurrently.

10   Upon release from imprisonment, the defendant shall be

11   placed on supervised release for a term of 27 months on

12   each of Counts 4, 5, 6, 11, 12, 15 and 20, to run

13   concurrently.  The Court recommends that the Bureau of

14   Prisons credit the defendant with 6 days spent in official

15   detention prior to sentencing.

16       Within 72 hours of release from the custody of the

17   Bureau of Prisons, the defendant shall report in person to

18   the probation office in the district in which the

19   defendant is released.  While on supervised release, the

20   defendant shall not commit another federal, state or local

21   crime; shall not illegally possess a controlled substance;

22   shall not possess a firearm or destructive device; and

23   shall comply with the standard conditions as adopted by

24   this Court.

25       The defendant is ordered to pay the balance of the

1   restitution outstanding, which is 11,000 -- I am sorry,

2   $11,016,600.60. Because this sentence imposes

3   restitution, it is a condition of supervision that the

4   defendant pay in accordance with the schedule of payment

5   sheet set forth in the judgment.

6       The defendant shall refrain from the unlawful use

7   of a controlled substance and submit to one drug test

8   within 15 days of release on supervised release and at

9   least two periodic drug tests thereafter for the use of a

10  controlled substance.

11      While on supervised release, the defendant shall

12  not commit another federal, state or -- I already have

13  that one. Sorry about that. The defendant shall also

14  comply with the following special conditions: The

15  defendant shall not incur new credit card charges or open

16  any lines of credit without the approval of the probation

17  officer unless the defendant is in compliance with the

18  periodic payment obligations imposed pursuant to the

19  Court's judgment and sentence.

20      This Court is also going to add to that that the

21  defendant shall not borrow any moneys from anyone without

22  first reporting that and clearing it with the probation

23  officer.

24      Second, the defendant shall be employed, and the

25  defendant's employment shall be approved by the United

1    States probation officer prior to the defendant's

2    commencing that employment.  The defendant's employer

3    shall pay him by way of a paycheck that denotes the hours

4    worked, the wages earned and the taxes withheld.

5          Third, upon the receipt of any funds or other

6    benefits received by the defendant or his immediate family

7    or any entities controlled by or affiliated with the

8    defendant, as a result of the defendant's work activities

9    or the sale of any of the defendant's assets in excess of

10   his monthly salary, the defendant shall give notice not

11   later than 24 hours after recepit of such funds to his

12   supervising probation officer, and shall not dispense such

13   funds within 30 days of their receipt without approval by

14   his supervising United States Probation Officer.

15         Fourth, the defendant is prohibited from employment

16   where he would solicit funds or employment which would

17   permit him to have control over investment funds, to have

18   custody of investment funds or investor funds, and the

19   defendant may not be a signatory on such accounts.

20         Fifth, the defendant is required to report to the

21   United States Probation Officer monthly all salary,

22   income, interest, dividends, profits, bonuses or other

23   moneys that the defendant should receive or his family

24   should receive, and this includes loans, whether directly

25   received or indirectly received by this defendant.

1        Six.  The defendant shall provide the probation

2   officer with access to any and all business records,

3   client lists, and other records pertaining to the

4   operation of any business owned, in whole or in part, by

5   the defendant, as directed by the probation officer.

6        Seven.  The defendant shall provide to the

7   probation officer a signed release authorizing credit

8   reporting inquiries, federal and state income tax returns,

9   or a signed release authorizing their disclosure.  And,

10  third, an accurate financial statement with supporting

11  documentation as to all assets, income and expenses of the

12  defendant.  In addition, the defendant shall not apply for

13  any loan without prior approval of the probation officer,

14  nor shall this defendant accept the benefits of any loan

15  without the prior approval of the probation officer.

16       Eight.  The defendant shall maintain one personal

17  checking account.  All of the defendant's income, monetary

18  gains or other pecuniary proceeds shall be deposited into

19  this account, which shall be used for payment of all

20  personal expenses.  Records of all other bank accounts,

21  including any business accounts, shall be disclosed to the

22  probation officer upon request.

23       Nine.  The defendant shall not transfer, sell, give

24  away or otherwise convey any asset with a fair market

25  value in excess of $500 without approval of the probation

1   officer until all financial obligations imposed by the

2   Court have been satisfied in full.

3       Now, Mr. Wallace, it was only a year ago, June of

4   2009, that I revoked your supervised release for three of

5   the same violations that you are currently before me on.

6   At that time, I imposed what I thought was a fairly light

7   sentence on you of only 3 months' incarceration as to each

8   of those counts, to run concurrently, because I did

9   believe you were a smart man, and I believed that such a

10  minimal sentence would be enough to get you to comply with

11  the terms of your supervised release.

12      Now, apparently I was wrong, because here you are

13  again before me, and your actions in this case, after your

14  release, have been no different than your actions prior to

15  my seeing you a year ago.  Now, I told you the last time,

16  Mr. Wallace, that if you did not comply with the terms of

17  your supervised release, and if you found yourself before

18  me again for failure to comply, that I would not be so

19  lenient in sentencing.  And I am giving you the full 9

20  months, because I believe that you have willfully failed

21  to provide the information that probation needs to

22  properly supervise you.

23      I believe that you believe the rules do not apply

24  to you; that you are too smart for the rules; that you are

25  better than the rules.  And I told you last time, you were

1  very fortunate to have been given a sentence of probation

2  in the first case, $11 million defrauding others.  I can't

3  believe they gave you a probation sentence.

4       And yet you continue to act as if you are not bound

5  by those terms of the probation, and now the supervised

6  release.  And I will tell you, after you're released, if

7  you ever appear before me again for violation and

8  refusing -- willfully refusing to provide the information

9  to this probation officer, I will upward depart the next

10 time, and you will be sent to prison for a lot more time,

11 because this is getting ridiculous.

12      You are not taking your responsibilities seriously.

13 So I give you fair warning right now, Mr. Wallace.  If you

14 continue in this mold, I will upward depart the next time,

15 which means I will go beyond the 9 months, or whatever it

16 is that is recommended.  Do you understand that?

17      THE DEFENDANT:  Yes.

18      THE COURT:  You continue to resist the supervision

19 efforts.  You failed to accurately identify your ability

20 to pay restitution.  And your lawyer argued, and you

21 stated to me that you're here to work as hard as you can

22 to pay restitution.  The record belies that.  The record

23 shows that while you work hard, you spend it all.  You

24 have not cut back in your lifestyle.  Now you have, by

25 necessity.  But prior to this, you've made absolutely no

1    effort, as far as I can tell, to pay restitution.

2         In this particular case, the probation officer gave

3    you the opportunity to reduce the $6,000 per month based

4    on your current financial circumstances, but she needed

5    the information to be able to modify that, and you failed

6    to provide her with that information.  So if there is the

7    inability -- your inability to pay that restitution at the

8    $6,000 per month, is solely your own fault.

9         A considerable amount of time and energy has been

10   expended in attempting to supervise you.  And, ironically,

11   although you indicate, and your wife testified you spend

12   innumerable hours working, it appears to me that you put

13   forth virtually no effort to comply with this Court's

14   orders or with the directives of the probation officer.

15        You have been given opportunity time and time

16   again, and you just sort of thumbed your nose at those

17   opportunities.  Based on your behavior, which I consider

18   to be willful, based on the fraud that I do believe you

19   attempted to perpetrate on both this Court and on the

20   probation officer in setting up with Mr. Egan this entity

21   called Envision, which has no funds, no contracts, perhaps

22   some prospects, but nothing has come to light, and is

23   merely a means, as Mr. Egan testified, of funneling moneys

24   from your father-in-law to you so that you are not in

25   violation of the supervised release, is a perpetration of

1    the fraud on this Court.

2         Therefore, I believe that a sentence at the top of

3    the guideline range was necessary to reflect the

4    seriousness of this offense, to promote respect for the

5    law, to provide a just punishment on your second

6    appearance for violation of supervised release.

7         I hope that this is going to be sufficient to get

8    you to comply, and comply timely and fully with the terms

9    of supervised release, so that the next time -- because,

10   as I told you, if you appear before me again, I will

11   depart upward, which means you will be spending years in

12   prison.

13        The 25 months of supervised release after

14   incarceration is needed to enforce your payment of your

15   restitution to these victims.

16        You're advised that you have the right to appeal

17   this sentence.  If you desire to appeal, a notice of

18   appeal must be filed with the Clerk of the Court within 14

19   days after entry of Judgment or your right to appeal will

20   be lost.  If you are unable to afford an attorney for an

21   appeal, the Court will appoint one to represent you.  If

22   you request, the Clerk of the Court must immediately

23   prepare and file a notice of appeal on your behalf.

24        I am not sure what to do with your bond, because I

25   do think that you willfully violated.  I am going to go

1    ahead and give you a break here and not remand you

2    immediately.  I will find that your bond conditions do

3    reasonably assure that you will not flee or pose a danger

4    to the safety of another person or the community and, as

5    such, I will allow you to remain free on bond subject to

6    the same terms and conditions set forth in the original

7    order of your release.

8        And I don't think you deserve that, Mr. Wallace,

9    based on your performance and your behavior here, but I am

10   going to give it to you.  I will order you to surrender at

11   the institution designated by the Bureau of Prisons before

12   noon within 15 days of the date of that designation.  And

13   at the time that you surrender, you voluntary surrender,

14   as long as you do so timely, your bond is exonerated.

15       Counsel, is there anything further?

16       MS. KAUFMAN:  No, thank you, Your Honor.

17       MS. PIERCE:  No, Your Honor.

18       THE COURT:  All right.  Court will be in recess.

19       (Proceedings conclude at 5:33 p.m.)

20

21

22

23

24

25

1

2          **R E P O R T E R ' S    C E R T I F I C A T E**

3

4          I, Darlene M. Martinez, Official Certified

5    shorthand Reporter for the United States District Court,

6    District of Colorado, do hereby certify that the foregoing

7    is a true and accurate transcript of the proceedings had

8    as taken stenographically by me at the time and place

9    aforementioned.

10

11

12         Dated this <u>23rd</u> day of <u>May</u>, 2012.

13

14

15         _____

16         s/Darlene M. Martinez

17         RMR, CRR

18

19

20

21

22

23

24

25